

FILED
2021 May-28  AM 11:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| J. THOMAS PILCHER, IV, as Personal Representative of the Estate of JAMIE LAWRENCE PRIM )<br><br>Plaintiff, )<br><br>v. )<br><br>JEFFERSON DUNN; MARK FASSL; GRANTT CULLIVER; RUTH NAGLICH; CHERYL PRICE; EDWARD ELLINGTON; KARLA JONES; GWENDOLYN GIVENS; ANTHONY BROOKS; CARLA GRAHAM; GARY MALONE; KEVIN WHITE; RAPHAEL SANTA-MARIA; UNKNOWN ST. CLAIR SHIFT COMMANDERS (St. Clair Correctional Facility); UNKNOWN ST. CLAIR CORRECTIONAL OFFICERS St. Clair Correctional Facility) WILLIAM CURTIS STREETER; UNKNOWN FOUNTAIN WARDENS (Fountain Correctional Facility); UNKNOWN FOUNTAIN SHIFT COMMANDERS (Fountain Correctional Facility); UNKNOWN FOUNTAIN CORRECTIONAL OFFICERS (Fountain Correctional Facility); WEXFORD HEALTH SOURCES, INCORPORATED; DR. WALTER WILSON; KELLEY PHILLIPS; UNKNOWN ST. CLAIR – WEXFORD HEALTH CARE PROVIDERS; DR MANUEL POUPARINAS; and | CIVIL ACTION NO:<br><br>4:21-cv-00204 - ACA<br><br>**JURY TRIAL DEMANDED** |

UNKNOWN FOUNTAIN – WEXFORD      )
HEALTH CARE PROVIDERS,          )
                                )
            Defendants.         )

## PLAINTIFF'S SECOND AMENDED COMPLAINT

**COMES NOW**, the Plaintiff, J. Thomas Pilcher, IV, and files this civil rights, negligence, intentional infliction of emotional distress, and wrongful death action as Administrator of the Estate of Jamie Lawrence Prim (J. Thomas Pilcher in his capacity as Administrator of the Estate of Jamie Lawrence Prim sometimes referred to as "Plaintiff") by and through counsel of record, and respectfully files this Second Amended Complaint.  In this Second Amended Complaint, Plaintiff amends the First Amended Complaint, and alleges as follows:

Defendants were deliberately indifferent to Mr. Prim's health and safety and violated his right under the Eighth Amendment not to be subjected to cruel and unusual punishment.  Plaintiff further alleges state law claims of negligence, civil conspiracy, Intentional Infliction of Emotional Distress, and Wrongful Death pursuant to Ala. Code §6-5-410.

## INTRODUCTION

1. J. Thomas Pilcher, IV, as Administrator of the Estate of Jamie Lawrence Prim, (sometimes referred to as "Mr. Prim" or "Jamie Prim") brings this action to redress the horrific death of Mr. Prim which occurred on February 10, 2019, while he was an incarcerated parolee in the custody of the Alabama

Department of Corrections ("ADOC"), and housed at St. Clair Correctional Facility ("St. Clair").

2. Jamie Prim was granted parole at a hearing on November 29, 2018, by the Alabama Board of Pardons and Paroles, however, at the time of his death, Mr. Prim had not yet been released by the ADOC.

3. Mr. Prim entered the custody of the ADOC in February 2017 for non-violent drug possession and theft convictions. At the age of 34, Mr. Prim was released from prison to a funeral home rather than to his family and his freedom.

4. On June 20, 2018, Mr. Prim was brutally beaten and left unconscious on the floor of the "Hot Bay" dorm while in custody as an inmate at Fountain Correctional Facility ("Fountain").  No prison personnel were present in the "Hot Bay" dorm and no prison personnel intervened to prevent the violent assault.  It is unknown how long Mr. Prim lay on the floor of the Hot Bay before being discovered by prison personnel.

5. The immediate physical injuries to Mr. Prim resulting from the vicious assault were a right parietal skull fracture and subdural hematoma. Mr. Prim was taken by Life Flight to Mobile Infirmary Medical Center where Mr. Prim underwent a right decompressive hemicraniectomy (surgical removal of a large flap of the right side of the skull) to relieve blood pooling under the membranes covering his brain (subdural hematoma) and for the removal of

skull fragments.  The brutal June 20, 2018 assault further resulted in, among other immediate injuries, paralysis of Mr. Prim's lower extremities, urinary and fecal incontinence, traumatic encephalopathy, acute kidney injury, and end-stage renal failure requiring dialysis.

6.  Mr. Prim was released from Mobile Infirmary Medical Center to Fountain on August 10, 2018 and he was transferred to St. Clair Correctional Facility ("St. Clair") on the following day, August 11, 2018.

7.  The injuries Mr. Prim suffered from the June 20, 2018 assault were exacerbated by the lack of adequate and proper medical care at both Fountain and St. Clair which, in turn, caused Mr. Prim to suffer additional critical health conditions, culminating in his death on February 10, 2019.

8.  The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.  This bedrock civil right enshrined in the Bill of Rights protects all Americans and fundamentally confers on those persons who are incarcerated the right to be free from known and unreasonable risk(s) of serious harm while incarcerated.

9.  Administrative Supervisor Defendants, the St. Clair Supervisor Defendants and the Fountain Supervisor Defendants have been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the following timeline (the following timeline is not

meant to be an exhaustive list of civil actions or Department of Justice actions

regarding the Alabama Department of Corrections):

a.  In **2014**, a class action was initiated in the Middle District of Alabama,

*Braggs v. Dunn*, Case 2:14-cv-00601.  In that case plaintiffs brought the

action to remedy the ADOC's failure to provide constitutionally adequate

medical care to persons in custody of ADOC.  This matter remains pending.

b.  On **October 13, 2014**, a separate class action was filed in the Northern

District of Alabama, *Duke v. Dunn*, Case 2:14-cv-01952. The Duke class

action was brought by men confined in the custody of the ADOC at St. Clair

Correctional Facility. The complaint contained only one count brought

under 42 U.S.C. §1983.  The complaint alleged that the defendants,

> Through their policies, practices, acts and omissions, exhibit
> deliberate indifference to the continuing real and imminent
> substantial risk of serious physical harm, in violation of the right
> of plaintiff class of prisoners to be free from cruel and unusual
> punishment under the Eighth and Fourteenth Amendments to the
> United States Constitution.

The named plaintiffs in the Duke class action alleged "mismanagement,

poor leadership, overcrowding, inadequate security, and unsafe

conditions…led to an extraordinarily high homicide rate, weekly stabbings

and assaults, and a culture where violence is tolerated," which created

conditions of confinement violating the Eighth and Fourteenth

Amendments.

The parties reached a consent settlement agreement on or about November 2, 2017 in which ADOC promised to implement multiple reforms, such as installing video cameras for security monitoring. But ADOC did not comply with the terms of the Settlement Agreement, forcing the parties to return to mediation in 2018. On or about January 29, 2021, Plaintiffs filed an unopposed motion to reinstate the action due to non-compliance and the case is currently pending.

c.  On **October 6, 2016**, the United States Department of Justice notified ADOC and the State of Alabama that it had opened an investigation, pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. §1997, into whether the conditions in Alabama's major correctional facilities for men violate the Eighth Amendment of the United States Constitution.  The United States Department of Justice ("DOJ") investigated whether ADOC (i) adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners; (ii) adequately protects prisoners from use of excessive force and sexual abuse by correctional officers or security staff; and (iii) provides prisoners with sanitary, secure and safe living conditions.

d. In the **October 6, 2016** letter, the DOJ stated: "In conducting the investigation, we will determine whether there are systematic violations of the Constitution of the United States."

e. Shortly after opening its investigation, the DOJ issued document requests to ADOC.  The documents requested include the following:

1. All documents created by ADOC's Research and Planning Division, including any reports or statistical compilations, provided to the Commissioner (but not including Monthly Statistical Reports or Annual Reports which were publicly available);

2. Medical records, body charts, and investigatory documents related to the treatment provided and the incident which required outside medical treatment for all prisoners who were transported to an outside medical facility for emergency or acute care;

3. Any documents related to prisoner claims or complaints of, and the investigation of, incidents or threats of:  excessive force, sexual abuse, and extortion by ADOC's employees, agents or contractors, including investigative files and summaries of those files provided by I&I Director to Commissioner Dunn;

4. Any documents related to reports of misconduct, records of discipline, and/or investigations of correctional officers, employees, and/or

contractors related to sexual abuse, excessive force, extortion, bribery, contraband and/or abandonment of post; and

5. A list of prisoner deaths, and all documents related to the cause of death, including autopsy reports, medical records and investigations.

f. After ADOC failed or refused to produce the vast majority of the requested documents, DOJ issued and served a subpoena in May 2017 demanding many of the same documents.

g. Due to numerous delays in document production, on October 3, 2018, the DOJ filed a petition in the Middle District of Alabama to enforce the DOJ subpoena.  See 2:18-MC-3837, *United States of America v. Jefferson Dunn.*

h. In an effort to resolve issues regarding the production of the requested documents, the Alabama Attorney General, Steve Marshall, arranged a meeting between ADOC and the DOJ.  The meeting between the respective representatives took place on May 24, 2017.  At that meeting, DOJ and ADOC representatives discussed DOJ having access to ADOC facilities, specifically, a facility in the Southern District, one in the Northern District and one in the Middle District.  Between September 13, 2017 and February 1, 2018, the DOJ inspected the three ADOC facilities.

i. On April 2, 2019, the DOJ issued a Notice Letter informing the State of Alabama and ADOC that DOJ had reasonable cause to believe that ADOC

violates the constitutional rights of male prisoners by failing to protect them from harm, including violence and sexual abuse, and by housing them in unsafe and unsanitary conditions.

j.  Along with the April 2, 2019 Notice Letter, the DOJ issued its 56-page report of the investigation of Alabama's State prisons for men.  Its report notified ADOC and the State of Alabama of its conclusions after the lengthy investigation.  In the report, the DOJ concluded:

> …there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered that:   (1) the conditions in Alabama's prisons for men…violate the Eighth Amendment of the U.S. Constitution; and (2) these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment.

And

> There is reasonable cause to believe that the Alabama Department of Corrections ("ADOC") has violated and continues to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions, and that such violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment.  The violations are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision; overcrowding, ineffective housing and classification protocols; inadequate incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons; ineffective prison management and training; insufficient maintenance and cleaning of facilities; the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse; and a high level of

violence that is too common, cruel, or an unusual nature, and pervasive.

k.  On or about **May 30, 2019** DOJ filed a Motion to Withdraw its Petition to enforce the subpoena, informing the court that after its April 2, 2019 Notice Letter was publicly released ADOC produced certain documents necessary for DOJ to complete all open areas of the investigation.

l.  In **July 2020**, the DOJ notified the State of Alabama and ADOC that the DOJ had reasonable cause to believe that Defendants were violating the Eighth Amendment by failing to protect prisoners from excessive force by staff.

m.  DOJ filed a Civil Complaint against the State of Alabama and ADOC on **December 9, 2020** alleging that the State of Alabama violates the Eighth and Fourteenth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse, by failing to protect prisoners from the use of excessive force by security staff, and by failing to provide safe conditions of confinement in violation of the U.S. Constitution.

10. The above timeline shows that Administrative Supervisor Defendants, St. Clair Supervisor Defendants and the Fountain Supervisor Defendants were aware of the ongoing and pervasive systemic Eighth Amendment violations for several years prior to the attack on Mr. Prim.

11. In a March 2017 New York Times article, Defendant Commissioner Dunn described ADOC prisons as the most overcrowded and noted that it would not be long until we are the most understaffed and most violent. See Campbell Robertson, *An Alabama Prison's Unrelenting Descent into Violence*, N.Y. Times (March 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.

12. ADOC fails to protect prisoners from serious harm and a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Helling v. McKinney*, 509 U.S. 25, 33-35 (1993); *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).   The combination of ADOC's overcrowding and understaffing created an environment rife with violence and one that posed a substantial risk of serious harm to prisoners at Fountain and specifically to Jamie Prim.

13. While he was a prisoner at Fountain, Mr. Prim was denied his most basic constitutional and human right to be free from known and unreasonable risk(s) of serious harm while incarcerated.

14. The Eighth Amendment's prohibition on "cruel and unusual punishments" extends to a State's failure to provide minimally adequate medical care that "may result in pain and suffering which no one suggests would serve any penological purposes." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Harris v.*

*Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) (Federal and state governments …have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."). Furthermore, the State's obligation remains where it has contracted with private parties to provide medical care. *West v. Atkins*, 487 U.S. 42, 56 (1988).

15. Defendants acted with deliberate indifference to Mr. Prim's serious medical needs which were caused by the vicious and violent assault on Mr. Prim that rendered him a paraplegic. The Defendants knew of and disregarded the excessive risk to Mr. Prim's health and safety as evidenced by their ongoing acts of deliberate indifference to the substantial risk of harm and to the actual harm caused to Mr. Prim.

16. The inadequate and blatant disregard for Mr. Prim's health and medical conditions, and the negligent and wanton disregard for proper medical care led to Mr. Prim's death.

17. The medical records from Wexford Health Sources, Incorporated, Mobile Infirmary Medical Center, and Brookwood Medical Center clearly show that Jamie Prim suffered and endured excruciating pain, disfigurement, extreme emotional distress, anxiety, the loss of the use of his lower extremities, fear, hopelessness, degradation, humiliation, and depression for many months before he passed away on February 10, 2019. Mr. Prim's death was not "a

mercy," it was a final insult and an end to what his physician at Brookwood Medical Center called, "a horrible situation." Mr. Prim's unimaginable suffering was not caused by anything he did. He did not create or exacerbate the extreme debilitating medical condition(s) that led to his death.

18. Defendants had a duty to protect Mr. Prim upon his incarceration. An inmate in Alabama does not leave his/her humanity at the door of the prison, nor is that inmate stripped of his/her constitutional rights when the cell door closes. Despite Defendants' knowledge and notice of the numerous constitutional deficiencies and the documented and well-litigated constitutional violations of ADOC prisoners' rights, Defendants actively and knowingly allowed the constitutional violations to continue.

19. At all times material herein, Mr. Prim was confined and under the supervision and control of the ADOC which was therefore responsible for protecting Mr. Prim's life, health, and well-being.

20. ADOC's Mission Statement found in ADOC's 2018 Annual Report is: "Dedicated professionals providing public safety through the safe and secure confinement, rehabilitation, and successful re-entry of offenders," yet, the rate of violence, including murders, rapes, and assaults in the prisons, has risen year after year at an alarming rate according to ADOC's monthly reports.

21. Plaintiff brings this action to redress Defendants' failure to protect Mr. Prim from physical harm while he was housed at ADOC's Fountain Correctional Facility where, on June 20, 2018 he was severely assaulted by an unknown number of ADOC inmates while in a "Hot-Bay" dormitory ("Hot Bay") which housed between 30 to 40 violent inmates.  Mr. Prim suffered serious and life-threatening injuries because of the vicious assault.  The assault on Mr. Prim was the initial act that, when combined with numerous other constitutional violations and acts of negligence, resulted in his death on February 10, 2019.

22. Plaintiff further brings this action against Defendants for violation of Mr. Prim's rights under the Eighth and Fourteenth Amendments to the United States Constitution.  Rather than fulfill their obligations to take reasonable measures to protect Mr. Prim from violence at the hands of other inmates, Defendants were deliberately indifferent to the serious risk of substantial harm to Mr. Prim.

23. The Defendants, acting under color of state law, enabled Mr. Prim's assault and ultimately, his death.  By their reckless or intentional failure(s) to take actions to reasonably protect Mr. Prim from violence and provide minimally adequate medical care, Defendants deprived Mr. Prim of his most fundamental constitutional rights.   Accordingly, Plaintiff brings this action on behalf of Mr. Prim's estate to redress Defendants' multiple and cumulative violations

of Mr. Prim's Eighth Amendment rights under the U.S. Constitution. By utterly failing to protect Mr. Prim from harm that was foreseeable and by failing to provide the most basic medical care, Defendants are liable for the criminal acts of the assailants and for the failure to provide adequate and proper medical care to Mr. Prim.

24. Plaintiff further brings this action for Mr. Prim's wrongful death, pursuant to § 6-5-410 of the Alabama Code.

25. Plaintiff further brings this action on behalf of Mr. Prim's estate seeking compensation to redress Defendants' deliberate indifference to the serious risk of substantial harm to Mr. Prim and the deliberate indifference to Mr. Prim's serious need for medical care.

## <u>JURISDICTION AND VENUE</u>

26. This action is brought pursuant to 42 U.S.C. §1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

27. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1343(a)(1)-(3).

28. Venue appropriately lies in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims presented in this case occurred in the Northern District of Alabama.

## PARTIES

### Plaintiff

29. Thomas J. Pilcher, IV, (the Plaintiff) is the duly appointed Administrator of the Estate of Jamie Lawrence Prim, see *In re: The Administration of the Estate of Jamie Lawrence Prim*, in the Probate Court of Baldwin County, Alabama, Case Number 38219, and brings this case pursuant to 42 U.S.C. § 1983 and Alabama Code § 6-5-410.

30. Plaintiff is a citizen of Alabama and over the age of nineteen (19) years old. Decedent, Mr. Prim, was originally from Foley, Alabama and is survived by his sister, LaTanya Davenport, and his brother, Markief Eaton.

### Defendants

31. Plaintiff sues each of the Defendants listed below in his or her individual and/or corporate capacity.

32. Each of the Defendants listed below acted under color of law and within the scope of his, her, or its employment when engaging in the misconduct described herein.

33. Each of the Defendants listed below is above the age of majority.

## I.      Defendant Administrative Supervisors

34. Defendant **Jefferson Dunn** ("Dunn" or "Defendant Dunn") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto Defendant Dunn was the Commissioner of the ADOC.

35. Defendant Dunn was appointed the Commissioner of the ADOC in 2015 and still holds this position as of the date of this filing. The Commissioner is the highest ranking official in the ADOC and is responsible for exercising the independent direction, supervision, and control of ADOC, and for approving and issuing administrative regulations and changes. Ala. Code 1975 §14-1-1.3 (2010). The Commissioner is responsible for providing constitutional conditions of confinement in all facilities. The Commissioner is responsible for the appointment of personnel and employees within the ADOC required for the performance of the ADOC's duties towards the prisoners it incarcerates. Those duties include operating a prison system that respects the constitutional and human rights of persons within the custody of the ADOC, including the rights belonging to Mr. Prim at all times during his incarceration.

36. Defendant Dunn is responsible for the management and staffing of prison facilities, as well as the safety and security of all inmates incarcerated within ADOC. The constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct within ADOC facilities, specifically St. Clair Correctional Facility and Fountain

Correctional Facility, which occurred with the consent and direction of Defendant Dunn, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

37. Defendant Dunn's liability herein stems from but is not limited to his failure in the execution of his numerous administrative responsibilities, including but not limited to correcting the overcrowding and understaffing conditions in ADOC correctional facilities that caused the Alabama Prison System to become known as one the most violent prison systems in the country. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Dunn and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

38. Further, Defendant Dunn's liability herein stems from but is not limited to his promotion of Defendant Grantt Culliver to the position of Associate Commissioner in the face of overwhelming evidence that Culliver was not capable of the appropriate execution of his duties.

39. Defendant **Mark Fassl** ("Fassl" or "Defendant Fassl") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Fassl was the Inspector General of the ADOC, including the time Mr. Prim was assaulted on or about June 20, 2018, up to and including the time of Mr. Prim's death on or about February 10, 2019. Defendant Fassl has executive authority for reviewing department policies and practices and providing oversight for internal affairs investigations. Defendant Fassl's liability herein stems from but is not limited to his ineffective administration of his office, including but not limited to the oversight of internal affairs.

40. Defendant Fassl's liability herein stems from but is not limited to his failure in the execution of his numerous administrative responsibilities, including but not limited to correcting and/or implementing the policies and practices that allow the overcrowding and understaffing conditions in ADOC correctional facilities that caused the Alabama Prison System to become known as one the most violent prison systems in the country. Further, Defendant Fassl's liability stems from the failure of the Department of Internal Affairs to conduct appropriate internal investigations and to effectuate corrective actions. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Fassl and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence and that those inefficiencies

19

further caused the ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

41. Defendant **Grantt Culliver** ("Culliver" or "Defendant Culliver") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Culliver was the Associate Commissioner of Operations and Institutional Security for the ADOC.  He first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015.  Defendant Culliver retired in December 2018 after allegations of misconduct, specifically misconduct associated with inappropriate communications and relations with ADOC correctional staff.

42. As Associate Commissioner of Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including Fountain and St. Clair. Defendant Culliver was responsible for overseeing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.  Further, Defendant Culliver was responsible for planning, monitoring, and reviewing the day-to-day operations of ADOC correctional institutions.

43. Upon information and belief, Defendant Culliver was responsible for developing and implementing the use of Hot Bays throughout the ADOC prisons, including Fountain.

44. Defendant Culliver's liability herein stems from but is not limited to his failures in the execution of his numerous administrative responsibilities, in promulgating dangerous, and constitutionally bereft institutional policies (i.e., Hot Bay), and for his failures in monitoring and ensuring the safety of ADOC prisoners, including Mr. Prim.  Housing Mr. Prim in the Hot Bay unit at Fountain placed Mr. Prim in direct and immediate harm.  Mr. Prim was violently attacked and beaten while he was housed in the Hot Bay.

45. Upon information and belief, Defendant Culliver's inappropriate and improper relationships with his ADOC subordinates created an institutional environment rife with accepted institutional attitudes and inappropriate behaviors that continue to exist.

46. Defendant, **Ruth Naglich** ("Naglich" or "Defendant Naglich") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Naglich was the Associate Commissioner of Health Services for the ADOC.  As Associate Commissioner of Health Services, Naglich heads the Office of Health Services (OHS) and is responsible for establishing, monitoring, and enforcing system-wide health care policies and practices.

She is responsible for supervising the provision of adequate medical, mental health and dental care for all prisoners within ADOC custody, including but not limited to those in Residential Treatment Units, Intensive Stabilization Units, and segregation units.

47. Defendant Ruth Naglich's liability herein stems from but is not limited to her failure to monitor and correct health care practices that were clearly ineffective, specifically as to Jamie Prim.    Further, Defendant Naglich's liability stems from but is not limited to the failure in the execution of her numerous administrative responsibilities, including but not limited to correcting the policies and procedures for the delivery of health care to prison inmates in overcrowded and understaffed conditions.    The systemic inefficiencies of overcrowding and understaffing were known to Defendant Naglich and she was aware that the combination of those inefficiencies perpetuated the unacceptable and ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

48. Defendant **Cheryl Price** ("Price" or "Defendant Price") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Price was the Institutional Coordinator for the Southern Region of the ADOC.  In that role, Price was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in her

22

assigned area, including Fountain.   Her duties included supervising the Warden of Fountain, ensuring effective and safe daily operations at Fountain, and leading the external security audit team.    Defendant Price was also responsible for serving as the liaison between Fountain and the ADOC executive leadership.

49. Defendant Price's liability herein stems from but is not limited to her failure to adequately execute the duties of her position and by allowing the use of Hot Bay dormitory at Fountain despite clear findings that the use of such mass dormitories, combined with overcrowding and understaffing at Fountain created a violent and dangerous environment specifically for Jamie Prim.

50. Further, Defendant Price's liability herein stems from but is not limited to failing to take actions to correct the overcrowding and understaffing conditions in Fountain. Defendant Price had constructive knowledge of the systemic inefficiencies of overcrowding and understaffing and she was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

51. Defendant **Edward Ellington** ("Ellington" or "Defendant Ellington") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Ellington was the Institutional Coordinator for the

Northern Region of the ADOC, a role which he assumed in June 2017. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair. His duties included supervising the Warden of St. Clair, ensuring effective and safe daily operations at St. Clair, and leading the external security audit team. Defendant Ellington was also responsible for serving as the liaison between St. Clair and the ADOC executive leadership.

52. Defendant Ellington's liability herein stems from but is not limited to failing to take actions to correct the overcrowding and understaffing conditions in St. Clair that caused the Alabama Prison System to be known as one the most violent prisons in the country. Defendant Ellington had constructive knowledge of the systemic inefficiencies of overcrowding and understaffing and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

53. Collectively, Defendants Dunn, Fassl, Culliver, Naglich, Price, and Ellington are referred to as the "**Defendant Administrative Supervisors**."

54. Each of the Defendant Administrative Supervisors acted in a supervisory capacity over St. Clair and Fountain operations and employees at all times

relevant to this Complaint.  Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair and Fountain, which occurred with the consent of the Defendant Administrative Supervisors, who personally knew about, facilitated, approved and/or condoned the pattern and practice of misconduct, and/or recklessly caused the deprivation of Mr. Prim's rights by their actions and/or by their deliberate indifference and failure to act.

## II.    St. Clair Facility Supervisors

55. Defendant **Karla Jones** ("Jones" or "Defendant Jones") is a citizen of Alabama over the age of nineteen (19) years old.  She was the Warden at St. Clair throughout Mr. Prim's incarceration at St. Clair.  As Warden of St. Clair, Defendant Jones was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at St. Clair, and the supervision of all subordinate employees.   Defendant Jones' responsibilities also included ensuring adequate supervision and monitoring of inmates, adequate classification of inmates, appropriate housing assignments for inmates, adequate staffing levels, appropriate discipline and deterrence of inmate and staff misconduct, adherence by staff to the requirements of PREA, adherence to St. Clair and ADOC protocols, adequate implementation of protocols to protect inmates from violence, adherence by staff to search protocols,

adequate implementation of internal security audits, and proper installation, repair and maintenance of locks, cameras, and other security devices necessary for safety and security.

56. Further, Defendant Jones' liability herein stems from but is not limited to the failure to take corrective actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in said delivery of medical care. Further, Defendant Jones' liability herein stems from her direct interference with the provision of adequate medical equipment and modalities for medical treatment.

57. Defendant **Gwendolyn Givens** ("Givens" or "Defendant Givens") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto, Defendant Givens was an Assistant Warden at St. Clair. As Assistant Warden, Defendant Givens was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees. Defendant Givens' oversight responsibilities included contraband searches, staffing levels, safety precautions and protocols (implementation and oversight), investigations into inmate and employee misconduct, reviews of such investigations, or both, inmate movement, and safety and security during certain shifts.

58. Defendant Givens' liability herein stems from but is not limited to her failure to take corrective actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in the delivery of medical care.

59. Defendant **Anthony Brooks** ("Brooks" or "Defendant Brooks") is a citizen of Alabama over the age of nineteen (19) years old.  At all times relevant hereto, Defendant Brooks was an Assistant Warden at St. Clair.  As Assistant Warden, Defendant Brooks was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.  Defendant Brooks' oversight responsibilities included contraband searches, staffing levels, safety precautions and protocols (implementation and oversight), investigations into inmate and employee misconduct, reviews of such investigations, or both, inmate movement, and safety and security during certain shifts.

60. Defendant Brooks' liability herein stems from but is not limited to his failure to take corrective actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in the delivery of medical care.

61. Defendant **Carla Graham** ("Graham" or "Defendant Graham") is a citizen of Alabama over the age of nineteen (19) years old.   At all times relevant hereto,

Defendant Graham was a Security Captain at St. Clair.  As Captain, Defendant Graham was responsible for the day-to-day supervision of the correctional staff and ensuring the safety of the inmates and staff at St. Clair.

62. Defendant Graham's liability herein stems from but is not limited to the failure to take actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in said delivery of medical care.

63. Defendant **Gary Malone** ("Malone" or "Defendant Malone") is a citizen of Alabama over the age of nineteen (19) years old.  At all times relevant hereto Defendant was a Security Captain at St. Clair.   As Security Captain, Defendant Malone is responsible for the safety of all inmates at St. Clair and the supervision of all security activities and subordinate employees.

64. Defendant Malone's liability herein stems from but is not limited to the failure to take actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in said delivery of medical care.

65. Defendant **Kevin White** ("White" or "Defendant White") is a citizen of Alabama over the age of nineteen (19) years old. At all times relevant hereto Defendant White was a Captain at St. Clair.  As Captain, Defendant White

was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

66. Defendant White's liability herein stems from but is not limited to the failure to take actions to ensure the safe and effective delivery of medical care without the interference by St. Clair Correctional staff and inmates in said delivery of medical care.

67. Defendant **Rafael Santa-Maria** ("Santa-Maria" or "Defendant Santa-Maria") is a citizen of Alabama over the age of nineteen (19) years old.  At all times relevant hereto Defendant Santa-Maria was employed by the ADOC as a Sergeant at St. Clair.    Upon information and belief, Defendant Santa-Maria was on duty at the time Mr. Prim fell out of his bed (August 16, 2018).  Upon information and belief, Defendant Santa-Maria has engaged in inappropriate interaction(s)/relations with a member or members of Defendant Wexford Health's employees.

68. Defendant Santa Maria's liability herein stems from but is not limited to the failure to take actions to ensure the safe and effective delivery of medical care without his direct interference and without the interference by St. Clair Correctional staff and inmates in said delivery of medical care.

69. Defendants **Unknown St. Clair Shift Commanders** (St. Clair Correctional Facility) acted in a supervisory capacity over other St. Clair employees at all

times relevant to this Complaint. Their responsibilities included staffing the housing units, overseeing subordinates, ensuring that security checks were completed, and investigating and evaluating requests for housing assignment changes. Additional duties included arranging medical care, health care, and coordinating treatment with inmates and Wexford Health employees.

70. Collectively, Defendants Jones, Givens, Brooks, Malone, Graham, White, Santa-Maria, and Unknown St. Clair Shift Commanders are referred to as the "Defendant St. Clair Facility Supervisors."

71. Defendants **Unknown St. Clair Correctional Officers** were correctional officers at the St. Clair Prison at the time of the events at issue in Plaintiff's Complaint. Defendants Unknown St. Clair Correctional Officers are responsible for enforcing rules and keeping order inside the prison, supervising the activities of inmates, searching for contraband items, inspecting facilities to make sure they meet standards, reporting inmate conduct and aiding in rehabilitation and counseling of offenders. Additional duties included arranging inmates' medical and health care and coordinating treatment for inmates with the Defendant Wexford Health employees.

## III. Fountain Facility Supervisors

72. Defendant **William Curtis Streeter** ("Streeter" or "Defendant Streeter") was the Warden at Fountain Correctional Facility leading up to and during the

events described in Plaintiff's Complaint.  As Warden of Fountain, Defendant Streeter was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at Fountain, and the supervision of all subordinate employees.  Defendant Streeter's responsibilities also included ensuring adequate supervision and monitoring of inmates, adequate classification of inmates, appropriate housing assignments for inmates, adequate staffing levels, appropriate discipline and deterrence of inmate and staff misconduct, adherence by staff to the requirements of PREA, adherence to Fountain and ADOC protocols, adequate implementation of protocols to protect inmates from violence, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair and maintenance of locks, cameras, and other security devices necessary for safety and security.

73. Defendant Streeter personally observed the pervasive and long-standing violence at Fountain and specifically at the residential unit known as the Hot Bay.  He personally saw the absent or failing safety protocols at Fountain through his presence at the facility and/or communications with his staff. Further, Streeter had knowledge of the 2016 DOJ investigation into the constitutional violations within ADOC.

74. Defendant Streeter's liability herein stems from but is not limited to his failure to adequately execute the duties of his position and by allowing the use of Hot Bay dormitories despite clear findings that the use of such mass dormitories, combined with the overcrowding, and understaffing at Fountain created a violent and dangerous environment specifically for Jamie Prim.

75. Further, Defendant Streeter's liability herein stems from but is not limited to failing to take actions to correct the overcrowding and understaffing conditions in Fountain. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Streeter and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

76. Defendants **Unknown Fountain Wardens** ("Unknown Fountain Wardens") were the associate wardens at Fountain during the time Jamie Lawrence Prim was housed at Fountain. The Unknown Fountain Wardens are responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at Fountain and the supervision of all subordinate employees.

77. Defendants **Unknown Fountain Shift Commanders** ("Unknown Fountain Shift Commanders") were the Shift Commanders at Fountain within the scope of their responsibilities for the ADOC at Fountain during the time Jamie

Lawrence Prim was housed at Fountain.  In addition, Defendants Unknown
Fountain Shift Commanders were the Shift Commanders on duty on or about
June 20, 2018, when Jamie Lawrence Prim was brutally beaten while he was
housed in a "Hot Bay."  Unknown Fountain Shift Commanders acted in a
supervisory capacity over other Fountain employees.  Their responsibilities
included staffing the housing units, overseeing subordinates, ensuring that
security checks were completed, and investigating and evaluating requests for
housing assignment changes. Additional duties included arranging medical
care, health care, and coordinating treatment with inmates and Wexford
Health staff.

78. Collectively, Defendants Streeter, Unknown Fountain Wardens, and
Unknown Fountain Shift Commanders are referred to as the "Defendant
Fountain Facility Supervisors."

79. Defendants **Unknown Fountain Correctional Officers** were correctional
officers at Fountain at the time of the events at issue in Plaintiff's Complaint.
Defendants Unknown Fountain Correctional Officers are responsible for
enforcing the rules and keeping order inside of the prison, to supervise and
monitor the activities of the inmates, search for contraband items, inspect
facilities to ensure they meet standards, report inmate conduct and aid in
rehabilitation and counseling offenders.  Additional duties include arranging

medical care, health care and coordinating treatment with inmates and Wexford Health staff.

## IV.   Wexford Health Sources, Incorporated

80. Defendant **Wexford Health Sources Incorporated** ("Wexford Health"), is a corporation doing business in Alabama. Defendant Wexford Health was at all times relevant to this Complaint, a private, for-profit Florida corporation that, among other services, contracts with prisons and jails to provide health care for inmates. At all relevant times hereto, Wexford Health was under contract with ADOC to provide such services to inmates in the Alabama prison system. Wexford Health was contractually and duty bound to provide proper and appropriate health care to all ADOC inmates.

81. As the ADOC's contracted health services provider, Defendant Wexford Health is responsible for the health care of inmates in the ADOC prisons including Fountain Correctional Facility and St. Clair Correctional Facility. Defendant Wexford Health is sued in its separate corporate capacity.

82. At the time of Mr. Prim's serious injuries at Fountain and up until his death at St. Clair while in ADOC custody, Defendant Wexford Health was responsible for providing medical care to ADOC inmates and specifically to Mr. Prim.

## V.   Wexford - St. Clair Defendants

83. Defendant **Dr. Walter Wilson** ("Dr. Wilson" or "Defendant Dr. Wilson") was the onsite Medical Director for St. Clair Correctional Facility and was responsible for providing care to and/or supervision of Mr. Prim's medical care during the entirety of the time Mr. Prim was housed at St. Clair.

84. At all relevant times herein, Defendant Dr. Walter Wilson was responsible for overseeing the general policies at St. Clair for medical care and for implementing and providing quality medical care.

85. Defendant **Kelley Phillips** ("Defendant Phillips" or "Phillips") was a health care provider serving prisoners at St. Clair and was obligated to provide medical care to and/or supervise the medical care of Mr. Prim during the time Mr. Prim was housed at St. Clair.

86. Defendant(s) **Unknown Wexford - St. Clair Health Care Providers** were health care providers serving prisoners at St. Clair and were obligated to provide medical care to and/or supervise the medical care of Mr. Prim during the entirety of the time Mr. Prim was housed at St. Clair.

87. Defendants Dr. Walter Wilson, Kelley Phillips, and Defendant Unknown Wexford - St. Clair Health Care Providers were health care providers serving prisoners at St. Clair, who failed to give Mr. Prim adequate medical care, including proper skin protection, proper wound care, timely and appropriate

physical rehabilitation; proper supervision and failure to provide necessary and safe medical equipment.

88. Upon information and belief Defendants Dr. Walter Wilson, Kelley Phillips, and Unknown Wexford - St. Clair Health Care Providers were employed by the outside medical care vendor, Defendant Wexford Health.

89. Plaintiff refers collectively to Defendants Wexford Health, Dr. Walter Wilson, Kelley Phillips, and Unknown Wexford - St. Clair Health Care Providers as "Wexford - St. Clair Defendants."

## VI.    Wexford - Fountain Defendants

90. Defendant **Dr. Manuel Pouparinas** ("Dr. Pouparinas" or "Defendant Dr. Pouparinas") was the onsite Medical Director for Fountain Correctional Facility and was responsible for providing medical care to and/or supervising the medical care of Mr. Prim during the entirety of the time Mr. Prim was housed at Fountain.

91. At all relevant times herein, Defendant Dr. Manuel Pouparinas was responsible for overseeing the general policies at Fountain for medical care and for implementing and providing quality medical care.

92. Defendant(s) **Unknown Wexford - Fountain Health Care Providers** were health care providers serving prisoners at Fountain and were obligated to

provide medical care to and/or supervise the medical care of Mr. Prim during the entirety of the time Mr. Prim was housed at Fountain.

93. Defendants Dr. Manuel Pouparinas and Unknown Wexford – Fountain Health Care Providers were health care providers serving prisoners at Fountain, who failed to give Mr. Prim adequate medical care, including proper skin protection, proper wound care, timely and appropriate physical rehabilitation; proper supervision and failure to provide necessary and safe medical equipment.

94. Upon information and belief Defendants Dr. Manuel Pouparinas and Unknown Wexford - Fountain Health Care Providers were employed by the outside medical care vendor, Defendant Wexford Health.

95. Plaintiff refers collectively to Defendants Wexford Health, Dr. Manuel Pouparinas and Unknown Wexford - Fountain Health Care Providers as "Wexford - Fountain Defendants."

## FACTUAL ALLEGATIONS

I.   **Mr. Prim's Relevant ADOC Incarceration history**
      **A. Pre-Correctional Facility Incarceration**

96. On January 26, 2017 Mr. Prim plead guilty on Information in the Baldwin County Circuit Court to Possession of a Controlled Substance.  On February

3, 2017 Mr. Prim was sentenced to 8 years, split to serve 16 months of incarceration with the ADOC.

97. Following his sentence, Mr. Prim was selected to attend (at that time) a new program located in Columbiana, Alabama named the Alabama Therapeutic Education Facility (ATEF).  It was considered an honor for him to be selected to attend.

98. In April 2017 Mr. Prim was transferred from Baldwin County, Alabama to the ATEF in Columbiana, Alabama, where he completed its full six (6) month program.  In the process, Mr. Prim completed his GED, got his forklift license, and obtained a certificate in cooking, among other certificates.

99. Mr. Prim planned to utilize the cooking skills and other skills he learned in ATEF to open a restaurant and business with his niece, Sabritney Roper, to support himself and his family after he was released from prison.

100.    Mr. Prim was a son, an uncle, and a brother.  He had a loving family who was proud of his accomplishments at ATEF and awaited his release from ADOC, not only because home with his family was where he belonged but also, because it was where he was needed.

101.    Following is completion of ATEF, on October 13, 2017 Mr. Prim filed a Request for Reconsideration for Probation on Split Sentence with the Baldwin County Circuit Court.

102.     The Program Director of the ATEF, Kenneth C. Garner, JD, wrote the following to the Baldwin County Circuit Court in support of amending Mr. Prim's sentence to allow him to serve the remainder of his sentence on probation:

> …Mr. Prim is participating in our Adult Education Curriculum and has received excellent reports from his instructor.  He is also participating in life skills, employability skills, SAP, relapse prevention, age specific, anger management and a host of other self-help groups.  In addition, Mr. Prim received his GED this month while in the Adult Education classes.
>
> Mr. Prim has an excellent compliance report with both the Department of Corrections and ATEF.  He will complete the 6-month transitional programming on October 6, 2017.  It is his request that the Court reviews his institutional record, time served, programs completed and uses them in considering an amended sentence to probation on the remaining 4 months of the split sentence to serve.  It is my opinion that Mr. Prim is capable of complying with community supervision, if given an opportunity.  He has a home-plan with his sister, who is an upstanding citizen of the Foley community…

103.     Mr. Prim's Request for Reconsideration to serve the remaining 4 months of his sentence on probation, was denied.

104.     After graduating from ATEF, Mr. Prim was sent to Loxley Work Release.   Shortly after arriving at Loxley Work Release, Mr. Prim was "written up" for a positive drug test after he had smoked a marijuana cigarette. He was only transferred to Fountain, a medium security facility because of the

positive drug test.  At the time that he was transferred, other than being a Type

2 Diabetic, Mr. Prim was a healthy 32-year old man.

### B. Mr. Prim's Incarceration at Fountain

#### 1. THE ASSAULT ON MR. JAMIE LAWRENCE PRIM
#### Assault While Housed in Hot Bay
#### June 20, 2018

105.     At the time of his transfer to Fountain, Mr. Prim was classified for

minimum custody or work release facilities.  There is a long-standing pattern

of men with minimum custody classifications being particularly vulnerable to

extortion and abuse at medium and maximum-security prisons.

106.     Fountain was classified as a medium security prison at the time of Mr.

Prim's incarceration but is now classified as a maximum-security prison.

107.     Mr. Prim was transferred to Fountain and placed in the Hot Bay

dormitory which housed between 30 to 40 men with serious and violent

disciplinary histories.  The Hot Bay had little to no officer supervision.  "Hot

Bay" is an ADOC internal nickname for what is also called the "Behavior

Modification" dormitory or "restricted housing unit."

108.     On information and belief, Defendant Culliver developed and

promulgated the use of Hot Bay residential incarceration in ADOC.  Prior to

Mr. Prim's incarceration at Fountain, the use of Hot Bays had been

investigated by the U.S. Department of Justice and in April 2019 the use of

Hot Bays was condemned by the U.S. Department of Justice.

109.    On April 2, 2019, the U.S. Justice Department issued its "Notice Letter"

to the State of Alabama that it concluded, based on its investigation spanning

2016 through 2019, that the conditions in Alabama's male prisons violated

the Eighth Amendment's protection from cruel and unusual punishment due

to ADOC's failure to "protect prisoners from serious harm and substantial risk

of serious harm."   The Justice Department also concluded that ADOC's

constitutional violations were "severe and systemic" and "pursuant to a

pattern or practice of resistance to the full enjoyment of rights secured by the

Eighth Amendment."   In the Notice Letter, the Department of Justice

specifically addressed the ADOC's use of Hot Bay dormitories.

110.    Per the April 2, 2019 Department of Justice Notice and Report

describing "Hot Bay" dormitories and the inmates who are assigned there:

> Most often that misconduct [disciplinary infraction], involves
> violence, resulting in these dorms housing a high percentage of
> violent prisoners.  Although some ADOC disciplinary units are
> termed "Behavior Modification" units, there is no additional
> staffing or behavioral programming offered in these units.
> Prisoners are commingled and under-supervised, but still housed
> in an open dormitory.   They are also being denied access to
> programming and visits to the canteen.  Food is brought to them
> on trays.   They are only given access to the yard if there are
> enough officers to supervise outside time, which rarely happens.
> These deprivations raise tension levels within the unit.  However,
> unlike disciplinary units in other correctional systems, which

require increased correctional staffing and supervision, prisoners and staff reported that there is little supervision in ADOC's Hot Bays, greatly contributing to the high level of violence in these units.  In fact, during one facility visit, when we entered the Hot Bay, a captain muttered, "Enter at your own risk."

111.    Upon information and belief, Mr. Prim was in his top bunk in the Hot Bay when he was attacked by several men (unknown number) armed with broken broomsticks.  It is not known how long Mr. Prim lay on the floor of the Hot Bay before Fountain staff discovered him.

112.    For several years, up to and including the date of Mr. Prim's death, pervasive violence including prisoner on prisoner assaults plagued ADOC. Prior to Mr. Prim's assault, statewide administrative officials and wardens within ADOC were aware of the violence that was and continues to be pervasive in the ADOC prisons, including Fountain and that factors under their control contributed to this violence.

113.    Defendants Administrative Supervisors and Fountain Facility Supervisors were and are aware that Hot Bay dorms pose a particular risk to inmates because of the concentration of inmates with serious and violent disciplinary infractions and a lack of officer supervision.

114.    Defendants Administrative Supervisors and Fountain Facility Supervisors were also aware that prisoners like Mr. Prim with minimum

custody were particularly vulnerable at higher security facilities like Fountain that house inmates with violent conviction and disciplinary histories.

115.     Defendants ADOC Administrative Supervisors and Fountain Facility Supervisors deliberately disregarded and were indifferent to the risk of serious harm to Mr. Prim by housing him in the Hot Bay and by failing to supervise, review, and monitor the Hot Bay.  That risk of serious harm to Mr. Prim became actual harm on June 20, 2018 when Mr. Prim was attacked and beaten by an unknown number of prisoners.

116.     Given the well-documented culture of violence in ADOC in the media and in court documents, the risk of inmate-on-inmate violence at Fountain was foreseeable, as were the specific risks to Mr. Prim as a minimum custody prisoner in a medium security Hot Bay dormitory.

### 2. Mr. Prim's Injuries and Medical Conditions During Incarceration at Fountain

#### i. Mobile Infirmary Medical Center June 20, 2018 – July 9, 2018

117.     The severity of the June 20, 2018 assault necessitated the transfer of Mr. Prim via "Life Flight" to Mobile Infirmary Medical Center ("MIMC"). During the flight, Mr. Prim was unresponsive and placed on ventilatory support.  Upon arrival and admission to the MIMC Emergency Department, Mr. Prim was found to have a right parietal skull fracture and subdural hematoma.  He

underwent a right decompressive hemicraniectomy (surgical removal of a large flap of the right side of the skull) to relieve blood pooling under the membranes covering his brain (subdural hematoma) and removal of skull fragments.  The serious assault further resulted in, among other injuries, lower extremity paralysis, urinary and fecal incontinence, Traumatic Encephalopathy, neurogenic bladder, Acute Kidney Injury, and end-stage Renal failure requiring regular dialysis.

118.    Mr. Prim's medical records from MIMC show that Mr. Prim was treated at MIMC for a period of twenty days, i.e., from June 20, 2018, until July 9, 2018.

119.    The medical records from MIMC reflect that Mr. Prim's paraplegia was a direct result of the skull fracture and subdural hematoma caused by the violent and vicious June 20, 2018 attack on Mr. Prim.

120.    During the time Mr. Prim was treated at MIMC (June 20 until July 9), there was no evidence of skin breakdown or pressure ulcers.

121.    Mr. Prim was discharged from MIMC on July 9, 2018 into the care, custody, and control of the ADOC, Fountain, and Defendant Wexford Health. Along with the discharge documents, MIMC provided instructions to ADOC, Fountain and Wexford Health for Mr. Prim's medical care.

122.    Upon Mr. Prim's discharge from MIMC, the MIMC medical records indicate that Mr. Prim had no active wounds and in fact had "good skin turgor."  The discharge goal included "Plans for discharge to long term care facility."

### ii.    Mr. Prim Discharged from MIMC - Returned to Fountain July 9, 2018 – July 20, 2018

123.    On July 9, 2018 Mr. Prim was rated as being at a Severe Risk of Pressure Ulcers.

124.    Upon Mr. Prim's return to Fountain, it was noted by Wexford -Fountain medical staff that Mr. Prim had "no active wounds" on his skin.  He was rated on the "Morse Scale" to Identify Fall Risk as a "Moderate Risk."   He was rated on the Braden Scale as being a "Severe Risk" for Pressure Ulcer sores.

125.    The Wexford records from Fountain further reflect that Defendant Dr. Pouparinas ordered that Mr. Prim be repositioned every 2 hours.

126.    The Defendants Wexford Health, Dr. Pouparinas and Unknown Fountain Health Care Providers were charged with Mr. Prim's medical care while Mr. Prim was housed at Fountain.  Upon information and belief, due to the severe health care understaffing, the Wexford Health staff regularly used ADOC inmates ("runners") to assist the Wexford staff in providing for the basic needs and care (such as turning the bedbound inmates/patients) of the inmates housed in the infirmary.

127.     The first report of Mr. Prim having a pressure ulcer was July 13, 2018 when he was found to have 2 pressure ulcers in the coccyx area, with one being 1.8 cm x 1.3 cm and the other being 1.3 cm x 0.3 cm.

128.     The following day, July 14, 2018, another pressure ulcer was found on Mr. Prim's right thigh.

129.     On July 19, 2018, Mr. Prim reported to the Wexford Health personnel that he was having problems with his vision; that he could only see outlines of people and he asked if the lights were out. Defendant Dr. Pouparinas ordered that Mr. Prim's labs be drawn.

130.     Mr. Prim was in the custody of the ADOC, Fountain and Wexford Health for approximately ten (10) days.  In that time the Wexford Health medical records reflect that Mr. Prim's health deteriorated dramatically as evidenced by the development of pressure ulcers which never fully healed.

131.     Defendant Fountain Facility Supervisors and Wexford-Fountain Defendants were aware that Mr. Prim needed serious medical care, but they acted with negligence and deliberate indifference by failing to provide Mr. Prim with adequate and proper medical care.

132.     The Wexford Health medical records from Fountain reflect that over a very short period the decubitis wounds, i.e., pressure ulcers, became so severe and needed immediate treatment.

133.     Defendants Wexford Health, Dr. Pouparinas' failure to provide sufficient preventive care and their failure to provide adequate, appropriate, and timely medical care to Mr. Prim to address the pressure ulcers was more than negligent, reckless, or wanton; it was deliberately indifferent and amounted to violating Mr. Prim's constitutional rights guaranteed by the Eighth Amendment to the United States Constitution.

134.     Defendants' deliberately indifferent, negligent, reckless, and wanton failure to provide necessary preventive measures, including, but not limited to, repositioning Mr. Prim every 2 hours, providing protective heel caps, treating the pressure ulcers with proper medication, and providing proper bedding, contributed to, and directly resulted in Mr. Prim's untimely death.

135.     Mr. Prim's need for preventive measures and protections to prevent and treat pressure ulcers was so medically dire that when left unattended posed a substantial risk of serious medical harm to Mr. Prim.

136.     Mr. Prim's need for prevention and medical treatment was so obvious that even a lay person could easily recognize the necessity for medical attention, including treatment and proper preventive measures.

137.     Defendants Wexford Health and Dr. Pouparinas were aware of the risk of serious harm to Mr. Prim caused by the existence and exacerbation of the pressure ulcers.

138.    Defendants Wexford Health and Dr. Pouparinas disregarded the risk of serious harm to Mr. Prim by failing to supervise, review, and monitor the Fountain Wexford Staff's daily treatment records. If Defendant Dr. Pouparinas had reviewed the daily reports, he would have noted the lack of preventive measures, the Wexford – Fountain staffs' reliance on prison inmates to assist with repositioning Mr. Prim every two hours, and the failure to regularly and consistently properly treat Mr. Prim's decubitis wounds.

139.    Defendants Wexford Health and Dr. Pouparinas's conduct and failure to protect and provide adequate medical care to Mr. Prim was more than merely negligent, it was deliberately indifferent.

140.    Mr. Prim's Death Certificate specifically lists Chronic Stage 4 Ulcers as a contributing cause of Mr. Prim's death.  The stage 4 ulcers on Mr. Prim's body were caused and exacerbated by Defendants' wrongful conduct.

141.    Wexford Health records from Fountain reflect that Defendants Dr. Pouparinas recommended that Mr. Prim be transferred to Hamilton Infirmary for the Aged and Infirmed (Hamilton) where it is likely that Mr. Prim would have been more closely monitored, given proper overall treatment for a paraplegic, and would have been housed in a unit with proper medical equipment.  The recommendation that Mr. Prim be transferred to Hamilton was based on Mr. Prim's serious need for long term medical care.  The

Wexford Health records reflect that Dr. Pouparinas's recommendations were ignored and Mr. Prim was never transferred to Hamilton. Instead, on August 11, 2018, Mr. Prim was transferred to St. Clair.

142.     On July 19, 2018, Defendant Dr. Manuel Pouparinas wrote:

> IM Prim is a 34y old AAM who underwent a right Hemicraniectomy to evacuate a large subdural hematoma. Also, IM had a parietal skull fracture. As a consequence of all this, he is now a paraplegic with urinary and fecal incontinence, requiring total care, also requiring to be reposition every 2 hours to avoid decubitus ulcers. He is a very poor [illegible] person with an out-of -control diabetes, who is now also on antiseizure medications to prevent seizures and further head trauma. He is currently an Acute renal failure who may eventually necessitate dialysis at some point. **Due to the complexity of his care at this time it is my professional opinion that the care that he will require cannot be provided at this institution.**

(Emphasis added)

### iii.    Readmission to MIMC
### July 20, 2018 – August 10, 2018

143.     On July 20, 2018, only ten (10) days after Mr. Prim was returned to Fountain, he was once again transferred by ambulance to MIMC for emergency medical services due to abnormal lab values. He was admitted and diagnosed, with, among other issues, Acute Renal Failure Syndrome, Severe Anemia, Hyperkalemia, Urinary Tract Infection, and Metabolic Acidosis. Mr. Prim was started on Dialysis on July 25, 2018.

144.     Upon his second admission to MIMC, the medical records reflect Mr.

Prim had "skin tears," i.e., pressure ulcers, also referred to as "decubitis" to his

right upper thigh and sacrum area.

145.     On July 26, 2018, an MIMC medical provider noted that the site on Mr.

Prim's skull of the previous June 20, 2018 hemicraniectomy remained open

and Mr. Prim was described as having a "large cranial defect."  The MIMC

medical records reflect that the section of Mr. Prim's skull, i.e., the "bone

flap" that had been removed to perform the hemicraniectomy, was still in the

MIMC freezer:

> Patient approaching 1 month out emergency decompressive
> craniectomy and evacuation of chronic and subacute subdural
> hematoma, who has what appears to be an extra-axial CSF
> (cerebrospinal fluid) collection, underneath the scalp flap, but
> superficial to the dura, which is no mass-effect. He is
> approaching the point of recovery where cranioplasty by
> returning the bone flap could certainly be considered, but this is
> an elective procedure, and thus not generally carried out in the
> face of a urinary tract infection.  Further, the appearance of the
> extra-axial collection, could potentially be an indication that,
> after the bone flap is returned, he may require CSF diversion
> procedure, which can also not be entertained in the face of any
> infection.
>
> I have checked with the operating room and informed that the
> bone flap is available in a freezer for the time for this patient's
> cranioplasty.

146.     On August 4, 2018, Mr. Prim attended physical therapy at MIMC after

which the Physical Therapist noted that Mr. Prim could not fully participate

in therapy due to the large cranial defect and due to Mr. Prim not having head protection.

147.     Mr. Prim remained in MIMC from July 20, 2018 until August 10, 2018 at which time he was transferred back to ADOC and remained under the care of Wexford Health.

148.     The MIMC Discharge record noted that Mr. Prim was found to have Renal Failure Syndrome and that his discharge condition was "good" and that the risk for readmission for the same issue was "low."

> ### iv.     Discharge from MIMC – Transfer back to Fountain August 10, 2018

149.     Mr. Prim was discharged from MIMC on August 10, 2018 and transferred to Fountain.

150.     On August 10, 2018, while at Fountain, Mr. Prim was evaluated for his risk of falls.   In the evaluation, Mr. Prim was rated as being at a moderate risk for falls, and it was noted: "…Pt. is a paraplegic at full bedrest.  Pt. is able to move upper body with no problems but needs to be turned every 2 hours. Sometimes, he gets too close to bedside that could cause a fall…"

> ### C. Mr. Prim's Incarceration at St. Clair

> #### 1.  Transfer to St. Clair  - August 11, 2018

151.     Mr. Prim was transferred from Fountain to St. Clair on August 11, 2018 where he could receive regular dialysis.

152.     St. Clair is a close-security, or Security Level V, men's prison located in Springville, Alabama with a designated capacity of approximately 984 men.

153.     At St. Clair, Mr. Prim was again given ratings for his risk of falling and for his risk of skin breakdown.  At Fountain, on July 9, 2018, he was rated as being at a Severe Risk of Pressure Ulcers, however on August 11, 2018, Mr. Prim was classified as being at *mild* risk for skin breakdown due to pressure.

154.     Mr. Prim was housed in the Infirmary unit at St. Clair.  Due to his lower extremity paralysis, Mr. Prim was restricted to a hospital bed.  On or about August 11, 2018, Mr. Prim was classified as being at **mild** risk for falling out of the bed due to his medical history.  The Wexford Health medical records reflect that Defendant Dr. Wilson noted that Mr. Prim's bed should be equipped with bed rails to prevent Mr. Prim from falling out of the bed.

### 2. August 2018

#### i. Lack of Protective Bed Rails
#### August 16, 2018 - Fall out of Hospital Bed.

155.     Upon information and belief, ignoring Dr. Wilson's recommendation, Mr. Prim was assigned to a bed that was not equipped with protective bed rails.

156.     The Wexford Health medical records reflect that St. Clair was not equipped to provide proper medical care to Mr. Prim.  According to the

Wexford Health records, Warden Jones ordered that protective bed rails be removed "out the back gate." The records further reflect that at the time Mr. Prim arrived at St. Clair there were no protective bed rails anywhere on the St. Clair campus.

157.    While at St. Clair, on August 16, 2018, Mr. Prim fell out of his bed and struck his head on floor on the right side of his head, directly striking the area that was missing the bone flap, (i.e., when Mr. Prim fell out of the bed, he struck his head on the location of the hemicraniectomy where the bone flap had been removed and which had not been placed back on), creating a condition called a meningocele.

158.    Defendant Wexford Health's progress note from August 16, 2018, reflects, "inmate found lying on floor states, 'I fell out of bed' Inmate holding right side of head complaining of severe pain and headache…"

159.    Defendant Wexford Health's records further reflect that on August 16, 2018, there were no protective bedrails on Mr. Prim's bed.

160.    *Following* August 16, 2018, Wexford Health nurse T. Haynes added the following three (3) late entry Progress Notes to Mr. Prim's medical record:

- *Late Note* (emphasis added) 8/12/18: "Attempted to locate bedrails to place on Inmate bed for safety due to Inmate being high risk for falls (sic) bed rails not in old dialysis rm anymore (sic) was told rails was

taking (sic) out back gate per orders of Warden Jones (sic) will confirm in AM."

- 8/14/18: "Spoke with Mrs. Phillips regarding get (sic) Bedrails (sic) for Inmate safety.  States she will get someone to help het go to P-block and try to find some today."

- 8/15/18: "Spoke with Mrs. Phillips Regarding (sic) if bedrails were found (sic) states no bedrails were in P building or in Camp but she has emailed other camps to see if we can borrow until we can order some with no response."

### ii.   Meningocele
### Brookwood Medical Center
### August 16, 2018 – August 24, 2019

161.    On August 16, 2018, after Mr. Prim was found lying on the floor in his cell, Mr. Prim was transported to Brookwood Medical Center ("Brookwood") and evaluated in the Emergency Room where he was admitted and diagnosed with having a large meningocele underlying the site of the previous hemicraniectomy and admitted to the hospital. The large meningocele was deemed to be "secondary to fall and skull defect." Surgical intervention was necessary but surgical intervention was not possible at that time because the bone flap that was meant to cover the surgical site on Mr. Prim's scalp (prior to August 16, 2018) *had not been placed back on*. Therefore, surgical

intervention was delayed until Mr. Prim's bone flap could be located and sent to Brookwood from MIMC.  Once the bone flap arrived at Brookwood, the Brookwood medical team could evacuate the meningocele and conduct the cranioplasty to replace the bone flap.  Mr. Prim remained at Brookwood until August 24, 2018 when he was returned to St. Clair pending the arrival of the bone flap from MIMC.

### iii.   Right Side Cranioplasty – Surgery
   Brookwood Medical Center
   August 29, 2018 – August 31, 2018

162.    Mr. Prim was readmitted to Brookwood on August 29, 2018 and underwent Right Cranioplasty surgery to remove the meningocele and to replace the bone flap.  Mr. Prim was returned to St. Clair on August 31, 2018.

### 3. September 2018

**Proliferation of Pressure Ulcers
Failure to Reposition Mr. Prim per Medical Recommendations**

163.    During the month of September 2018 Mr. Prim remained at St. Clair. Wexford Health records reflect that in the month of September 2018, Mr. Prim suffered from pressure ulcers located at the sacrum, hip, coccyx, right medial heel, and left lateral malleolus.  With all four locations being treated in the latter part of the month.

164.    The Wexford Health record does not reflect that Mr. Prim received proper preventive care or adequate medical treatment for the multiple pressure ulcers while he was at St. Clair.    Except for a scant few notations, the Wexford Health records from St. Clair are virtually void of notations reflecting that Mr. Prim was repositioned.

165.    As part of Mr. Prim's regular health care, as with any paraplegic confined to a medical bed, Mr. Prim needed regular re-positioning, and/or rotation to prevent skin breakdowns and bed sores.  If left unattended and/or unprotected a bedridden patient will develop debilitating bed sores which pose a substantial risk of serious harm to a patient.

166.    The MIMC physician(s), Dr. Pouparinas, Dr. Wilson, and Dr. Thompson (Brookwood physician) each recommended that Mr. Prim be repositioned every 2 hours to prevent the development of bed sores.

167.    While at St. Clair, Mr. Prim suffered from multiple pressure ulcers some of which became so critical that they required surgical debridement.   Mr. Prim suffered ulcers on, but not limited to, the following locations:  left hip, sacrum, coccyx, right heel, left heel, right and left ankles, gluteal area, right medial heel, and left lateral malleolus.  At times during his custody at St. Clair Mr. Prim suffered from pressure ulcers in/on five locations at the same time.

### 4.  October 2018

**Increase in number, location, and severity of Pressure Ulcers.
October 27 – November 5, 2018 – Brookwood Medical Center
(Radical Debridement of Pressure Ulcers)**

168.    In October 2018, the number of pressure ulcers increased in location and in severity. Wexford Health records reflect that Mr. Prim had pressure ulcers located on his sacrum, hip, coccyx, right medial heel, left lateral malleolus, gluteal area, left heel.

169.    On October 27, 2018, Mr. Prim was transferred to Brookwood because of "low blood counts." While at Brookwood, it was noted that Mr. Prim suffered from "Chronic Sacral Decubitis" and that the sacral ulcer was inflamed.

170.    On October 30, 2018, Mr. Prim underwent a debridement procedure on two pressure ulcers: an 8x9 cm ulcer of "full thickness down to bone" and a left 8x8 cm ulcer "down to fascia." The description of the procedure stated: "Using a 10-blade, forceps, scissors greater than 200 sq cm of necrotic skin, subcutaneous fat, fascia and muscle were debrided. There was palpable femur at the depths of the ischial ulcer…" "left ischial decubitis ulcer 8x9 cm full thickness down to bone; left ischial decubitis ulcer 8x8 down to fascia."

171.    The wound care recommendations from Brookwood medical records stated: "Turn patient every two hours, continuous elevation of heels, offload heels using pillows…dressing change daily, apply prevention boots, barrier

spray:  heels; dressing change left hip and sacrum; dressing change left distal ankle."

### 5.  November 2018

#### Multiple Failures to Provide Medical Treatment
#### Parole Granted to Mr. Prim

172.    In November 2018 Mr. Prim continued to suffer numerous areas of decubitis.  In November there were several occasions when Mr. Prim did not receive the necessary treatment at all.   Wexford Health records reflect that on November 12, he did not receive the prescribed treatment because St. Clair did not have the necessary medication(s) because the medication was "stolen from the cart."   On the following day, the Wexford Health medical staff substituted a secondary medication because they did not have the prescribed medication to treat the pressure ulcers.

173.    On November 16, Mr. Prim did not receive treatment due to the Wexford Health's employee's "workload."

174.    On November 29, 2018, the Alabama Board of Pardons and Paroles granted Mr. Prim parole.  Instead of being released to the care of his family, Mr. Prim remained in the custody of the ADOC.

### 6.  December 2018

#### December 11 – December 12, 2018 Brookwood
#### Radical Debridement of Pressure Ulcers

175.    In December 2018 and January of 2019 Mr. Prim continued to suffer with decubitis ulcers and multiple medical conditions.   According to the December 29, 2018 Wexford Health Progress Note, Mr. Prim's left ankle wound needed debriding.

176.    On December 11, 2018, Mr. Prim was again admitted to Brookwood for debridement of "foul smelling" wounds.   Brookwood medical records show that at that time the Brookwood physician debrided:

> …greater than 100 cm2 of skin, fascia, subcutaneous fat down to the greater trochanter.   We then debrided the greater trochanter. For the most part we removed the necrotic tissues. There was moderate bleeding. This was controlled with pressure and packing the wound. We then changed his dressings.  This of course, will never heal.  Ultimately, he may need an ostomy. **This is a horrible situation**. (emphasis added)

177.    The Wexford Health records from St. Clair and Brookwood are replete with documentation of the rapid deterioration of the integrity of Mr. Prim's skin.  Over a very short period the decubitis wounds, i.e., pressure ulcers, became so severe as to require radical debridement.

178.    Defendants Wexford Health, Dr. Wilson, and Kelly Phillips' failure to provide preventive care and their failure to provide adequate, appropriate, and timely medical care to Mr. Prim to address the pressure ulcers was more than negligent, reckless, or wanton; it was deliberately indifferent and amounted to

violating Mr. Prim's constitutional rights guaranteed by the Eighth Amendment to the United States Constitution.

179.     Defendants' deliberately indifferent, negligent, reckless, and wanton failure to provide necessary preventive measures, including, but not limited to, repositioning Mr. Prim every 2 hours, providing protective heel caps, treating the pressure ulcers with proper medication, and providing proper bedding, directly resulted in Mr. Prim's untimely death.

180.     Mr. Prim's need for preventive measures and protections to prevent and treat pressure ulcers was so medically dire that when left unattended it posed a substantial risk of serious medical harm to Mr. Prim.

181.     Mr. Prim's need for prevention and medical treatment was so obvious that even a lay person could easily recognize the necessity for medical attention, including treatment and proper preventive measures.

182.     Defendants Wexford Health and Dr. Wilson were aware of the risk of serious harm to Mr. Prim caused by the existence and exacerbation of the pressure ulcers.

183.     Defendants Wexford Health and Dr. Wilson disregarded the risk of serious harm to Mr. Prim by failing to supervise, review, and monitor the St. Clair-Wexford Health staff's daily treatment records.   If Defendant Dr. Wilson had reviewed the daily reports, he would have noted the lack of

preventive measures, the Wexford – St. Clair staffs' all but complete failure to reposition Mr. Prim every two hours, and the failure to regularly and consistently treat Mr. Prim's decubitis wounds.

184.    Defendants Wexford Health and Dr. Wilson's conduct and failure to protect and provide adequate medical care to Mr. Prim was more than merely negligent, it was deliberately indifferent.

185.    Mr. Prim's Death Certificate specifically lists Chronic Stage 4 Ulcers as a contributing cause of Mr. Prim's death.  The stage 4 ulcers on Mr. Prim's body were caused by Defendants' wrongful conduct.

### 7.  January 2019

#### i.  Dr. Wilson placed a Hold on Dialysis.
January 21, 2019 – Brookwood Medical Center (Anemia)
Sacral Pressure Ulcer – Severe

186.    On January 2, 2019, the wound located on Mr. Prim's coccyx was cultured and taken to the lab.

187.    Mr. Prim's lab results were received on January 19, 2019.  Mr. Prim's labs were deemed critical and Defendant Dr. Wilson instructed the Wexford Health staff to "hold" Mr. Prim's next scheduled dialysis which would have been January 21, 2019.

188.    On or about January 21, 2019, Mr. Prim was admitted to Brookwood due to anemia.  He was returned to St. Clair the same day.

189.     On January 20 and 23, 2019 Mr. Prim did not receive any wound care for his sacral decubitis.   On January 24, 2019, a foul smell was noted associated with the sacral wound.

### ii.     January 25, 2019 – February 10, 2019

190.     The Wexford Health Progress Note states that on January 25, 2019:

> Called to cell per Runner and Officer Kelly to come check on Inmate.  Upon entry [to] cell Inmate found yelling out, crying with facial (illegible) when asked whats (sic) wrong Inmate states I am still hurting nothing is helping me.   Inmate complained of upper and lower (illegible) back pain unrelieved with pain med (illegible) that has progressively worsened in last couple of days.  Dr. Wilson was aware of Inmates condition and (illegible).  Dr. Wilson called and notified of Inmates condition now and Inmates complaints of worsening pain.  Orders given to transfer to Brookwood ER via ambulance.  Sgt. Santa Maria notified of need for transport officers….

191.     The Wexford Health record reflects that Mr. Prim had been suffering from back pain for a period before his condition was noted by a prison runner, i.e., not a Wexford staff member.   Defendants Wexford Health and Dr. Wilson's delay in diagnosing and/or treating Mr. Prim's upper and lower back pain violated Mr. Prim's constitutional rights guaranteed by the Eighth Amendment to the United States Constitution.

192.     Defendants Wexford Health and Dr. Wilson were deliberately indifferent to Mr. Prim's back pain.

193.     Mr. Prim's report of excruciating upper and lower back pain that was unrelieved by pain medications was an objectively serious medical issue that if left unattended posed a substantial risk of serious harm.

194.     Defendants Wexford and Dr Wilson's response to Mr. Prim's upper and lower back pain was so poor that it constituted an unnecessary and wanton infliction of pain.

195.     The Wexford medical records reflect that Mr. Prim's back pain condition was so obvious that even a lay person (prison inmate runner) could easily recognize the necessity for a doctor's attention.

196.     Defendants Wexford Health and Dr. Wilson were aware of the risk of serious harm to Mr. Prim caused by the delay in identifying and treating the cause of Mr. Prim's complaints of excruciating pain in his upper and lower back.

197.     Further, Defendants Wexford Health and Dr. Wilson were aware of the risk of serious medical harm to Mr. Prim from the delays in diagnosis and treatment,  who within the seven (7) months next proceeding his complaints of excruciating back pain, suffered from a vicious assault resulting in paraplegia, a traumatic skull fracture, a subdural hematoma, a craniectomy surgical procedure,  a meningocele caused by a fall from his improperly equipped infirmary bed, and a cranioplasty surgical procedure,.

198.     Defendants Wexford Health and Dr. Wilson disregarded the risk of serious harm to Mr. Prim by failing to supervise, review, diagnose and treat Mr. Prim's reports of excruciating back pain.

199.     Mr. Prim's death certificate reflects that one of the underlying causes of Mr. Prim's death was C2-T9 (i.e., spinal) Fluid collection.

200.     Defendants Wexford Health and Dr. Wilson's conduct and failure to provide adequate medical care to Mr. Prim was more than merely negligent, it was deliberately indifferent and demonstrated a complete medical failure.

201.     On January 25, 2019 Mr. Prim was transported and admitted to Brookwood for the last time.  He remained at Brookwood until the date of his death – February 10, 2019.  Mr. Prim died after being in the care of the ADOC and Wexford Health for a period of eight months.  His untimely death was the result of a series of connected, cumulative, and exacerbating occurrences and related failures to provide and deliver adequate health care. The sequence of events that culminated in Mr. Prim's death demonstrate a wonton disregard for and denial of Mr. Prim's basic constitutional rights.

202.     Mr. Prim's death certificate reflects that the underlying causes of Mr. Prim's death were: Hypoxic Hypercapnic Respiratory Failure, C2-T9 Fluid collection, End Stage Renal Disease requiring dialysis and Diabetes Mellitus

Type 2.  The contributing conditions were Paraplegia secondary to traumatic brain injury and Chronic Stage 4 Ulcers.

203.     Defendants' inadequate and blatant disregard for Mr. Prim's health and medical conditions, and Defendants' negligent and wanton disregard for proper medical care led to Mr. Prim's death.

## II.   THE ASSAULT ON MR. PRIM WAS A MANISFESTATION OF DEFENDANTS' POLICIES AND CUSTOMS

204.     The Eighth Amendment of the United States Constitution requires that prisoners be furnished with basic human needs, housed in safe conditions, and not be subjected to violence.  Despite these constitutional protections, Alabama's prisoners are subject to the nation's highest prison homicide rate and violence while incarcerated in ADOC prisons.

205.     As demonstrated by the 2019 U.S. Department of Justice investigative findings, detailed patterns of violence and deliberate indifference by Defendants during the time that Mr. Prim was violently assaulted at Fountain, Defendant Administrative Supervisors had personal knowledge of the Eighth Amendment violations occurring in Alabama's prisons but did not take meaningful or adequate corrective measures.  But for Defendant Administrative Supervisors' failures, Mr. Prim, a minimum custody prisoner would not have been placed in a notoriously violent and inadequately

supervised Hot Bay dorm and he would not have been assaulted so severely that he was rendered a paraplegic.

## A. Alabama Prisons are Chronically Overcrowded and Egregiously understaffed.

### 1. Prison Overcrowding and Understaffing created an unsafe and dangerous environment for Mr. Prim.

206.    ADOC prisons including Fountain and later St. Clair, where Mr. Prim was housed, have been systemically understaffed for years creating an unsafe and extremely dangerous environment for the prisoners in ADOC custody and specifically, to Mr. Prim.

207.    The dangerous patterns and practices in Alabama's prisons that led to Mr. Prim's assault and his related death were known to Defendants.  On October 6, 2016, the United States Department of Justice put ADOC and Defendant Administrative Supervisors on notice that it had opened an investigation, pursuant to the Civil Rights Act of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, into whether the conditions of violence in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution.

208.    Defendant Administrative Supervisors responded to the 2016 United States Department of Justice investigation with unqualified and deliberate indifference to the serious and systemic Eighth Amendment violations present

at Fountain and St. Clair.   The systemic constitutional violations (overcrowding and understaffing) directly created the violent and dangerous conditions that led to the vicious assault on Mr. Prim which caused serious, life threatening injuries which, in concert with the lack of adequate medical treatment, culminated in Mr. Prim's death.

209.     Defendant Dunn stated in his 2018 Annual Report for the Fiscal Year addressed to Governor Ivey, "In 2018, ADOC implemented an aggressive plan to optimize the chronic understaffing of correction officers through a comprehensive recruiting and marketing initiative…The plan comes at a critical time as ADOC prepares to move forward to address significant challenges caused by long-term issues in an overpopulated prison system that has been under-resourced for decades."

http://www.doc.state.al.us/docs/AnnualRpts/2018AnnualReport.pdf

210.     A spokesperson for the ADOC observed: "There is a direct correlation between the level of prison violence and the shortage of correctional staff in an overpopulated prison system with limited resources for rehabilitating offenders."  Jennifer Horton, ADOC:  Staffing shortages, contraband fueling prison violence, WSFA News (Dec. 18, 2018). https://www.wsfa.com/2018/12/19adoc-staffing-shortages-contraband-fueling-prison-violence/

211.     In the April 2, 2019 Notice Letter, the U.S. Department of Justice detailed the findings of its CRIPA investigation, finding, among other issues, that overcrowding of Alabama's Prisons contributes to the serious harm to prisoners, which is a violation of the Eighth Amendment: "Alabama has one of the most overcrowded prison systems in the nation."

212.     At the time the U.S. Department of Justice published its findings, the ADOC housed "approximately 16,327 prisoners in its major correctional facilities, but the system was designed to hold 9,822."

213.     The U.S. Department of Justice found "the deficit in the number of security staffing working any given shift can be worse than 20% below required level." U.S. Dep't of Justice, Investigation of Alabama State Prisons for Men (April 2, 2019), https://www.justice.gov/opa/press-release/file.

214.     In addition to understaffing, correction officers are also required to work "voluntary mandatory overtime" believed to be authorized by Defendant Administrative Supervisors.  These overtime hours cause staff to be exhausted and overworked.  The U.S. Department of Justice found, "staffing prisons with exhausted staff makes for ineffective and, in this system, potentially life-threatening outcomes." U. S. Dep't of Justice, Investigation of Alabama State Prisons for Men (April 2, 2019), https://www.justice.gov/opa/press-release/file.

215.     When inmates, such as Mr. Prim, are injured in violent incidents, officer responses are drastically delayed and inadequate, especially in relation to the severity of inmate injuries.  Further, officers often make little or no effort to investigate or protect injured inmates from future attacks.  Defendants Administrative Supervisors and Fountain Facility Supervisors denied and delayed Mr. Prim medical care after the June 20, 2018 brutal assault.  It is unknown how long Mr. Prim remained unconscious on the Hot Bay floor before his body was discovered.  Further, it is unknown if/what efforts were made to provide medical treatment to Mr. Prim immediately following the assault.

216.     ADOC mismanagement by Defendant Administrative Supervisors, understaffing, poor leadership, overcrowding, inadequate security, and unsafe conditions have led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture in the prisons where violence is not adequately controlled or prevented by those in positions of authority who are entrusted with ensuring prisoner safety.

217.     Defendant Administrative Supervisors were aware of the overcrowding and understaffing issues specifically within Fountain and St. Clair and knew about the excessive amount of violence within the ADOC prisons generally that resulted from overcrowding and understaffing.

218.   Because of the relationship between the Defendants and Mr. Prim, as well as the foreseeability of the harm that ultimately befell Mr. Prim, Defendants are liable for the criminal acts of the third-party assailant or assailants.

219.   At all relevant times, insufficient correctional staffing compromised available correctional officers' abilities to respond to incidents, crises, and emergencies.

220.   The systemic failures and lack of oversight perpetuated by the Administrative Supervisor Defendants and the Fountain Facility Supervisor Defendants paired with their failures to perform their most rudimentary job duties, directly led to the life-threatening injuries that Mr. Prim suffered while in the custody of ADOC.

221.   Instead of taking actions that could have prevented Mr. Prim's violent assault at Fountain, Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors did nothing.

222.   Defendant Administrative Supervisors and Fountain Supervisors had knowledge of the substantial risk of serious harm facing prisoners like Mr. Prim at Fountain – particularly in the Hot Bay dorm – based on their personal observations, the DOJ investigation, the DOJ report, ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical

records, annual and monthly ADOC data reports, prisoner progress reports and/or prisoner lawsuits.

223.     Defendant Administrative Supervisors and Fountain Supervisors knew of the excessive risk of inmate-on-inmate violence at Fountain, especially for Mr. Prim who was a particularly vulnerable inmate with minimum custody who was recklessly housed in the Hot Bay dormitory. Defendants' deliberate indifference to the risk of serious harm indeed placed Mr. Prim in substantial danger of serious harm.

224.     Despite this knowledge, Defendants took no actions – either at a policy level or at the prison on the day of Mr. Prim's assault – to minimize the severe staffing shortages and lack of officer supervision in the Hot Bay dorm, nor to alleviate the extreme overcrowding, and culture of violence that allowed the violent and vicious assault on Mr. Prim.

225.     While at Fountain, Mr. Prim was incarcerated under conditions that posed a substantial risk of serious harm and which in fact resulted in serious physical harm to Mr. Prim.  The Defendants' deliberate indifference to the specific risk of harm to Mr. Prim combined with ADOC's systemic overcrowding and understaffing resulted in the violent assault on Mr. Prim.

226.     Defendants Administrative Supervisors and Defendant Fountain Facility Supervisors disregarded the known risk of harm to Mr. Prim by failing

to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff Fountain with prudent and well-trained correctional officers; failing to address serious inmate overcrowding, failing to address known security deficiencies, such as lack of intercoms, security cameras, and mirrors; failing to properly monitor and supervise the Hot Bay; failing to discontinue the use of Hot Bays in disregard of recommendations that the use of Hot Bays should be terminated; and failing to safely and adequately provide proper medical equipment and supplies to the State's third party medical provider.

## 2. Defendants' Knowledge that Alabama Prisons are Chronically Overcrowded and Egregiously Understaffed

227.    Per the U.S. Department of Justice April 2, 2019 Notice letter and its findings, Defendants Administrative Supervisors and other named Defendants, St. Clair Facility Supervisors and Fountain Facility Supervisors were aware of the overcrowding and understaffing issues within ADOC, and specifically at Fountain and St. Clair.  They also had specific knowledge of the violence that occurs within Fountain and St. Clair because of the overcrowding and understaffing.

228.    In its April 2, 2019 Notice Letter, the Department of Justice found that correctional officer staffing levels across ADOC were "at crisis level."  Further:

a. Based on information available during the CRIPA investigation, as of June 2018, around the time Mr. Prim was viciously assaulted, Alabama's prisons were employing only 1072 of the 3,326, i.e., less than 1/3 of the total number of officers ADOC was authorized to hire.

b. Of the 13 facilities investigated by the Justice Department, only three had correctional officer staffing levels over 40% of the authorized total officers.

229. The Department of Justice concluded that, between 2016 and 2018, (which includes the time period Mr. Prim was housed and fatally assaulted in the Hot Bay at Fountain), violence and crime were so pervasive and extreme, and mismanagement was so egregious at Alabama prisons, that there was "reasonable cause to believe that conditions at Alabama's prisons violate the Eighth Amendment of the Constitution and that these violations are pursuant to a pattern and practice of resistance to the full enjoyment of rights protected by the Eighth Amendment."

230. In particular, the Department of Justice found that "Alabama routinely violates the constitutional rights of prisoners housed in the Alabama prisons by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions."

231.    Further, the DOJ found:

> The Eighth Amendment violations are severe, systemic and
> exacerbated by serious deficiencies in staffing and supervision,
> overcrowding, ineffective housing and classification protocols;
> inadequate incident reporting; inability to control the flow of
> contraband into and within the prisons, including illegal drugs
> and weapons; ineffective prison management and training;
> insufficient maintenance and cleaning of facilities, the use of
> segregation and solitary confinement to both punish and protect
> victims of violence and/or sexual abuse; and a high level of
> violence that is too common, cruel, and of an unusual nature and
> pervasive."

232.    The 2019 DOJ Report concluded that "ADOC fails to protect prisoners

from serious harm and a substantial risk of serious harm."

233.    After extensive investigation into the State of Alabama prison system,

on December 9, 2020, the United States Department of Justice filed a

Complaint against the State of Alabama and the Alabama Department of

Corrections, alleging, among other allegations "Alabama's prisons for men

are now more overcrowded than in 2016, when the United States initiated its

investigation, prisoner-on-prisoner homicides have increased, prisoner-on-

prisoner violence including sexual abuse remains unabated, the physical

facilities remain inadequate, use of excessive force by security staff is

common and staffing rates remain critically and dangerously low."

234.    In *Braggs v. Dunn*, 257 F.Supp.3[rd] 1171 at 1198, Judge Myron

Thompson of The United States District Court for the Middle District of

Alabama noted that, "Understaffing has been a persistent, systemic problem that leaves many ADOC facilities incredibly dangerous and out of control."

235.     Judge Thompson also found that "[t]he combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." *Id.* at 1200.

236.     Although Defendant Administrative Supervisors were aware of the violent conditions throughout ADOC confinement facilities, including Fountain, and the well documented connection between violence and ADOC'S chronic problems with overcrowding and understaffing, the Defendants failed to take meaningful steps prior to Mr. Prim's assault to significantly alter the systemic staffing disparities that created an environment rife with widespread violence.

237.     In ADOC's January 2020 budget presentation to the Alabama Legislature, it was noted "there is a direct correlation between overcrowding and understaffing." *Prison Officials Request $42 Million Increase to Hire Staff, Improve Healthcare, WBHM.org, University of Alabama, January 21, 2020,* https://wbhm.org/feature/2020/prisons-officials-request-42-million-increase-to-hire-staff-improve-healthcare/

238.     In that same article, Defendant Dunn is reported to have informed the Legislature that ADOC was under pressure to reform it prisons which were among the most violent in the country.  He specifically stated that the prisons were significantly overcrowded and understaffed and that the rate of violence in ADOC prisons was unacceptably high.

239.     Despite their knowledge, Defendant Administrative Supervisors failed to address overcrowding and understaffing issues.

### 3. The Epidemic of Violence at Fountain Correctional Facility

240.     Long before the vicious assault of Jamie Prim, the Defendants were aware that prison violence was an endemic problem at Fountain.

241.     The Alabama Department of Corrections and Defendant Administrative Supervisors failed or refused to correct the unconstitutional conditions in Alabama's prisons for men, including but not limited to Fountain and St. Clair.

242.     Defendant Administrative Supervisors, Defendant St. Clair Facility Supervisors, and Defendant Fountain Facility Supervisors are responsible for the safety, care, custody, and control of individuals incarcerated at St. Clair and at Fountain.

243.     Defendant Administrative Supervisors, Defendant St. Clair Facility Supervisors, and Defendant Fountain Facility Supervisors were deliberately

indifferent to the serious and systemic constitutional violations present at Fountain and St. Clair.

244.    The prison conditions at Fountain, specifically the normalized culture of violence, chronic under-staffing, and lack of inmate supervision, and use of dormitory incarceration units, specifically the Hot Bay, posed a substantial risk of serious harm to Mr. Prim.

245.    Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors knew of this substantial risk.  The substantial risk of serious harm at Fountain has been well-documented in the press, in legal actions, including prior lawsuits filed against multiple ADOC Defendants, has been clearly acknowledged by the United States Department of Justice and is readily apparent to any individual present on the grounds of Fountain.  Moreover, Defendants and/or their subordinates have explicitly acknowledged the substantial risk of harm at Fountain both in the press and in testimony.

246.    Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors consciously disregarded this substantial risk by failing to respond in an objectively reasonable manner to reduce the risk of harm at Fountain, including but not limited to, failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff the Fountain prison with prudent and well-trained correctional

officers; failing to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; the use of dormitory incarceration units, specifically, the "Hot Bay," and exacerbating the risk and condoning the conduct and conditions creating this substantial risk of serious harm.

247.     Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors knew that, by their failure to act, Fountain's dangerous conditions would be insufficient to provide Mr. Prim with reasonable protection from violence.

248.     In engaging in this unlawful conduct, Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors were not acting within their discretionary authority, and their conduct violated clearly established rights, including Mr. Prim's constitutional right to be protected from physical assault by other inmates.

249.     Defendants showed deliberate indifference through their reckless or intentional failures to take any actions to safeguard Mr. Prim's rights, safety, and well-being. Defendants' conduct was objectively unreasonable.

250.     Defendants' conduct in violation of Mr. Prim's Eighth Amendment right to be free from a known and unreasonable risk of harm led to and caused

Mr. Prim's death.  Each Defendant was able to avert Mr. Prim's death and, due to their deliberate indifference, failed to do so.

251.    Below are examples of assaults and violence at Fountain in the two years preceding Mr. Prim's violent assault:

a. In March 2018, several correctional officers were performing a contraband search.  They informed a prisoner that they were going to pat search him, and he refused.  When they tried to place the prisoner in handcuffs, he punched a lieutenant in the face and then kicked him in the chest.  Other officers were able to subdue and handcuff the prisoner.  He was searched and found to have on his person a five-inch box cutter with a razor blade attached.

b. In February 2018, a Fountain prisoner was stabbed 10 times by another prisoner, including stab wounds to his medial lower elbow through the fascia, left upper shoulder, left bicep, left inner upper arm, left palm, left upper thigh, left upper medial calf, lower medial calf, and behind his right knee.  He was airlifted to an outside hospital.  A search recovered a homemade weapon that was approximately nine inches long.

c.  In September 2017, a prisoner set fire to another prisoner's bed blanket while that prisoner was sleeping, leading to a fight between the two men.

d.  In May 2017, "several" prisoners reported to a captain that two other prisoners were held and assaulted in a dormitory unit at Fountain over the weekend by a group of four or five prisoners.

e.  In March 2017, a prisoner at Fountain reported to a nurse that he had been physically assaulted and raped then night before.

f.  In February 2017, a prisoner at Fountain was gang raped inside his dormitory during the evening meal.  Two prisoners held him down while a third "penetrated his anus," then they "forced him to perform oral sex."

g.  In November 2016, a prisoner at Fountain reported to a Mental Health Site Administrator that another prisoner had extorted him to engage in anal and oral sex over a period of two months.

h.  In October 2016, while housed at Fountain, a correctional officer witnessed a prisoner being repeatedly stabbed.

252.  Defendant Administrative Supervisors and Defendant Fountain Facility Supervisors violated Mr. Prim's Eight and Fourteenth Amendment rights by failing to prevent prisoner-on-prisoner violence and by failing to provide him

with safe conditions of confinement in violation of the United States Constitution.

### 4. Overcrowding and Understaffing Issues in ADOC Prisons caused a Lack of Adequate Medical Care and specifically Created an Unsafe Environment for Mr. Prim.

253.    Defendant Administrative Supervisors were aware of the overcrowding and understaffing issues within Fountain and St. Clair.   Further these defendants were aware that the lack of adequate medical care within the ADOC prisons generally was a direct result of the prison overcrowding and understaffing.

254.    Due to the overcrowding and understaffed prisons, the ADOC Administrative Supervisors, Defendant Fountain Facility Supervisors, Defendant St. Clair Facility Supervisors, Defendant Wexford Health, Defendant Dr. Wilson, and Defendant Dr. Pouparinas could not and did not provide adequate medical care to inmates housed within its facilities.

255.    At the time of Mr. Prim's assault and subsequent inadequate medical care which culminated in his death, the treacherous conditions were well known to Defendants.  The ADOC's culture of extreme and commonplace violence, mismanagement, inadequate health care, overcrowding and understaffing have been well documented in court documents, case filings, the media, and reports by non-profit organizations, and triggered an investigation by the

United States Department of Justice in 2016 and a DOJ Civil Complaint filed against the State of Alabama December 2020.

256.    While at St. Clair, Mr. Prim was incarcerated under conditions (overcrowding and understaffing) that posed a substantial risk of serious harm and which in fact resulted in serious physical harm to Mr. Prim.   The Defendants' deliberate indifference to the risk of harm to Mr. Prim combined with the ADOC's systemic overcrowding and understaffing resulted in Mr. Prim's rapid physical deterioration and multiple admissions to Brookwood Medical Center.

257.    ADOC has admitted that its prisons are dangerously understaffed.   In *Braggs v. Dunn*, a class action filed in the Middle District of Alabama, Case Number 2:14-cv-601, the plaintiffs sued the ADOC in 2014, several years before Mr. Prim's death, for failing to provide adequate medical and mental health care, and for discriminating against prisoners with disabilities.   The court ordered ADOC to determine how many correctional officers were needed to adequately staff its prisons.   In February 2019, the same month of Mr. Prim's death, ADOC filed a report indicating that it needed to hire over 2,200 correctional officers and 130 supervisors over a period of four years to adequately staff its men's prisons.

258.     ADOC monthly Statistical Reports clearly reflect systemic prison population overcrowding.  According to ADOC's June 2018 Statistical Report, during the time Mr. Prim was housed and assaulted at Fountain, Fountain was designed to accommodate 831 prisoners, but its actual population was 1253 prisoners, which was 150% of its accommodation capacity.

259.     Another report (the "Warren Averett Report") submitted to the *Braggs* court on April 16, 2019 (document 2492-1, page 11), found that as of December 2017 (approximately six months before Mr. Prim's assault at Fountain):

    a.  <u>Fountain</u>:  The recommended number of correctional officers was 193 however, Fountain only employed 55 correctional officers (28.5% of the number of recommended of correctional officers).  Further, the ratio of prisoners to correctional officers at Fountain was 19.3 to 1; and

    b.  <u>St. Clair</u>:  The recommended number of correctional officers was 299 however, St. Clair only employed 91 correctional officers (30.4% of the number of recommended correctional officers).  Further, the ratio of prisoners to correctional officers at St. Clair was 11.2 to 1.

260.     Upon information and belief, the extreme understaffing combined with the extreme overcrowding at Fountain and St. Clair led to delays in medical care, failure to diagnose and treat medical conditions, failure to follow up with patients, errors, and decisions not to treat seriously ill prisoners.

261.    At all relevant times, the combination of overcrowding and understaffing taxed Defendants Wexford Health and ADOC's ability to provide adequate medical health care to Mr. Prim.

262.    At all relevant times, insufficient correctional staffing led to impaired medical care and treatment for critically ill individuals and specifically, Mr. Prim.

263.    Upon information and belief, up to and including the time Mr. Prim was an inmate at St. Clair, St. Clair Correctional Officers and/or Facility Supervisors exerted inappropriate and improper influence over Wexford Health - St. Clair staff, including but not limited to inappropriate relations and various means of communications.  Such inappropriate actions were and are known to ADOC Administration.  Further, upon information and belief, such inappropriate conduct occurred at/on the St. Clair premises during the hours when the inmates, and specifically, Mr. Prim, needed medical care and attention, thereby interfering with the effective delivery of medical care.

264.    Upon information and believe, the highly inappropriate conduct and sexualized atmosphere in the St. Clair Infirmary was a factor that created an environment which led to a systemic failure to provide adequate medical care.

265.    In April 2019, approximately two months after Mr. Prim died while in the custody of ADOC, Defendant Jefferson Dunn, the Commissioner of

ADOC agreed that overcrowding, as addressed in the 2016 Notice Regarding Investigation of Alabama's State Prisons for Men by the Justice Department, "is a major issue when it comes to providing medical care" https://www.apr.org/post/prison-reform-health-care-alabamas-prisons. Dunn further stated,

> The medical facilities, the clinics were designed for a system to hold about 13,800 inmates, and right now we've got 24,000 inmates in that system. So, the physical facilities to provide medical care are not adequate. So that creates challenges.

Even while acknowledging the prison overcrowding, Defendant Dunn stated that he thought the medical care provided to the prisoners was "adequate."

266.    Furthermore, at the time of Mr. Prim's untimely death, due to the overcrowding and understaffed prisons, ADOC and Defendant Wexford Health could not and did not provide adequate medical care to inmates housed within its facilities.

267.    On information and belief, despite the knowledge of serious and widespread deficiencies, Defendant Administrative Supervisors failed to remedy known problems and exercised minimal oversight of its medical contractor, Defendant Wexford Health.

## III    LACK OF SUPERVISION AND MONITORING OF HOT BAY DORM

268.    Defendants Administrative Supervisors and Fountain Facility Supervisors failed to promulgate, implement and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units and specifically the Hot Bay at Fountain, and to maintain the safety of prisoners therein.

269.    Defendants Administrative Supervisors and Fountain Facility Supervisors were aware that Fountain was both dangerously overcrowded and woefully understaffed at the time Mr. Prim was housed in the Hot Bay and assaulted, putting inmates such as Mr. Prim at a substantial risk of harm.

270.    Defendants Administrative Supervisors and Fountain Facility Supervisors, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed in Fountain's Hot Bay.

271.    In June of 2018, the month Mr. Prim was assaulted, according to the ADOC monthly Statistical Report, Fountain reported an inmate population of 1253, an occupancy rate of more than 150% capacity.   The Warren Averett Report found that as of December 2017, six months before Mr. Prim's assault, that the recommended number of corrections officers at Fountain was 193, however at that time, Fountain only employed 55 correctional officers (i.e., 28% of the number of recommended officers).   The ratio of prisoners to correctional officers at Fountain was 19.3 to 1.

272.     On information and belief, at the time of Mr. Prim's assault, there were no corrections officers supervising or monitoring the Hot Bay dorm.

273.     On information and belief, Defendants Administrative Supervisors and Fountain Facility Supervisors intentionally concentrated inmates with disciplinary problems in its Hot Bay but did not staff the Hot Bay with additional correctional officers, implement any additional safety procedures, or even follow the existing security procedures.

274.     Despite the known risks to the safety of inmates, especially to Jamie Prim who was a non-violent, minimum custody prisoner, no correctional officer or ADOC employee was present in the Hot Bay to monitor and maintain a safe environment for Mr. Prim at the time he was assaulted. Despite knowing that a large portion of the prisoners housed in the "Hot Bay" at Fountain had disciplinary problems and histories of violence while in ADOC custody, Defendants Administrative Supervisors and Fountain Facility Supervisors failed to provide adequate security and oversight of the Hot Bay.

275.     Defendants Administrative Supervisors and Fountain Facility Supervisors were well aware of the acute staffing shortages at Fountain.

276.     Defendants Administrative Supervisors and Fountain Facility Supervisors were also aware that the resulting inadequate supervision of

prisoners in the Hot Bay created a dangerous environment that allowed homicides, assaults and prison violence, such as the assault of Jamie Prim.

277.     Upon information and belief, inmates were able to carry out lengthy attacks on other inmates without being discovered by guards, whether because of inadequate staffing or insufficient supervision.  As with Mr. Prim, victims of inmate-on-inmate violence were not discovered until substantial time had passed following the attack.

278.     Defendants Administrative Supervisors and Fountain Facility Supervisors further had actual and constructive notice of at least three security deficiencies that, when combined with understaffing and overcrowding, created a substantial risk of harm to inmates: (1) "blind spots" in the Hot Bay due to limited sight lines; (2) the lack of surveillance cameras; (3) the lack of emergency call buttons in the Hot Bay to summon assistance from the correctional staff.

279.     Defendants Administrative Supervisors and Fountain Facility Supervisors knew or had constructive knowledge that the existing policies and practices were deficient and created a substantial risk of harm to inmates, yet they failed to take any reasonable, meaningful corrective action to adequately staff Fountain and/or provide for the safety of Mr. Prim and prevent the extreme violence at the hands of other prisoners at Fountain.

280.     The deliberate indifference of Defendants Administrative Supervisors and Fountain Facility Supervisors to Mr. Prim's constitutional rights exposed him to a continuing and substantial risk of serious harm to his health and safety.

281.     As a result of Defendants' creation of a Hot Bay and Mr. Prim's assignment there, particularly in the absence of additional security measures, Defendants placed Mr. Prim at an unreasonably high risk of violence which directly led to the attack on Mr. Prim.

## IV     DEFENDANT WEXFORD HEALTH SOURCES, INC.

282.     While the June 20, 2018 assault brought about serious injuries, Mr. Prim could have survived the serious assault but for Defendant Wexford Health's failure to provide Mr. Prim with constitutionally adequate medical care in the months that followed.

283.     The lack of constitutionally adequate medical care that followed the June 20, 2018 assault on Mr. Prim directly caused his death.

284.     The ADOC Office of Health Services is responsible for the management, implementation, and oversight of the medical treatment provided to the inmates in the custody of the ADOC.  Defendant Ruth Naglich is the ADOC Associate Commissioner of Health Services and, in that role, is the Commissioner in charge of the Office of Health Services (OHS).

285.     The OHS provides administrative oversight of the contracted health care professionals through a contract with Wexford Health which was entered into in April 2018.

286.     As part of its "Quality Assurance Program," OHS performs medical health care contract audits to ensure that ADOC inmates have access to medical services and that the inmates are housed in institutions that can provide for each inmate's specific health care needs.

287.     Wexford Health is contracted to perform "a comprehensive variety of on and off-site primary, secondary, and tertiary health care functions," including medical, dental, pharmaceutical, and diagnostic functions.  Wexford Health also provides administrative staffing and management services.

288.     The brutal assault on Mr. Prim and his subsequent death were perpetuated by pervasive and systemic deficiencies in the ADOC and its third-party contractor Wexford Health.  Those deficiencies include prison population overcrowding, correctional officer understaffing, and medical care understaffing.  The combination of those deficiencies along with the lack of staffing qualified medical professionals resulted in the provision of inadequate and negligent health care to Mr. Prim.

289.     Upon information and belief, Mr. Prim was informed by the Brookwood physician and physical therapy staff that with appropriate

physical therapy his paralysis would likely not be permanent and that a full recovery was possible.  While receiving medical treatment at Brookwood Mr. Prim received several sessions of physical therapy.  Likewise, he received physical therapy while he was at MIMC.  When Mr. Prim was transferred to St. Clair, all physical therapy was terminated.  Upon information and belief a doctor at St. Clair told Mr. Prim that the "new" company [Wexford] would not pay for physical therapy treatment.   Upon information and belief, Brookwood sent physical therapists to St. Clair to work with Mr. Prim two weeks after he was brought to St. Clair.  The physical therapists were not allowed to work with Mr. Prim and the prison turned them away at the fence.

290.     While at St. Clair, Mr. Prim received no treatment for his paralysis, and spent almost all of his time, confined to a non-reclining bed in a four-bed infirmary cell.

291.     Given the well-documented understaffing and overcrowding in the Alabama Department of Corrections in the media and in court documents, the risk of death related to the provision of negligent and inadequate medical care to an ADOC inmate was foreseeable.

292.     Defendants Wexford Health, St. Clair Facility Supervisors, Fountain Facility Supervisors,  Wexford - St. Clair Defendants, and  Wexford - Fountain Defendants, disregarded the known risk of harm to Mr. Prim by

91

failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff Fountain and St. Clair Prison with a sufficient number of prudent and well-trained medical personnel; refusing to permit Mr. Prim to receive physical therapy; relying on inmates to assist with basic care for inmates in the infirmary; engaging in inappropriate relations with ADOC-Wexford employees; allowing ADOC employees to control medical supplies to be utilized by Wexford Health.

293.     As a result of the June 20, 2018 brutal beating, Mr. Prim suffered extensive, critical, and life-threatening injuries. Defendants' multiple and concerted acts of omissions, including the failure to provide adequate and reasonable protection from physical harm and the failure to provide medical care to Mr. Prim for those injuries, were the direct and proximate causes of Mr. Prim's death.

## V   PLAINTIFF'S DAMAGES

294.     As a direct and proximate result of the Defendants' wrongful actions, Jamie Lawrence Prim was brutally beaten, resulting in severe and critical injuries, including but not limited to, acute kidney injury, a skull fracture, and a subdural hematoma which rendered him a paraplegic.  He suffered severe physical injuries, excruciating pain, emotional trauma, and death.   The

medical care he received for those injuries and the injuries that resulted from the inadequate medical care resulted in his death.  Jamie Lawrence Prim had his future and his life taken from him.

295.      Plaintiff J. Thomas Pilcher in his capacity as Administrator of the Estate of Jamie Lawrence Prim, brings this action to redress the deprivation of Mr. Prim's civil rights, lack of medical care, lack of medical attention, negligent and/or wanton disregard for Mr. Prim's suffering, which ultimately resulted in Mr. Prim's untimely death.

## VI      EXHAUSTION OF ADMINISTRATIVE REMEDIES

296.      There are no administrative remedies within Alabama Department of Corrections for Plaintiff to exhaust.

## CLAIMS

## COUNT I

### Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983

### Failure to Protect
### (Against Defendant Jefferson Dunn)

297.      Plaintiff incorporates the allegations contained in paragraphs 2-23, 34 - 38, 53-54, 104-105, 107-250,  and 252-294  by reference as if set forth fully herein to support this Count I.

298.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

299.     As the highest-ranking official in ADOC, Defendant Commissioner Jefferson Dunn was/is responsible for exercising the independent direction, supervision and control of ADOC and for approving and issuing administrative regulations and changes.  Defendant Dunn's responsibilities include:  providing constitutionally sound conditions of confinement in all prison facilities, the appointment of personnel and employees within ADOC to administer the operations of the prison facilities in such a manner as to respect the constitutional and human rights of persons within the custody of ADOC.

300.     Defendant Dunn, as Commissioner of the ADOC, was aware of the substantial risk of harm to Mr. Prim based on his receipt and constructive knowledge of the contents of the monthly reports released by ADOC reflecting the crippling level of inmate-on-inmate violence within ADOC.

301.     Defendant Dunn received the October 2016 Notice of Investigation and actively engaged in the document production litigation that ensued. Furthermore, Defendant Dunn was also on notice of the substantial risk to Prim based on litigation in which he was involved in the *Duke v. Dunn* and

*Braggs v. Dunn* class action cases.  Furthermore, Defendant Dunn has made numerous statements regarding violence throughout ADOC and the drastic need for systemic change.

302.    Defendant Commissioner Dunn has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

303.    The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain and St. Clair, under the direction of Defendant Dunn led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC.  The systemic inefficiencies of overcrowding and understaffing were known to Defendant Dunn and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and specifically, to Jamie Prim.

304.    Defendant Dunn acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff Fountain and St. Clair Prisons with a sufficient number of prudent and well-trained medical personnel;  housing Mr. Prim in the Hot Bay dorm at Fountain when he was classified as minimum security; permitting and approving the use of Hot Bay

dormitories for mass incarceration; failing to provide resources to prisoners housed on Hot Bay dormitories; failure to monitor and supervise the Hot Bay; and failing to take corrective action to address the extreme overcrowding at the Fountain and St. Clair facilities.

305.    Defendant Dunn had actual, personal knowledge of ADOC's history of widespread violence, the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain and St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

306.    Defendant Dunn, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

307.    Defendant Dunn consciously disregarded the substantial risk of serious harm to Mr. Prim and violated Mr. Prim's constitutional rights by the failure to properly staff ADOC facilities, including Fountain and St. Clair, which directly led to no correctional officer being in the Hot Bay when Mr. Prim was attacked.  Leaving the Hot Bay unmonitored created an unsafe environment and unreasonably increased the risk of violence to Mr. Prim and substantial harm to his health and safety.

308.    Defendant Dunn consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by overcrowding at Fountain and St. Clair; (b) failing to alleviate or mitigate the overcrowding of inmates at Fountain and St. Clair; (c) failing to address the understaffing at Fountain and St. Clair; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays"; (g) failing to adequately investigate and address inmate-on-inmate violence; and/or (g) to take other reasonable measures within ADOC and at Fountain to monitor the Hot Bay, and to maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner on prisoner violence.

309.    Furthermore, Defendant Dunn consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

310.    Defendant Dunn's actions and inactions set forth herein were deliberately indifferent, malicious willful, and/or recklessly indifferent to the substantial risks he knew Mr. Prim faced and were objectively unreasonable.

311.    Defendant Dunn's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

312.    Through the deliberate indifference of Defendant Dunn, including the failure to implement measures to protect prisoners from violence, provide adequate staffing, reduce overcrowding, and ensure proper medical care, Mr. Prim was subjected to an unreasonable risk of serious physical harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

313.    The pattern and practice of misconduct at Fountain and St. Clair occurred with the consent and direction of Defendant Dunn, who personally knew about, facilitated, approved and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by Dunn's actions and inactions.

314.    Dunn's misconduct directly and proximately caused the serious injuries suffered by Mr. Prim from the Fountain attack.  Further, Dunn's misconduct

directly and proximately caused the abject failure in the delivery of adequate medical care which ultimately resulted in Mr. Prim's death.

315.     Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Dunn's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT II

**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983**

**Failure to Protect**
**(Against Defendant Grantt Culliver)**

316.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 41-45, 53-54, 104-105, 107-250, and 252-294, by reference as if set forth fully herein to support this Count II.

317.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a known and unreasonable risk of serious harm while in custody of the State.

318.     Defendant Culliver was the Associate Commissioner of Operations and Institutional Security and his primary responsibility was to ensure the effective and safe daily operations of ADOC's correctional facilities, including Fountain and St. Clair.   In addition, he was responsible for

overseeing institutional security, staffing, the Classification Review Board, the Training Division and the Transfer Division.

319.    The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain and St. Clair, under the direction of Defendant Culliver led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC.

320.    Defendant Culliver, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew of the substantial understaffing issues and resulting lack of control therefrom. Further, Defendant Culliver knew of and discussed the DOJ investigation with other ADOC officials.

321.    Defendant Culliver was aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

322.    Defendant Culliver consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by overcrowding at Fountain and St. Clair; (b) failing to alleviate or mitigate the overcrowding of inmates at Fountain and St. Clair; (c) failing to address the

understaffing at Fountain and St. Clair; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays"; (g) failing to adequately investigate and address inmate-on-inmate violence;  and/or (g) to take other reasonable measures within ADOC and at Fountain to monitor the Hot Bay, and to maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner on prisoner violence.

323.    Furthermore, Defendant Culliver consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

324.    Additionally, Defendant Culliver acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact or follow reasonable policies and procedures designed to provide adequate security and supervision; failing to properly staff Fountain and St. Clair Prisons with a sufficient number of prudent and well-trained medical personnel;  housing Mr. Prim in the Hot Bay dorm at Fountain when he was classified as minimum security; promulgating and permitting and the

use of Hot Bay dormitories for mass incarceration; failing to provide resources to prisoners housed on Hot Bay dormitories; failure to monitor and supervise the Hot Bay; and failing to take corrective action to address the extreme overcrowding at the Fountain and St. Clair facilities.

325.     Defendant Culliver had actual, personal knowledge of ADOC's history of widespread violence, the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain and St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

326.     Defendant Culliver, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

327.     Defendant Culliver consciously disregarded the substantial risk of serious harm to Mr. Prim and violated Mr. Prim's constitutional rights by failing to properly staff ADOC facilities, including Fountain and St. Clair, which directly led to no correctional officer being in the Hot Bay when Mr. Prim was attacked.  Leaving the Hot Bay unmonitored created an unsafe environment and unreasonably increased the risk of violence to Mr. Prim and substantial harm to his health and safety.

328.     Defendant Culliver consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by overcrowding at Fountain, and/or to take other reasonable measures within ADOC and at Fountain to monitor the Hot Bay, maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner on prisoner violence.

329.     The misconduct described in this Count was undertaken by Defendant Culliver with deliberate indifference, malice, willfulness, and/or reckless indifference to the known prisoner-on-prisoner violence and constant threat of violence at Fountain and to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

330.     Through the deliberate indifference of Defendant Culliver, including the failure to implement measures to protect prisoners from violence, provide adequate staffing, reduce overcrowding, and ensure proper medical care, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

331.     The pattern and practice of misconduct at Fountain and St. Clair occurred with the consent and direction of Defendant Culliver, who personally

knew about, facilitated, approved and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by Culliver's actions and inactions.

332.    Defendant Culliver's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

333.    Culliver's misconduct directly and proximately caused the serious injuries suffered by Mr. Prim from the Fountain attack.  Further, Culliver's misconduct directly and proximately caused the abject failure in the delivery of adequate medical care which ultimately resulted in Mr. Prim's death.

334.    Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Culliver's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT III

### Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983

### Failure to Protect
### (Against Defendant Mark Fassl)

335.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 39-40, 53-54, 104-105, 107-250 and 252-294 by reference as if set forth fully herein to support this Count III.

336.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

337.     Defendant Fassl was the Inspector General of ADOC during the time Mr. Prim was incarcerated.  Defendant Fassl had executive authority for reviewing department policies and providing oversight of internal affairs investigations.

338.     The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain and St. Clair, under the oversight of Defendant Fassl led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC.

339.     Defendant Commissioner Fassl has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

340.     Defendant Fassl consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was

employed to adequately control foreseeable violence caused by overcrowding at Fountain and St. Clair; (b) failing to alleviate or mitigate the overcrowding of inmates at Fountain and St. Clair; (c) failing to address the understaffing at Fountain and St. Clair; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays"; (g) failing to adequately investigate and address inmate-on-inmate violence; and/or (g) to take other reasonable measures within ADOC and at Fountain to monitor the Hot Bay, and to maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner on prisoner violence.

341.     Furthermore, Defendant Fassl consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

342.     Additionally, Defendant Fassl acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; permitting and the use of Hot

Bay dormitories for mass incarceration; failing to provide resources to prisoners housed on Hot Bay dormitories; failure to monitor and supervise the Hot Bay; and failing to take corrective action to address the extreme overcrowding at the Fountain and St. Clair facilities.

343.    Defendant Fassl had actual, personal knowledge of ADOC's history of widespread violence, the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain and St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

344.    Defendant Fassl, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

345.    Defendant Fassl consciously disregarded the substantial risk of serious harm to Mr. Prim and violated Mr. Prim's constitutional rights by failing to properly staff ADOC facilities, including Fountain and St. Clair, which directly led to no correctional officer being in the Hot Bay when Mr. Prim was attacked.

346.    Defendant Fassl consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by failing to review and implement policies to hire and train sufficient

numbers of correctional staff to maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner-on-prisoner violence.

347.     The misconduct described in this Count was undertaken by Defendant Fassl with deliberate indifference, malice, willfulness, and/or reckless indifference to the known prisoner-on-prisoner violence and constant threat of violence at Fountain and to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

348.     Through the deliberate indifference of Defendant Fassl, including the failure to implement measures to protect prisoners from violence, provide adequate staffing, reduce overcrowding, and ensure proper medical care, Mr. Prim was subjected to an unreasonable risk of serious physical harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

349.     The pattern and practice of misconduct at Fountain and St. Clair occurred with the consent and direction of Defendant Fassl, who personally knew about, facilitated, approved and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by Fassl's actions and inactions.

350.     Defendant Fassl's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

351.     Defendant Fassl's misconduct directly and proximately caused the serious injuries suffered by Mr. Prim from the Fountain attack.  Further, Fassl's misconduct directly and proximately caused the abject failure in the delivery of adequate medical care which ultimately resulted in Mr. Prim's death.

352.     Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Fassl's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT IV

**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983**

**Failure to Protect**
**(Against Defendant Ruth Naglich)**

353.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 46-47, 54-54, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count IV.

354.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

355.     Defendant Naglich was the Associate Commissioner of Health Services of ADOC during the time Mr. Prim was incarcerated.  Defendant Naglich heads the Office of Health Services and is responsible for establishing, monitoring, and enforcing system-wide healthcare policies and practices.  In addition, she is responsible for supervising the provision of adequate medical, mental health and dental care for all ADOC prisoners.

356.     Defendant Naglich has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

357.     The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain and St. Clair led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC.  The systemic inefficiencies of overcrowding and understaffing were known to Defendant Naglich and she was aware that the combination of those inefficiencies had a direct deleterious impact on the ability to provide appropriate and adequate health care to ADOC inmates and specifically, to Jamie Prim.

358.    Defendant Naglich acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at the Fountain and St. Clair facilities.

359.    Defendant Naglich consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by overcrowding at Fountain and St. Clair; (b) failing to alleviate or mitigate the overcrowding of inmates at Fountain and St. Clair; (c) failing to address the understaffing at Fountain and St. Clair; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to monitor and review medical records of inmates with serious medical needs and/or (g) failing to develop and implement adequate policies of oversight of inmate medical records

360.    Furthermore, Defendant Naglich consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and

overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

361.    Defendant Naglich had actual, personal knowledge of ADOC's history of the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain and St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

362.    Defendant Naglich, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution. Despite being informed of Mr. Prim's serious medical needs by Equal Justice Initiative and via Dr. Pouparinas's notations in the Wexford records, Defendant Naglich allowed Mr. Prim to remain in the custody of a dangerous correctional facility where Mr. Prim would not receive adequate medical care.  Defendant Naglich disregarded the substantial risk of serious harm to Mr. Prim by failing to recognize that Wexford Health was wholly inadequate to provide proper medical care to Mr. Prim.

363.    Defendant Naglich consciously disregarded the substantial risk of serious harm to Mr. Prim and violated his constitutional rights by the failure

to properly staff ADOC facilities, including Fountain and St. Clair which had a direct impact on the provision of healthcare services to Mr. Prim.

364.     Defendant Naglich consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by her failure to monitor and correct healthcare practices that were clearly ineffective, specifically as to Mr. Prim.

365.     The misconduct described in this Count was undertaken by Defendant Naglich with deliberate indifference, malice, willfulness, and/or reckless indifference to the known prisoner-on-prisoner violence and constant threat of violence at Fountain and to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

366.     Through the deliberate indifference of Defendant Naglich, including failing to implement measures to provide adequate staffing and reduce overcrowding, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

367.     Through the deliberate indifference of Defendant Naglich, including failing to implement measures to protect prisoners from violence, provide adequate staffing, reduce overcrowding, and ensure proper medical care, Mr.

Prim was subjected to an unreasonable risk of serious physical harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

368.    The pattern and practice of misconduct at Fountain and St. Clair occurred with the consent and direction of Defendant Naglich, who personally knew about, facilitated, approved and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by her actions and inactions.

369.    Defendant Naglich's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

370.    Defendant Naglich's misconduct directly and proximately caused the abject failure in the delivery of adequate medical care which ultimately resulted in Mr. Prim's death.

371.    Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Naglich's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

**COUNT V**

**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983**

**Failure to Protect**
**(Against Defendant Cheryl Price)**

372.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 48-50, 53-54, 104-150, 202, 204-281, and 291-294 by reference as if set forth fully herein to support this Count V.

373.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

374.     Defendant Price was the Institutional Coordinator for the Southern Region of ADOC during the time Mr. Prim was incarcerated.  Defendant Price was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in her assigned area, which included Fountain.  Her duties included supervising the Warden, ensuring safe conditions and leading the external audit team.  Price knew or should have known of the substantial overcrowding and understaffing at Fountain through (a) her oversight of the prison, including personal visits; (b) her communications with Warden Streeter and other Fountain staff; and (c) her position as liaison between ADOC executive leadership and Fountain.

375.     Defendant Price was and has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

376.     The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Price and she was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, to Jamie Prim.

377.     Defendant Price acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at Fountain.

378.     Defendant Price consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by overcrowding

at Fountain; (b) failing to alleviate or mitigate the overcrowding of inmates at Fountain; (c) failing to address the understaffing at Fountain; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays"; (g) failing to adequately investigate and address inmate-on-inmate violence;  and/or (g) to take other reasonable measures within ADOC and at Fountain to monitor the Hot Bay, and to maintain a safe environment for prisoners, and to protect Mr. Prim from prisoner on prisoner violence.

379.    Furthermore, Defendant Price consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

380.    Defendant Price had actual, personal knowledge of ADOC's history of the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

381.    Defendant Price, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

382.    Defendant Price consciously disregarded the substantial risk of serious harm to Mr. Prim and violated his constitutional rights by the failure to properly staff ADOC facilities, including Fountain which directly led to no correctional officer being in the Hot Bay when Mr. Prim was attacked.

383.    Defendant Price consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by permitting the use of the Hot Bay dorm at Fountain and Mr. Prim's placement in the Hot Bay and further by the failure to implement effective security measures and efficient monitoring of the Hot Bay.

384.    The misconduct described in this Count was undertaken by Defendant Price with deliberate indifference, malice, willfulness, and/or reckless indifference to the known prisoner-on-prisoner violence and constant threat of violence at Fountain and to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

385.    Defendant Price's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

386.    Through the deliberate indifference of Defendant Price, including the failure to implement measures to protect prisoners from violence, provide adequate staffing, reduce overcrowding, and ensure proper medical care, Mr. Prim was subjected to an unreasonable risk of serious physical harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

387.    The pattern and practice of misconduct at Fountain occurred with the consent and direction of Defendant Price, who personally knew about, facilitated, approved and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by her actions and inactions.

388.    Defendant Price's misconduct directly and proximately caused the serious injuries suffered by Mr. Prim from the Fountain attack.  Further, Price's misconduct directly and proximately caused the abject failure in the delivery of adequate medical care which ultimately resulted in Mr. Prim's death.

389.    Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Price's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

**COUNT VI**

**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983**

**Failure to Protect**
**(Against Defendant Edward Ellington)**

390.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 51-54, 109-110, 112, 151-220, 227-239, 242-243, 250, 253-267, and 288-294 by reference as if set forth fully herein to support this Count VI.

391.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

392.     Defendant Ellington was the Institutional Coordinator for the Northern Region of ADOC during the time Mr. Prim was incarcerated.  Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair.  His duties included supervising the Warden, ensuring safe conditions and leading the external audit team.   Ellington knew or should have known of the substantial overcrowding and understaffing at St. Clair through (a) his oversight of the prison, including personal visits; (b) his communications with Warden Jones and other St. Clair staff; and (c) his position as liaison between ADOC executive leadership and St. Clair.

393.    Defendant Ellington was and has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

394.    The policies of understaffing and overcrowding within the ADOC, and specifically at St. Clair led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Ellington and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, to Jamie Prim.

395.    Defendant Ellington acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at the St. Clair.

396.    Defendant Ellington consciously disregarded the increased risk of violence and substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by (a) failing to properly staff and train the minimal staff that was employed to adequately control foreseeable violence caused by

overcrowding at St. Clair; (b) failing to alleviate or mitigate the overcrowding of inmates at St. Clair; (c) failing to address the understaffing at St. Clair; (d) failing to implement and adopt or oversee the adoption of effective security protocols; (e) failing to institute effective prison management and training; (f) failing to appropriately house and classify inmates; (g) to take other reasonable measures within ADOC and at St. Clair to control the interactions between St. Clair staff and Wexford Health and/or (h) to monitor the provision of health care and to maintain a safe environment for prisoners, and to protect Mr. Prim.

397.   Furthermore, Defendant Ellington consciously disregarded the substantial risk facing Mr. Prim by failing to adopt and/or effectively implement proper policies and procedures to address (a) understaffing and overcrowding; (b) inadequately trained prison personnel; (c) improper housing and classification procedures; and (d) inadequate security protocols.

398.   Defendant Ellington had actual, personal knowledge of ADOC's history of the increased threat of harm to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

122

399.     Defendant Ellington, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

400.     Defendant Ellington consciously disregarded the substantial risk of serious harm to Mr. Prim and violated Mr. Prim's constitutional rights by failing to properly staff ADOC facilities, including St. Clair, which directly led to interference with the effective delivery of medical care to ADOC inmates housed at St. Clair and specifically to Jamie Prim.

401.     Defendant Ellington consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by failing to ensure proper medical modalities were in supply, by failing to ensure the safety of the prisoners in the infirmary, and by failing to implement policies regarding interactions between ADOC correctional staff and Wexford Health personnel.  These failures, combined with systemic overcrowding and understaffing created a failure to provide adequate healthcare and unreasonable delays in providing healthcare to ADOC inmates, and specifically to Mr. Prim.

402.     The misconduct described in this Count was undertaken by Defendant Ellington with deliberate indifference, malice, willfulness, and/or reckless indifference to the known systemic overcrowding and understaffing at St.

Clair, the inappropriate interactions between St. Clair correctional staff and Wexford Health staff all of which violated Mr. Prim's rights and was objectively unreasonable.

403.     Defendant Ellington's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

404.     Through the deliberate indifference of Defendant Ellington, including the failure to implement measures to provide adequate staffing and reduce overcrowding, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

405.     Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Ellington's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT VII

## Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983

## Failure to Protect
## (Defendants Karla Jones, Gwendolyn Givens, and Anthony Brooks)

406.     Plaintiff incorporates the allegations contained in paragraphs 7-12, 14-

20, 23, 55-60, 151-203, 206-224, 227-239, 253-267, and 282-294 by reference

as if set forth fully herein to support this Count VII.

407.     Pursuant to the Eighth Amendment of the United States Constitution,

Mr. Prim was entitled to be free from a substantial risk of serious harm while

in custody of the State.

408.     Defendants named in this Count VIII are similarly situated ADOC

personnel, each having been employed at St. Clair in supervisory positions at

all relevant times herein.

409.     Defendant Karla Jones was the Warden at St. Clair during the time Mr.

Prim was incarcerated.  Defendant Jones was primarily responsible for the

day-to-day operations of St. Clair, the safety and security of all prisoners at

St. Clair and the supervision of all subordinate employees.  Her additional

responsibilities included ensuring adequate supervision and monitoring of

prisoners, adequate classification of prisoners, appropriate housing

assignments for prisoners, adequate staffing levels, appropriate discipline and

deterrence of prisoner and staff misconduct, adherence by staff to the

requirements of PREA, adherence by staff to search protocols, adequate

implementation of internal security audits, and proper installation, repair, maintenance of locks, cameras, and other security devices necessary for safety and security.

410.    Defendant Jones has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

411.    Defendant Jones, as Warden of St. Clair, personally observed the pervasive and long-standing issues of overcrowding and understaffing at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff.

412.    Defendant Jones failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between St. Clair staff and Wexford Health staff.  Further Defendant Jones failed to take reasonable steps to ensure that any policies or procedures that were adopted were adequately implemented by the St. Clair staff.

413.    Defendants Givens and Anthony Brooks were Assistant Wardens at St. Clair during the time Mr. Prim was incarcerated.  The Assistant Wardens were

responsible for the day-to-day operations of St. Clair, the safety and security of all prisoners at St. Clair and the supervision of all subordinate employees.

414.     Defendants Givens and Brooks were and have been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

415.     Defendant Givens personally observed the pervasive and long-standing issues of overcrowding and understaffing at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her subordinates.

416.     Defendant Gwendolyn Givens failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between St. Clair staff and Wexford Health staff.  Further Defendant Givens failed to take reasonable steps to ensure that any policies or procedures that were adopted were adequately implemented by the St. Clair staff.

417.     Defendant Brooks personally observed the pervasive and long-standing issues of overcrowding and understaffing at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates.

418.     Defendant Brooks failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between St. Clair staff and Wexford Health staff.  Further Defendant Brooks failed to take reasonable steps to ensure that any policies or procedures that were adopted were adequately implemented by the St. Clair staff.

419.     The policies of understaffing and overcrowding within the ADOC, and specifically at St. Clair led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC. The systemic inefficiencies of overcrowding and understaffing were known to Defendants Jones, Givens and Brooks and they were aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, to Jamie Prim.

420.     Defendants Jones, Givens, and Brooks each acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at St. Clair.

421.    Defendants Jones, Givens, and Brooks each had actual, personal knowledge of ADOC's history of the increased threat of harm to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

422.    Defendants Jones, Givens, and Brooks, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

423.    Defendants Jones, Givens, and Brooks consciously disregarded the substantial risk of serious harm to Mr. Prim and violated his constitutional rights by the failure to properly staff St. Clair, which directly led to interference with the effective delivery of medical care to ADOC inmates housed at St. Clair and specifically to Jamie Prim.

424.    Defendants Jones, Givens, and Brooks consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by failing to ensure proper medical modalities were in supply, by failing to ensure the safety of the prisoners in the infirmary, and by failing to implement policies regarding interactions between ADOC correctional staff and Wexford Health personnel. These failures, combined with systemic overcrowding and understaffing created a failure to provide

adequate healthcare and unreasonable delays in providing healthcare to ADOC inmates, and specifically to Mr. Prim.

425.     The misconduct described in this Count was undertaken by Defendants Jones, Givens, and Brooks with deliberate indifference, malice, willfulness, and/or reckless indifference to the known systemic overcrowding and understaffing at St. Clair, the inappropriate interactions between St. Clair correctional staff and Wexford Health staff, all of which violated Mr. Prim's rights and were objectively unreasonable.

426.     The pattern and practice of misconduct at St. Clair occurred with the consent and direction of the Defendants Jones, Givens and Brooks, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarding the substantial risk of serious harm posed by the actions and inactions described herein.

427.     Defendants Jones, Givens, and Brooks' misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

428.     Through the deliberate indifference of Defendants Jones, Givens, and Brooks, including the failure to implement measures to provide adequate staffing and reduce overcrowding, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer

damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

429.    Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendants Jones, Givens, and Brooks' deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT VIII

### Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983

### Failure to Protect
### (Against Defendants Carla Graham, Gary Malone Kevin White, and Raphael Santa-Maria)

430.    Plaintiff incorporates the allegations contained in paragraphs 7-20, 23, 61-68, 70, 151-203, 206-224, 227-239, 253-267, and 282-294 by reference as if set forth fully herein to support this Count VIII.

431.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

432.    Defendants named in this Count VIII are similarly situated ADOC personnel, each having been employed at St. Clair at all relevant times herein.

131

433.     Defendants Carla Graham, Gary Malone and Kevin White were Captains at St. Clair during the time Mr. Prim was incarcerated at St. Clair.

434.     As Captains Defendants Graham, Malone and White were primarily responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

435.     Defendants Graham, Malone and White were and have been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

436.     Defendants Graham, Malone and White personally observed the pervasive and long-standing issues of overcrowding and understaffing at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through their presence at the facility and communications with their subordinates.

437.     Defendants Graham, Malone and White failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between St. Clair staff and Wexford Health staff.  Further Defendants failed to take reasonable steps to ensure that any policies or

procedures that were adopted were adequately implemented by the St. Clair staff.

438.     Defendant Raphael Santa-Maria was a Correctional Sergeant at St. Clair during the time Mr. Prim was incarcerated at St. Clair.  As Sergeant, Defendant Santa-Maria was responsible for overseeing the on-duty correctional officers, the safety and security of all prisoners at St. Clair and the supervision of all subordinate employees.

439.     Defendant Santa-Maria was and has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

440.     Defendant Santa-Maria personally observed the pervasive and long-standing issues of overcrowding and understaffing at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates.  Further, Defendant Santa-Maria interacted with the Wexford Health staff in the custodial care of Mr. Prim.  Upon information and belief, Defendant Santa-Maria had personal knowledge of the inefficient delivery of medical care to inmates at St. Clair and specifically to Mr. Prim.

441.     Defendant Santa Maria failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison

personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between St. Clair staff and Wexford Health staff.  Further Defendant Santa-Maria failed to take reasonable steps to ensure that any policies or procedures that were adopted were adequately implemented by the St. Clair staff.

442.    The policies of understaffing and overcrowding within the ADOC, and specifically at St. Clair led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC. The systemic inefficiencies of overcrowding and understaffing were known to Defendants Graham, Malone, White and Santa-Maria and they were aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, to Jamie Prim.

443.    Defendants Graham, Malone, White and Santa-Maria each acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at St. Clair.

444.     Defendants Graham, Malone, White and Santa-Maria each had actual, personal knowledge of ADOC's history of the increased threat of harm to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at St. Clair, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

445.     Defendants Graham, Malone, White and Santa-Maria, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

446.     Defendants Graham, Malone, White and Santa-Maria consciously disregarded the substantial risk of serious harm to Mr. Prim and violated his constitutional rights by the failure to properly staff ADOC facilities, including St. Clair, which directly led to interference with the effective delivery of medical care to ADOC inmates housed at St. Clair and specifically to Jamie Prim.

447.     Defendants Graham, Malone, White and Santa-Maria consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by failing to ensure proper medical modalities were in supply, by failing to ensure the safety of the prisoners in the infirmary, and by failing to implement policies regarding interactions between ADOC correctional staff and Wexford Health personnel.  These failures, combined

with systemic overcrowding and understaffing created a failure to provide adequate healthcare and unreasonable delays in providing healthcare to ADOC inmates, and specifically to Mr. Prim.

448.     The misconduct described in this Count was undertaken by Defendants Graham, Malone, White and Santa-Maria with deliberate indifference, malice, willfulness, and/or reckless indifference to the known systemic overcrowding and understaffing at St. Clair, the inappropriate interactions between St. Clair correctional staff and Wexford Health staff all of which violated Mr. Prim's rights and was objectively unreasonable.

449.     Defendants Graham, Malone, White and Santa-Maria's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

450.     Through the deliberate indifference of Defendants Graham, Malone, White and Santa-Maria, including the failure to implement measures to provide adequate staffing and reduce overcrowding, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

451.     Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendants Graham, Malone, White and Santa-Maria's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT IX

**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983**

**Failure to Protect**
**(Against Defendant William Streeter)**

452.     Plaintiff incorporates the allegations contained in paragraphs 4-23, 72-75, 78, 104-150, 202-281 and 291-294 by reference as if set forth fully herein to support this Count IX.

453.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Prim was entitled to be free from a substantial risk of serious harm while in custody of the State.

454.     Defendant William Streeter was the Warden at Fountain during the time Mr. Prim was incarcerated.  Defendant Streeter was primarily responsible for the day-to-day operations of Fountain, the safety and security of all prisoners at Fountain and the supervision of all subordinate employees.  His additional responsibilities included ensuring adequate supervision and monitoring of

prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, maintenance of locks, cameras, and other security devices necessary for safety and security at Fountain.

455.     The policies of understaffing and overcrowding within the ADOC, and specifically at Fountain led to the deprivation of Mr. Prim's rights while he was incarcerated with the ADOC. The systemic inefficiencies of overcrowding and understaffing were known to Defendant Streeter and he was aware that the combination of those inefficiencies perpetuated an unacceptably high rate of violence, and that those inefficiencies further caused the ineffective delivery of medical care to ADOC inmates and specifically, to Jamie Prim.

456.     Defendant Streeter was and has been aware of the dangerous conditions and constitutional violations in Alabama's Prisons for Men for many years as evidenced in the timeline set out in paragraph 9.

457.     Defendant Streeter, as Warden of Fountain, personally observed the pervasive and long-standing issues of inmate-on-inmate violence at Fountain,

overcrowding and understaffing at Fountain and further personally saw the absent or failing safety protocols at Fountain through his presence at the facility and communications with his staff.   Further, on information and belief, Streeter was aware of the DOJ investigation and the subsequent DOJ report.  Defendant Streeter was aware of the substantial risk posed by the pervasive violence at Fountain.

458.    Defendant Streeter acted individually and in conspiracy with other ADOC Defendants in failing to protect Mr. Prim from harm, by failing to enact and implement reasonable policies and procedures designed to provide adequate security and supervision; and failing to take corrective action to address the extreme overcrowding at Fountain.

459.    Defendant Streeter had actual, personal knowledge of ADOC's history of the increased threat of violence to prisoners like Mr. Prim due to the understaffing and overcrowding throughout ADOC and specifically at Fountain, and the substantial risk to Mr. Prim posed by the policies and customs and the known institutional deficiencies.

460.    Defendant Streeter failed to adopt proper policies and procedures to address (a) understaffing and overcrowding, (b) inadequately trained prison personnel, (c) improper housing and classification procedures, (d) inadequate security protocols, and (e) inappropriate interactions between Fountain staff

and Wexford Health staff.   Further Defendant Streeter failed to take reasonable steps to ensure that any policies or procedures that were adopted were adequately implemented by the Fountain staff.

461.    Defendant Streeter, while acting under the color of state law, recklessly or intentionally deprived Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.

462.    Defendant Streeter consciously disregarded the substantial risk of serious harm to Mr. Prim and violated his constitutional rights by the failure to properly staff ADOC facilities, including Fountain which directly led to no correctional officer being in the Hot Bay when Mr. Prim was attacked.

463.    Defendant Streeter consciously disregarded the increased risk of substantial harm to Mr. Prim in violation of Mr. Prim's constitutional rights by permitting the use of the Hot Bay dorm at Fountain and Mr. Prim's placement in the Hot Bay and further by the failure to implement effective security measures and efficient monitoring of the Hot Bay.

464.    The misconduct described in this Count was undertaken by Defendant Streeter with deliberate indifference, malice, willfulness, and/or reckless indifference to the known prisoner-on-prisoner violence and constant threat of violence at Fountain and to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

465.     Defendant Streeter's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

466.     Through the deliberate indifference of Defendant Streeter, including the failure to implement measures to provide adequate staffing and reduce overcrowding, Mr. Prim was subjected to an unreasonable risk of serious harm, and directly and proximately caused Mr. Prim to suffer damages, including pain, suffering, fear, anxiety, disfigurement, paraplegia, depression and death.

467.     Plaintiff, as Administrator of the estate of seeks compensatory and punitive damages due to Defendant Streeter's deliberate indifference and failure to protect Jamie Lawrence Prim in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## COUNT X

### Violation of the Eighth and Fourteenth Amendments
### of the United State Constitution and 42 U.S.C. §1983

### State-Created Danger
### (Against Defendants Cheryl Price and William Streeter)

468.     Plaintiff incorporates the allegations contained in paragraphs 4-23, 72-75, 78, 104-150, 202 -281, and 291-294 by reference as if set forth fully herein to support this Count X.

469.     Pursuant to the Eighth and Fourteenth Amendment of the United States Constitution, ADOC inmates are entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State, including from a State-created danger.

470.     Defendants Price and Streeter are similarly situated ADOC personnel, each having been employed at by ADOC with responsibilities at Fountain at all relevant times herein.

471.     Defendants limited Mr. Prim's ability to care for himself in prison.

472.     By housing Mr. Prim in the Hot Bay dorm, Defendants affirmatively placed Mr. Prim in a position of extreme danger he would not otherwise have faced.

473.     Defendants Price and Streeter know of the substantial risk that Prim would be seriously injured while in custody and housed in the Hot Bay at Fountain.  Given the obviousness of the risk based on the ever-increasing rates of inmate-on-inmate violence at Fountain, Defendants Price and Streeter had notice of the substantial risk of serious harm to Mr. Prim.

474.     Defendant Price, as Institutional Coordinator for the Southern Division of the ADOC, knew of the substantial inmate-on-inmate violence at Fountain through (a) her oversight of the prison, including personal visits; (b) her communications with Warden Streeter and other Fountain staff; and (c) being the liaison between ADOC executive leadership and Fountain.  Further, on information and belief, Defendant Price knew of and discussed the DOJ investigation with ADOC officials.

475.     Defendant Streeter, as Warden of Fountain, personally observed the pervasive and longstanding inmate-on-inmate violence at Fountain and further, personal saw the absent or failing safety protocols at Fountain through his presence at the facility and communications with his staff.  Further, on information and belief, Defendant Streeter was aware of and discussed the DOJ investigation with ADOC officials.

476.     Defendants Price and Streeter consciously disregarded the substantial risk of serious harm Mr. Prim faced while house at Fountain in the Hot Bay by (a) failing to alleviate or mitigate the overcrowding of inmates, (b) failing to address the understaffing, (c) failing to implement and adopt or oversee the adoption of effective security protocols, (d) failing to institute effective prison management and training, (e) failing to appropriately house and classify

inmates to mitigate the risk of substantial violence in the Hot Bay; (f) failing to adequately investigate and address inmate-on-inmate violence.

477.     In violation of Mr. Prim's Eighth and Fourteenth Amendment rights, Defendants knew of and consciously disregarded the substantial risk that Mr. Prim would be injured while in custody at Fountain including from a State-created danger.

478.     Defendants, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and unknown risks of serious harm to Mr. Prim resulting from the State-created danger.

479.     Defendants' failures placed Mr. Prim in an increased danger of violence by another inmate that he would not otherwise have faced.

480.     The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

481.     The pattern and practice of misconduct at Fountain occurred with the consent and direction of Defendants Price and Streeter, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm to Mr. Prim.

482.    Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including, pain, disfigurement, emotional distress, anxiety, suffering, the loss of use of his lower extremities, fear, hopelessness, degradation, humiliation, and depression, both from the brutal assault and its devastating aftermath.

483.    Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference and misconduct, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XI

### Violation of the Eighth and Fourteenth Amendments
### of the United State Constitution and 42 U.S.C. §1983

### State-Created Danger
### (Against Defendants Jefferson Dunn and Grantt Culliver)

484.    Plaintiff incorporates the allegations contained in paragraphs 2-23, 34-38, 41-45, 53-54, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count XI.

485.    Pursuant to the Eighth and Fourteenth Amendment of the United States Constitution, ADOC inmates are entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State, including from a State-created danger.

486.   Defendants Dunn and Culliver are similarly situated ADOC Administrative Supervisors, each having been employed at by ADOC with responsibilities at Fountain and St. Clair at all relevant times herein.

487.   Defendants limited Mr. Prim's ability to care for himself in prison.

488.   By housing Mr. Prim in the Hot Bay dorm, Defendants affirmatively placed Mr. Prim in a position of danger he would not otherwise have faced.

489.   Defendants Dunn and Culliver knew of the substantial risk that Mr. Prim would be seriously injured while in custody at Fountain. Given the obvious risk based on the staggering and increasing rate of inmate-on-inmate violence at Fountain, Defendants Dunn and Culliver were on notice of the substantial risk of serious harm to Mr. Prim.

490.   In violation of Mr. Prim's Eighth and Fourteenth Amendment rights, Defendants Dunn and Culliver knew of and consciously disregarded the substantial risk that Mr. Prim would be injured while in custody at Fountain including from a State-created danger.

491.   Defendants Dunn and Culliver, acting individually and in conspiracy with other Defendants, failed to take reasonable steps to address the known and unknown risks of serious harm to Mr. Prim resulting from the State-created danger.

492.     Defendant Dunn, as Commissioner of ADOC, was aware of the monthly reports released by the ADOC reflecting the increasing rates of inmate-on-inmate violence at Fountain.  Further, Defendant Dunn was aware of the DOJ investigation.  Dunn was aware of the substantial risk of harm to Mr. Prim based on the litigation in which he was involved, *Duke v. Dunn* and *Braggs v. Dunn*.

493.     Defendant Culliver, through his role as Associate Commissioner for Operations and Security in charge of staffing and security, know of the substantial inmate-on-inmate violence at Fountain, the understaffing issues and resulting lack of control therefrom.   Defendant Culliver was aware of the extremely violent conditions inherent in the use of Hot Bays for mass incarceration and specifically the dangerous conditions at the Hot Bay dorm at Fountain.  Further, Defendant Culliver was aware of the DOJ investigation.

494.     Defendants Dunn and Culliver consciously disregarded the substantial risk of serious harm Mr. Prim faced while house at Fountain in the Hot Bay by (a) failing to alleviate or mitigate the overcrowding of inmates, (b) failing to address the understaffing, (c) failing to implement and adopt or oversee the adoption of effective security protocols, (d) failing to institute effective prison management and training, (e) failing to appropriately house and classify

inmates to mitigate the risk of substantial violence in the Hot Bay; (f) failing to adequately investigate and address inmate-on-inmate violence.

495.     The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

496.     The pattern and practice of misconduct at Fountain occurred with the consent and direction of Defendants Dunn and Culliver, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm to Mr. Prim.

497.     Defendants Dunn and Culliver's failures placed Mr. Prim in an increased danger of violence by another inmate that he would not otherwise have faced.

498.     Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to an unreasonable risk of serious harm, and caused him to suffer damages including, pain, disfigurement, emotional distress, anxiety, suffering, the loss of use of his lower extremities, fear, hopelessness, degradation, humiliation, and depression, both from the brutal assault and its devastating aftermath.

499.    Plaintiff seeks compensatory and punitive damages due to Defendants'

deliberate indifference and misconduct, in an amount to be determined by the

jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XII

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### Denial of Adequate Health Care
### (Against Defendants Jefferson Dunn, Grantt Culliver and Ruth Naglich)

500.    Plaintiff incorporates the allegations contained in paragraphs 4-23, 34-

38, 41-47, 53-54, 117-203, 227-239, 253-267, and 282-294 by reference as if

set forth fully herein to support this Count XII.

501.    Pursuant to the Eighth and Fourteenth Amendments to the United States

Constitution, Mr. Prim was entitled to adequate medical care while in the

custody of the State.

502.    Defendants named in this Count XII are similarly situated ADOC

Administrative Supervisors, each having been employed at by ADOC with

responsibilities at Fountain and St. Clair at all relevant times herein.

503.    Mr. Prim had serious medical needs because of his assault on June 20,

2018.  His serious medical need posed a substantial risk of serious harm,

including death to Mr. Prim.

504.     After being severely beaten on June 20, 2018, Mr. Prim had an objectively serious need for immediate and long-term health care.

505.     Defendant Dunn, as Commissioner of ADOC, was aware of the monthly reports released by the ADOC reflecting the understaffing and overcrowding at Fountain and St. Clair.  Further, Dunn was aware of the substantial risk of harm to Mr. Prim based on the class action litigation in which he was involved, *Braggs v. Dunn* which specifically addressed the systemic failure of ADOC to provide adequate medical care to inmates.  Dunn was personally aware that the increase in prison overcrowding and understaffing negatively impacted the provision of adequate medical care.

506.     Defendant Culliver, through his role as Associate Commissioner for Operations and Security in charge of staffing and security, knew of the understaffing issues and resulting lack of control therefrom.   On information and belief, Culliver was personally aware that the increase in prison overcrowding and understaffing negatively impacted the provision of adequate medical care.

507.     Defendants Dunn and Culliver consciously disregarded the substantial risk of serious harm Mr. Prim faced while housed at Fountain by (a) failing to alleviate or mitigate the overcrowding of inmates, (b) failing to address the understaffing, (c) failing to implement and adopt or oversee the adoption of

effective security protocols, and (d) failing to institute effective prison management and training.

508.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

509.    Defendant Naglich, the Associate Commissioner of Health Services for the ADOC heads the Office of Health Services (OHS) and is responsible for establishing, monitoring, and enforcing system-wide health care policies and practices.  Defendant Naglich is responsible for supervising the provision of adequate medical, mental health and dental care for all prisoners within ADOC custody.

510.    Defendant Naglich failed to monitor and correct health care practices that were clearly ineffective, specifically as to Jamie Prim. Further, Defendant Naglich failed in the execution of her numerous administrative responsibilities, including but not limited to correcting the policies and procedures for the delivery of health care to prison inmates in overcrowded and understaffed conditions.  The systemic inefficiencies of overcrowding and understaffing were known to Defendant Naglich and she was aware that the combination of those inefficiencies perpetuated the unacceptable and

ineffective delivery of medical care to ADOC inmates and specifically, Jamie Prim.

511.     Defendant Naglich had or should have had knowledge of Mr. Prim's dire medical condition.  On information and belief, a representative from the Equal Justice Initiative contacted Defendant Naglich regarding Mr. Prim's dire medical condition.  In addition, during the time Mr. Prim was housed at Fountain, the Wexford Health records clearly reflect that the health services at Fountain were inadequate to properly treat Mr. Prim.  Further, Mr. Prim was transported to private hospitals numerous times between June 20, 2018 and the date of his death, February 10, 2019.  The fact of the multiple occurrences and length of the inpatient stays should have served as a notification of ADOC's abject failure to provide adequate and proper medical care to Mr. Prim.

512.     Defendants Dunn, Naglich and Culliver had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, they failed to provide him with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

513.     Defendants Dunn, Naglich and Culliver acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

514.    The Defendants' misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

515.    As a result of Defendants' misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

516.    Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

517.    An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate.  *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

518.    Plaintiff seeks compensatory and punitive damages due to Defendants' misconduct and deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XIII

**Violation of the Eighth Amendment**
**of the United State Constitution and 42 U.S.C. §1983**

**Denial of Adequate Health Care**
**(Against Defendant Cheryl Price and William Streeter)**

519.     Plaintiff incorporates the allegations contained in paragraphs 4-23, 48-
50, 72-75, 53-54, 104-105, 107-150, 206-239, 253-255, 257-262, and 282-
294 by reference as if set forth fully herein to support this Count XIII.

520.     Pursuant to the Eighth and Fourteenth Amendments to the United States
Constitution, Mr. Prim was entitled to adequate medical care while in the
custody of the State.

521.     Defendants Price and Streeter are similarly situated ADOC employees,
each having been employed at by ADOC with responsibilities at Fountain at
all relevant times herein.

522.     Mr. Prim had a serious medical need because of his assault on June 20,
2018.  His serious medical need posed a substantial risk of serious harm,
including death to Mr. Prim.

523.     After being severely beaten on June 20, 2018 Mr. Prim had an
objectively serious need for immediate and long-term health care.

524.     Defendants had notice of Mr. Prim's health care needs and the
seriousness of his health care needs, and yet, they failed to provide him with
necessary health care, in violation of the Eighth Amendment to the United
States Constitution.

525.     Defendants acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

526.     The Defendant's misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

527.     As a result of Defendant's misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

528.     Defendant's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

529.     An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

530.    Plaintiff seeks compensatory and punitive damages due to Defendant's

misconduct and deliberate indifference, in an amount to be determined by the

jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XIV

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### <u>Denial of Adequate Health Care</u>
### (Against Defendant Edward Ellington)

531.    Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-

23, 51-54, 151-203, 206-239, 253-267, and 282-294 by reference as if set forth

fully herein to support this Count XIV.

532.    Pursuant to the Eighth and Fourteenth Amendments to the United States

Constitution, Mr. Prim was entitled to adequate medical care while in the

custody of the State.

533.    Mr. Prim had a serious medical need because of his assault on June 20,

2018.  His serious medical need posed a substantial risk of serious harm,

including death to Mr. Prim.

534.    After being beaten Mr. Prim had an objectively serious need for

immediate and long-term health care.

535.    Defendant Ellington had notice of Mr. Prim's health care needs and the

seriousness of his health care needs, and yet, he failed to provide him with

necessary health care, in violation of the Eighth Amendment to the United States Constitution.

536.    Defendant Ellington, acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

537.    The Defendant Ellington's misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

538.    As a result of Defendant's misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

539.    Defendant's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

540.    An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

541.     Plaintiff seeks compensatory and punitive damages due to Defendant's

misconduct and deliberate indifference, in an amount to be determined by the

jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XV

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### Denial of Adequate Health Care
### (Against Defendants Karla Jones, Gwendolyn Givens,
### and Anthony Brooks)

542.     Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-

23, 55-58, 70, 151-203, 206-239, 253-267, and 282-294 by reference as if set

forth fully herein to support this Count XV.

543.     Pursuant to the Eighth and Fourteenth Amendments to the United States

Constitution, Mr. Prim was entitled to adequate medical care while in the

custody of the State.

544.     Defendants Karla Jones, Gwendolyn Givens and Anthony Brooks are

similarly situated St. Clair Facility Supervisors each having been employed at

by ADOC with responsibilities at St. Clair at all relevant times herein.

545.     Mr. Prim had a serious medical need because of his assault on June 20,

2018.  His serious medical need posed a substantial risk of serious harm,

including death to Mr. Prim.

546.     After being beaten Mr. Prim had an objectively serious need for immediate and long-term health care.

547.     Defendants had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, they failed to provide him with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

548.     Defendants, acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

549.     The Defendants' misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

550.     As a result of Defendants' misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

551.     Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

552.    An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

553.    Plaintiff seeks compensatory and punitive damages due to Defendants' misconduct and deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

### COUNT XVI

**Violation of the Eighth Amendment
of the United State Constitution and 42 U.S.C. §1983**

**<u>Denial of Adequate Health Care</u>
(Against Defendants Carla Graham, Gary Malone,
Kevin White and Raphael Santa-Maria)**

554.    Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-23, 61-68, 70, 151-203, 206-239, 253-267, and 252-294 by reference as if set forth fully herein to support this Count XVI.

555.    Pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, Mr. Prim was entitled to adequate medical care while in the custody of the State.

556.    Defendants Carla Graham, Gary Malone, Kevin White and Raphael Santa-Maria are similarly situated St. Clair Correctional Officers, each having

been employed at by ADOC with responsibilities at St. Clair at all relevant times herein.

557.     Mr. Prim had a serious medical need because of his assault on June 20, 2018.  His serious medical need posed a substantial risk of serious harm, including death to Mr. Prim.

558.     After being beaten Mr. Prim had an objectively serious need for immediate and long-term health care.

559.     Defendants had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, they failed to provide him with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

560.     Defendants, acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

561.     The Defendants' misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

562.     As a result of Defendants' misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his

death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

563.     Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

564.     An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

565.     Plaintiff seeks compensatory and punitive damages due to Defendants' misconduct and deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XVII

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### <u>Denial of Adequate Health Care</u>
### (Against Defendant Wexford Health)

566.     Plaintiff incorporates the allegations contained in paragraphs 80-82, 89, 95, 111, 117-203, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XVII.

567.     Pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, Mr. Prim was entitled to adequate medical care while in the custody of the State.

568.     Mr. Prim had a serious medical need because of the injuries resulting from the brutal assault on Mr. Prim on June 20, 2018.  His serious medical need posed a substantial risk of serious harm, including death to Mr. Prim.

569.     After being severely beaten on June 20, 2018, Mr. Prim had an objectively serious need for immediate and long-term health care.

570.     Defendant Wexford Health had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, Defendant failed to provide Mr. Prim with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

571.     Defendant Wexford Health acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

572.     Wexford Health's misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

573.    As a result of Defendant's misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

574.    Defendant's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

575.    An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

576.    Plaintiff seeks compensatory and punitive damages due to Defendant's misconduct and deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XVIII

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### Denial of Adequate Health Care
### (Against Defendants Dr. Walter Wilson and RN, Kelley Phillips)

577.     Plaintiff incorporates the allegations contained in paragraphs 83-85, 88, 89, 111, 117-203, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XVIII.

578.     Pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, Mr. Prim was entitled to adequate medical care while in the custody of the State.

579.     Defendants Dr. Walter Wilson and Kelley Phillips are similarly situated medical providers at St. Clair, each with responsibilities at St. Clair at all relevant times herein.

580.     Mr. Prim had a serious medical need because of the injuries resulting from the brutal assault on Mr. Prim on June 20, 2018.  His serious medical need posed a substantial risk of serious harm, including death to Mr. Prim.

581.     After being beaten Mr. Prim had an objectively serious need for immediate and long-term health care.

582.     Defendants had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, they failed to provide him with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

583.    Defendants, acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

584.    The Defendants' misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

585.    As a result of Defendants' misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

586.    Defendants' misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

587.    An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical treatment for the inmate. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

588.     Plaintiff seeks compensatory and punitive damages due to Defendants'

misconduct and deliberate indifference, in an amount to be determined by the

jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XIX

### Violation of the Eighth Amendment
### of the United State Constitution and 42 U.S.C. §1983

### <u>Denial of Adequate Health Care</u>
### (Against Defendant Dr. Manuel Pouparinas)

589.     Plaintiff incorporates the allegations contained in paragraphs 90-91, 93-

95, 111, 117-203, 253-267, and 282-294 by reference as if set forth fully

herein to support this Count XIX.

590.     Pursuant to the Eighth and Fourteenth Amendments to the United States

Constitution, Mr. Prim was entitled to adequate medical care while in the

custody of the State.

591.     Defendant, Dr. Manuel Pouparinas was the medical director at Fountain

at all relevant times herein.

592.     Mr. Prim had a serious medical need because of the injuries resulting

from the brutal assault on Mr. Prim on June 20, 2018.  His serious medical

need posed a substantial risk of serious harm, including death to Mr. Prim.

593.     After being beaten Mr. Prim had an objectively serious need for

immediate and long-term health care.

594.     Defendant had notice of Mr. Prim's health care needs and the seriousness of his health care needs, and yet, Defendant failed to provide Mr. Prim with necessary health care, in violation of the Eighth Amendment to the United States Constitution.

595.     Defendant, acting individually and in conspiracy with other Defendants, failed to provide Mr. Prim with access to timely and necessary medical care in response to his serious medical need(s).

596.     The Defendant's misconduct described in this cause of action undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Prim, and was objectively unreasonable.

597.     As a result of Defendant's misconduct, during the period of Mr. Prim's incarceration at Fountain and St. Clair and up to and including the date of his death, Mr. Prim endured extreme pain and suffering, including physical and emotional harm.

598.     Defendant's misconduct directly and proximately caused Mr. Prim to be subjected to a substantial risk of serious harm and caused him to suffer horrific physical and emotional injuries and death.

599.     An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care but fails or refuses to obtain medical

treatment for the inmate.  *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).

600.     Plaintiff seeks compensatory and punitive damages due to Defendants' misconduct and deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XX

### Violation of the Eighth and Fourteenth Amendments of the United State Constitution and 42 U.S.C. §1983

### Deliberate Indifference to Serious Medical Needs
### (Against Defendants Jefferson Dunn, Grantt Culliver and Ruth Naglich)

601.     Plaintiff incorporates the allegations contained in paragraphs 4-23, 34-38, 41-47, 53-54, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count XX.

602.     Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendants for depriving Mr. Prim of the right to treatment for serious medical needs in violation of the Eighth Amendment.

603.     Defendants, while acting under color of state law, acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.  Defendants knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally

attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

604.     Prior to Mr. Prim's death on February 10, 2019, the Defendants were aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

605.     Defendants failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.   Further, Defendants failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

606.     Defendants were aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair.   Despite their awareness of the substantial risk of harm, Defendants' misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent.   Defendants failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

607.    As a direct and proximate result of Defendants' malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

608.    Defendants' deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

609.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendants' policies, practices, and customs that did not keep Mr. Prim safe.

610.    At all times relevant to their involvement in this case, Defendants were responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

611.    Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXI

### Violation of the Eighth and Fourteenth Amendments
### of the United State Constitution and 42 U.S.C. §1983

### <u>Deliberate Indifference to Serious Medical Needs</u>
### (Against Defendant Cheryl Price and William Streeter)

612.    Plaintiff incorporates the allegations contained in paragraphs 4-23, 48-

50, 53-53, 72-75, 104-105, 107-150, 206-239, 253-255, 257-262 and 282-294

by reference as if set forth fully herein to support this Count XXI.

613.    Plaintiff, as the personal representative of the estate of Decedent Jamie

Lawrence Prim, brings this claim against Defendants for depriving Mr. Prim

of the right to treatment for serious medical needs in violation of the Eighth

Amendment.

614.    Defendants, while acting under color of state law, acted recklessly or

intentionally in depriving Mr. Prim of his rights under the Eighth Amendment

to the United States Constitution.  Defendants knew of or should have known

that Mr. Prim was in serious need for medical treatment after he was brutally

attacked and upon the periods of incarceration at Fountain and St. Clair.

Defendants failed to comply with providing Mr. Prim standard medical

treatment while he was in their custody, care, and control.

615.    Prior to Mr. Prim's death on February 10, 2019, the Defendants were aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

616.    Defendants failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.   Further, Defendants failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

617.    Defendants were aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair.   Despite their awareness of the substantial risk of harm, Defendants' misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent.   Defendants failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

618.    As a direct and proximate result of Defendants' malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

619.    Defendants' deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

620.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendants' policies, practices, and customs that did not keep Mr. Prim safe.

621.    At all times relevant to their involvement in this case, Defendants were responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

622.    Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

### COUNT XXII

**Violation of the Eighth and Fourteenth Amendments
of the United State Constitution and 42 U.S.C. §1983**

**Deliberate Indifference to Serious Medical Needs**
**(Against Defendant Edward Ellington)**

623.     Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-23, 51-54, 151-203, 206-239, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XXII.

624.     Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendant for depriving Mr. Prim of the right to treatment for serious medical needs in violation of the Eighth Amendment.

625.     Defendant, while acting under color of state law, acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.  Defendant knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

626.     Prior to Mr. Prim's death on February 10, 2019, the Defendant was aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

627.     Defendant failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical

condition. Further, Defendant failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

628. Defendant was aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair. Despite their awareness of the substantial risk of harm, Defendant's misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent. Defendant failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

629. As a direct and proximate result of Defendant's malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

630. Defendant's deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

631.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendant's policies, practices, and customs that did not keep Mr. Prim safe.

632.    At all times relevant to their involvement in this case, Defendant was responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

633.    Plaintiff seeks compensatory and punitive damages due to Defendant's deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXIII

### Violation of the Eighth and Fourteenth Amendments of the United State Constitution and 42 U.S.C. §1983

### Deliberate Indifference to Serious Medical Needs
### (Against Defendants Karla Jones, Gwendolyn Givens, and Anthony Brooks)

634.    Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-23, 55-58, 70, 151-203, 206-239, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XXIII.

635.    Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendants for depriving Mr. Prim

of the right to treatment for serious medical needs in violation of the Eighth Amendment.

636.    Defendants, while acting under color of state law, acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.  Defendants knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

637.    Prior to Mr. Prim's death on February 10, 2019, the Defendants were aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

638.    Defendants failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.  Further, Defendants failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

639.    Defendants were aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and

throughout the remainder of the time he was incarcerated at Fountain and St. Clair.  Despite their awareness of the substantial risk of harm, Defendants' misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent.  Defendants failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

640.    As a direct and proximate result of Defendants' malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

641.    Defendants' deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

642.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendants' policies, practices, and customs that did not keep Mr. Prim safe.

643.    At all times relevant to their involvement in this case, Defendants were responsible for the creation, implementation, oversight, and/or supervision of

policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

644.      Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXIV

### Violation of the Eighth and Fourteenth Amendments of the United State Constitution and 42 U.S.C. §1983

### Deliberate Indifference to Serious Medical Needs
### (Against Defendants Carla Graham, Kevin Malone, Kevin White and Raphael Santa-Maria)

645.      Plaintiff incorporates the allegations contained in paragraphs 4-12, 14-23, 61-68, 70, 151-203, 206-239, 253-267, and 252-294 by reference as if set forth fully herein to support this Count XXIV.

646.      Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendants for depriving Mr. Prim of the right to treatment for serious medical needs in violation of the Eighth Amendment.

647.      Defendants, while acting under color of state law, acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution.  Defendants knew of or should have known

that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

648.    Prior to Mr. Prim's death on February 10, 2019, the Defendants were aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

649.    Defendants failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.  Further, Defendants failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

650.    Defendants were aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair.  Despite their awareness of the substantial risk of harm, Defendants' misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent.  Defendants failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

651.    As a direct and proximate result of Defendants' malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

652.    Defendants' deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

653.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendants' policies, practices, and customs that did not keep Mr. Prim safe.

654.    At all times relevant to their involvement in this case, Defendants were responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

655.    Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXV

### Violation of the Eighth and Fourteenth Amendments
### of the United State Constitution and 42 U.S.C. §1983

### <u>Deliberate Indifference to Serious Medical Needs</u>
### (Against Defendant Wexford Health)

656.     Plaintiff incorporates the allegations contained in paragraphs 80, 89, 95, 111, 117-203, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XXV.

657.     Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendant for depriving Mr. Prim of the right to treatment for serious medical needs in violation of the Eighth Amendment.

658.     Defendant acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution. Defendant knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

659.    Prior to Mr. Prim's death on February 10, 2019, the Defendant was aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

660.    Defendant failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.   Further, Defendant failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

661.    Defendant was aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair. Despite awareness of the substantial risk of harm, Defendant's misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent.   Defendant failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

662.    As a direct and proximate result of Defendant's malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

663. Defendant's deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

664. Upon information and belief, Mr. Prim's death was also proximately caused by Defendant's policies, practices, and customs that did not keep Mr. Prim safe.

665. At all times relevant to their involvement in this case, Defendant was responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

666. Plaintiff seeks compensatory and punitive damages due to Defendant's deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXVI

**Violation of the Eighth and Fourteenth Amendments of the United State Constitution and 42 U.S.C. §1983**

**Deliberate Indifference to Serious Medical Needs**
**(Against Defendants Dr. Walter Wilson and Kelley Phillips)**

667.     Plaintiff incorporates the allegations contained in paragraphs 83-85, 88-89, 111, 117-203, 253-267, and 282-294 by reference as if set forth fully herein to support this Count XXVI.

668.     Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendants for depriving Mr. Prim of the right to treatment for serious medical needs in violation of the Eighth Amendment.

669.     Defendants acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution. Defendants knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendants failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

670.     Prior to Mr. Prim's death on February 10, 2019, the Defendants were aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

671.     Defendants failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical

condition. Further, Defendants failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

672.     Defendants were aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout the remainder of the time he was incarcerated at Fountain and St. Clair. Despite their awareness of the substantial risk of harm, Defendants' misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent. Defendants failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

673.     As a direct and proximate result of Defendants' malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

674.     Defendants' deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

675.     Upon information and belief, Mr. Prim's death was also proximately caused by Defendants' policies, practices, and customs that did not keep Mr. Prim safe.

676.     At all times relevant to their involvement in this case, Defendants were responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

677.     Plaintiff seeks compensatory and punitive damages due to Defendants' deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXVII

### Violation of the Eighth and Fourteenth Amendments
### of the United State Constitution and 42 U.S.C. §1983

### <u>Deliberate Indifference to Serious Medical Needs</u>
### (Against Defendant Dr. Manuel Pouparinas)

678.     Plaintiff incorporates the allegations contained in paragraphs 90-95, 111, 117-203, 253-267, and 282-294, by reference as if set forth fully herein to support this Count XXVII.

679.     Plaintiff, as the personal representative of the estate of Decedent Jamie Lawrence Prim, brings this claim against Defendant for depriving Mr. Prim

of the right to treatment for serious medical needs in violation of the Eighth Amendment.

680.     Defendant acted recklessly or intentionally in depriving Mr. Prim of his rights under the Eighth Amendment to the United States Constitution. Defendants knew of or should have known that Mr. Prim was in serious need for medical treatment after he was brutally attacked and upon the periods of incarceration at Fountain and St. Clair. Defendant failed to comply with providing Mr. Prim standard medical treatment while he was in their custody, care, and control.

681.     Prior to Mr. Prim's death on February 10, 2019, the Defendant was aware of and were deliberately indifferent to the need to provide Mr. Prim with consistent immediate and long-term medical care and treatment.

682.     Defendant failed to adequately staff, supervise, comply with standard treatment protocols, provide basic safety equipment needed for paraplegics, monitor and/or treat Mr. Prim's exponentially deteriorating medical condition.  Further, Defendant failed to provide proper and reasonable medical care for Mr. Prim, and failed to take any other reasonable measures to facilitate providing or obtaining timely medical treatment for Mr. Prim.

683.     Defendant was aware of the substantial risk of harm that could result to Mr. Prim due to inadequate medical care from June 20, 2018 and throughout

the remainder of the time he was incarcerated at Fountain and St. Clair. Despite their awareness of the substantial risk of harm, Defendant's misconduct was negligent, objectively unreasonable, malicious, indifferent, and/or recklessly indifferent. Defendant failed to take reasonable measures to alleviate the substantial risk in violation of Mr. Prim's constitutional rights.

684.    As a direct and proximate result of Defendant's malice, deliberate indifference, and/or reckless indifference to Mr. Prim's medical needs, medical treatment and/or delay in providing medical attention and treatment, Mr. Prim's injuries and suffering were unnecessarily exacerbated.

685.    Defendant's deliberate indifference and/or reckless indifference to Mr. Prim's objectively serious medical needs, culminated in Mr. Prim being admitted to Brookwood Medical Center until his untimely death, which was due in large part to the negligence in providing Mr. Prim proper medical treatment.

686.    Upon information and belief, Mr. Prim's death was also proximately caused by Defendant's policies, practices, and customs that did not keep Mr. Prim safe.

687.    At all times relevant to their involvement in this case, Defendant was responsible for the creation, implementation, oversight, and/or supervision of

190

policies, practices, and procedures regarding the provision of medical care to ADOC prisoners.

688.     Plaintiff seeks compensatory and punitive damages due to Defendant's deliberate indifference, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXVIII

### State Law Civil Conspiracy
**(Against Defendant Jefferson Dunn, Grantt Culliver and Ruth Naglich)**

689.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 2-23, 34-38, 41-47, 53-54, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count XXVIII.

690.     As described more fully in the preceding paragraphs, the Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

691.     The Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to act in concert to deprive Mr. Prim of his right to be free from unreasonable harm and to receive adequate medical care, and to fail to intervene to prevent harm from occurring to Mr. Prim, in violation of his constitutional rights, in the manner described herein.

692.     The Defendants reached an agreement amongst themselves to act in concert to deprive Mr. Prim of his right to be free from unreasonable harm

and failed to intervene to prevent harm from occurring to Mr. Prim, in violation of Mr. Prim's constitutional rights, by agreeing to not adopt safer policies and procedures in response to the epidemic of violence at Fountain and St. Clair, by agreeing to understaff and overpopulate Fountain and St. Clair, by agreeing to house perceived danger-prone inmates together, and by agreeing to overlook correctional officers' safety and security failings.

693.    In furtherance of this conspiracy, and as set forth in the Complaint above, each of the co-conspirators committed overt acts and were otherwise willful participants in joint activity.

694.    Defendants' misconduct directly and proximately caused Mr. Prim's serious injuries and death.

## COUNT XIX
## 42 U.S.C. § 1983

### Failure to Intervene
### (Against Jefferson Dunn, Grantt Culliver, Cheryl Price, and William Streeter)

695.    Plaintiff incorporates the allegations contained in paragraphs 2-23, 34-38, 41-45, 48-50, 53-54, 72-75, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count XIX.

696.    At all times relevant to the incident(s) made the basis of this suit, the Defendants were responsible for confining Mr. Prim safely without depriving him of his constitutional rights.

697.     At all times relevant hereto, Defendants were responsible for the creation, implementation, oversight, and/or supervision of policies, practices, and procedures regarding the patrolling of dormitories, overseeing inmates, and being stationed throughout the living areas.

698.     Defendants were aware of the substantial risk of harm to prisoners like Mr. Prim as a result of the high volume of reported prisoner-on-prisoner violence, constant threats of prisoner-on-prisoner violence and the systemic, ongoing horrific conditions at Fountain.

699.     Prior to the assault on Mr. Prim, Defendants also knew of overcrowding and understaffing of the ADOC facilities, including Fountain, as well as the increased risk of violence and substantial harm to prisoners created by these issues.

700.     One or more Defendants knew that Mr. Prim's rights were being violated and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above but failed to do so.

701.     Defendants consciously disregarded the risk of violence by failing to take reasonable steps to protect Mr. Prim from harm despite having reasonable opportunity to do so and to prevent the assault to Mr. Prim.

702.     Defendants' failures were objectively unreasonable and were undertaken intentionally and with willful indifference to Mr. Prim's constitutional rights and/or beyond their authority.

703.     By failing to take adequate action to address the understaffing and overcrowding at Fountain, Defendants ratified these as custom or policy within ADOC, and specifically at Fountain.  Understaffing and overcrowding resulted in no correctional officer being present in the Hot Bay to monitor the dorm and maintain a safe environment for Mr. Prim.

704.     As a direct and proximate result of  Defendants' failure to intervene, Mr. Prim was not provided a safe environment in violation of his constitutional rights were violated.  This deliberate indifference was the direct and proximate cause of the assault on Mr. Prim and his resulting bodily injuries and death.

## COUNT XXX
## State Law Claim

### Negligence
### (Against Wexford Health, Dr. Pouparinas, Dr. Wilson, and Kelley Phillips)

705.     Plaintiff incorporates the allegations contained in paragraphs 80-82, 83-85, 87-89, 90-91, 93-95, 111, 117-203, 253-267 and 282-294  by reference as if set forth fully herein to support this Count XXX.

706.     Defendants had a duty of care to Mr. Prim.

707.     Defendants breached that duty of care.

708.     In doing so, Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

709.     Defendants breach of their duty of care to Mr. Prim directly and proximately caused Mr. Prim to suffer damages, including physical and emotional pain and suffering.

710.     Plaintiff seeks compensatory and punitive damages due to Defendants' negligence in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

## COUNT XXXI
## State Law Claim

### Intentional Infliction of Emotional Distress
### (Against Jefferson Dunn, Grantt Culliver, and Ruth Naglich)

711.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 34-38, 41-47, 53-54, 104-105, 107-250, and 252-294 by reference as if set forth fully herein to support this Count XXXI.

712.     The acts of Defendants as set forth herein were both extreme and outrageous and were undertaken with malice, willfulness, and reckless indifference to Mr. Prim's rights

713.     Defendants intended to cause or acted in reckless disregard of the probability that they would and did cause severe emotional distress to Mr. Prim.

714.     Defendants intentionally and recklessly disregarded the substantial risk of serious harm Mr. Prim faced while housed at Fountain and St. Clair.

715.     As a direct and proximate result of the misconduct described herein, Mr. Prim's rights were violated, and he suffered damages.

716.     Plaintiff seeks compensatory and punitive damages due to Defendants' negligence, in an amount to be determined by the jury, together with interest, attorneys' fees, and the costs of this action.

**COUNT XXXII**
**State Law Claim**
**Alabama Code §6-5-410**

**<u>Wrongful Acts or Omissions Resulting in Death</u>**
**(Against Defendants Jefferson Dunn, Grantt Culliver, Ruth Naglich, Cheryl Price, Edward Ellington, Karla Jones, William Streeter, Wexford Health, Dr. Wilson and Dr. Pouparinas)**

717.     Plaintiff incorporates the allegations contained in paragraphs 2-23, 34-38, 41-47, 53-54, 80-85, 87-91, 93-95, 104-105, 107-250, and 252-294  by reference as if set forth fully herein to support this Count XXXII.

718.     Plaintiff brings this cause of action under Alabama Code § 6-5-410.

719.     Defendants had a duty of care to Mr. Prim to refrain from acts and omissions which could cause Mr. Prim unnecessary and unwarranted harm.

720.     Defendants breached that duty of care.

721.     In doing so, Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

722.     Defendants' breach of their duty of care to Mr. Prim directly and proximately caused Mr. Prim to suffer damages, including physical and emotional pain and suffering and death.

723.     Mr. Prim would have been able to bring a claim for Defendants' misconduct had that misconduct not resulted in his death.

724.     Plaintiff, as Administrator of the Estate of Jamie Lawrence Prim, seeks punitive damages against the Defendants, separately and severally, in an amount to be determined by the jury, together with interest, reasonable attorneys' fees, and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, J. THOMAS PILCHER, IV Plaintiff, as Personal Representative of the Estate of Jamie Lawrence Prim, Deceased, respectfully requests that the Court:

(a)    grant judgment in Plaintiff's favor on all counts asserted herein;

(b)    award compensatory damages against Defendants, jointly and severally in their individual capacity in an amount to be determined at trial;

(c)    award punitive damages against Defendants, in their individual capacity in an amount to be determined at trial;

(d)    award reasonable attorneys' fees and the costs of litigation in accordance with 42 U.S.C. §1988 and any other applicable law;

(e)    Pre-and post-judgment interest as allowed by law;

(f)    award such other and further relief as the Court may deem just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted this 28th day of May 2021.

_s/Laura S. Gibson_
Laura S. Gibson
Alabama Bar No. 8271-O74L
lgibson@whitearnolddowd.com

**WHITE ARNOLD & DOWD P.C.**
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Telephone: (205) 323-1888
Facsimile: (205) 323-8907

## CERTIFICATE OF SERVICE

This certifies that I have this day served a true and correct copy of the within and foregoing SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following counsel of record:

Philip G. Piggott
**WEBSTER, HENRY, BRADWALL,**
      **COHAN, SPEAGLE & DESHAZO, P.C.**
Two Perimeter Park
Suite 445 East
Birmingham, AL  35243
Ppiggitt@websterhenry.com

William Lunsford
Stephen Rogers
Kenneth Steely
**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin St. S.W.
Huntsville, AL 35801
blunsford@maynardcooper.com
srogers@maynardcooper.com
Ksteely@maynardcooper.com

Terri O. Tompkins
Alexandra Montgomery
**ROSEN HARWOOD P.A.**
2200 Jack Warner Parkway
Suite 200
Tuscaloosa, AL  35401
Ttompkins@rosenharwood.com
amontgomery@rosenharwood.com

**The remaining Defendant will be served with a copy of the Amended Complaint via Certified Mail.**

*s/Laura S. Gibson*
Laura S. Gibson