FILED

2023 Mar-31  PM 04:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **J. THOMAS PILCHER, IV,**<br>**as personal representative of the**<br>**estate of Jamie Lawrence Prim,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**JEFFERSON DUNN, et al.,**<br><br>    **Defendants.** | ]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]   **Case No.: 4:21-cv-00204-ACA** |

## <u>MEMORANDUM OPINION AND ORDER</u>

On February 10, 2019, Jamie Lawrence Prim died while in the custody of the Alabama Department of Corrections ("ADOC"). (Doc. 90 at ¶ 1). J. Thomas Pilcher IV is the representative of Mr. Prim's estate. (*Id*.). In that capacity, he filed suit against fourteen named defendants who served as supervisors at either ADOC, Fountain Correctional Facility ("Fountain"), or St. Clair Correctional Facility ("St. Clair"). (*Id*. at ¶¶ 34–79). Mr. Pilcher also filed suit against Wexford Health Services, Incorporated and three individual defendants employed by Wexford. (*Id*. at ¶¶ 80–95).

Mr. Pilcher's complaint asserts federal claims for violations of Mr. Prim's Eighth and Fourteenth Amendment rights and various state law tort claims against all Defendants. (Doc. 90 at ¶¶ 297–724). Currently before the court are Defendants

Anthony Brooks, Gwendolyn Givens, Carla Graham, Gary Malone, Ralph Santa-Maria, Kevin White, Jefferson Dunn, Grant Culliver, Edward Ellington, Mark Fassl, Karla Jones, Ruth Naglich, Cheryl Price, and William Curtis Streeter's (the "moving Defendants") motions to dismiss. (Docs. 95, 97).

Because Mr. Pilcher's federal claims fail to state a claim for relief and the Defendants are immune from Mr. Pilcher's state law claims, the court **WILL GRANT** the Defendants' motions to dismiss.

## I.    BACKGROUND

At this stage, the court must accept as true the factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).

Mr. Prim was incarcerated at Fountain and classified as a minimum custody inmate. (Doc. 90 at ¶¶ 105, 107). Despite that classification, Mr. Prim was assigned to the "Hot Bay" dormitory which housed between thirty to forty inmates with "serious and violent disciplinary histories." (*Id*. at ¶ 107). Historically, the Hot Bay had little to no officer supervision. (*Id.*). On June 20, 2018, Mr. Prim was violently attacked by an unknown number of inmates armed with broken broomsticks. (*Id.* at ¶¶ 107, 111).

No prison personnel were present in the Hot Bay during Mr. Prim's attack. (Doc. 40 at ¶ 4). After the attack, Mr. Prim was left on the floor of the Hot Bay for

an unknown length of time before Fountain staff discovered him. (*Id*.). The severity of his injuries required a helicopter transfer to the Mobile Infirmary Medical Center ("MIMC"). (*Id.* at ¶ 117). Mr. Prim was unresponsive and placed on a ventilator during the flight. (*Id*.).

Doctors in MIMC's emergency room initially diagnosed Mr. Prim with a right parietal skull fracture and subdural hematoma which required the surgical removal of a large flap of the right side of Mr. Prim's skull and the removal of skull fragments. (Doc. 90 at ¶ 117). Doctors later determined the attack on Mr. Prim also caused a number of other injuries, including traumatic encephalopathy, paralysis in his lower extremities, incontinence, acute kidney injury, and end-stage renal failure. (*Id*.). Mr. Prim remained in MIMC's care for twenty days. (*Id.* at ¶ 118). At discharge, Mr. Prim had no active wounds and good skin elasticity. (*Id.* at ¶ 122).

On July 9, 2018, Mr. Prim returned to Fountain and was assessed by medical staff employed by Defendant Wexford Health.[1] (Doc. 90 at ¶ 121, 124). Wexford medical staff determined that Mr. Prim had no active wounds on his skin but had a severe risk of pressure ulcers and a moderate fall risk. (*Id*. at ¶¶ 123, 124).

Dr. Pouparinas, a doctor employed by Wexford Health, ordered that Mr. Prim be repositioned every two hours. (*Id.* at ¶ 125). Due to "severe health care

---

[1] Wexford is a private, for-profit company that was under contract with ADOC to provide proper and appropriate health care to all ADOC inmates. (Doc. 90 at 34 ¶ 80). Wexford is a defendant in this case but has not moved to dismiss.

understaffing," Wexford used ADOC inmates, called "runners" to assist with repositioning bedbound inmate patients like Mr. Prim. (*Id.* at ¶ 126). Within five days of his return to Fountain, Mr. Prim's medical records reveal three pressure ulcers. (Doc. 90 at ¶¶ 127, 128).

On July 19, 2018, Mr. Prim reported issues with his vision, and Dr. Pouparinas ordered Mr. Prim to undergo laboratory testing. (*Id.* at ¶ 129). When the results of that testing revealed "abnormal lab values," Mr. Prim returned to MIMC in an ambulance. (*Id.* at ¶ 143). MIMC doctors diagnosed Mr. Prim with acute renal failure, among other issues, and he began dialysis several days later. (*Id.*). When Mr. Prim was discharged on August 10, 2018, his records indicated that he was in "good" condition and his risk of readmission for the same issue was "low." (Doc. 90 at ¶ 147–48).

Mr. Prim returned to Fountain when he was discharged but was transferred to St. Clair the next day so that he could receive regular dialysis. (*Id.* at ¶ 151). According to Wexford records from St. Clair, Mr. Prim required rails to avoid falling from his bed. (*Id.* at ¶ 154). Despite that recommendation, Mr. Prim was assigned to a bed in St. Clair's infirmary that lacked protective bed rails. (*Id.* at ¶ 155). According to Wexford records, there were no bed rails at all within St. Clair because Warden Jones previously ordered they be removed. (Doc. 90 at ¶ 156).

On August 16, 2018, Mr. Prim fell from his bed and landed directly on the area of his skull still missing a bone flap. (*Id*. at ¶ 157). Mr. Prim was taken to Brookwood Medical Center for surgery. (*Id.* at ¶ 161). Doctors at Brookwood determined that surgery was not possible at that time because the bone flap removed after the attack at Fountain had not been placed back on his skull. (*Id*.). After MIMC located and sent the bone flap to Brookwood, Mr. Prim underwent surgery on August 29, 2018. (Doc. 90 at ¶ 161–62).

Upon Mr. Prim's return to St. Clair, his pressure ulcers became more severe. (*Id*. at ¶ 168). On more than one occasion, the severity of his ulcers necessitated surgical debridement. (*Id.* at ¶¶ 167, 170, 176). But despite Mr. Prim's increasingly severe ulcers, "Wexford Health records from St. Clair are virtually void of notations reflecting that Mr. Prim was repositioned." (*Id*. at ¶ 164). In fact, on several occasions Mr. Prim did not receive necessary treatment at all. (Doc. 90 at ¶ 172–73). On January 2, 2019, one of Mr. Prim's ulcers was cultured and sent to a lab. (*Id*. at ¶ 186). A Wexford doctor reviewed the labs when they returned and instructed staff to hold Mr. Prim's dialysis scheduled for January 21, 2019. (*Id*. at ¶ 187). Instead of his scheduled dialysis, Mr. Prim went to the hospital for the day. (*Id*. at ¶ 188).

Four days later, Mr. Prim complained of severe back pain. (Doc. 90 at ¶ 190). Later that day, Mr. Prim was transported and admitted to Brookwood, where he remained until his death on February 10, 2019. (*Id*. at ¶ 201). According to

Mr. Prim's death certificate, the underlying causes of his death included respiratory failure, spinal fluid collection, end-stage renal disease, and type 2 diabetes. (*Id.* at ¶ 202). The death record also reflects that paralysis and chronic stage 4 ulcers contributed to Mr. Prim's death. (*Id.*).

Mr. Pilcher alleges that Mr. Prim's death was a result of widespread and systemic conditions of confinement throughout ADOC prisons, namely overcrowding and understaffing. (*See* doc. 90 at ¶¶ 204–281). Six months before Mr. Prim was attacked, Fountain employed only 28.5% of the number of recommended correctional officers and St. Clair employed only 30.4%. (*Id.* at ¶ 259). And during the month Mr. Prim was attacked, Fountain housed 1,253 prisoners in a facility designed to accommodate only 831. (*Id.* at ¶ 258). Fountain also contained security deficiencies such as a lack of intercoms, operative security cameras, and mirrors (*id.* at ¶ 246), and in the two years prior to Mr. Prim's assault, there were six other instances of inmate-on-inmate violence that occurred there. (Doc. 90 at ¶ 251(b)–(f), (h)). According to Mr. Pilcher, extreme overcrowding and understaffing also "led to delays in medical care, failure to diagnose and treat medical conditions, failure to follow up with patients, errors, and decisions not to treat seriously ill prisoners." (*Id.* at ¶ 260).

Mr. Pilcher filed his original complaint on February 9, 2021. (*See* doc. 1). Of the thirty-two Counts in the operative complaint (doc. 90), Mr. Pilcher brings

twenty-five of those Counts against the moving Defendants: (1) failure to protect in violation of the Eighth and Fourteenth Amendments under 42 U.S.C. § 1983 against the moving Defendants (Counts One through Nine); (2) state-created danger in violation of the Eighth and Fourteenth Amendments under 42 U.S.C. § 1983 against Ms. Price, Mr. Streeter, Mr. Dunn, and Mr. Culliver (Count Ten and Eleven); (3) denial of adequate health care in violation of the Eighth Amendment under 42 U.S.C. § 1983 against Mr. Dunn, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Streeter, Mr. Ellington, Ms. Jones, Ms. Givens, Mr. Brooks, Ms. Graham, Mr. Malone, Mr. White, and Mr. Santa-Maria (Counts Twelve through Sixteen); (4) deliberate indifference to serious medical needs in violation of the Eighth and Fourteenth Amendments under 42 U.S.C. § 1983 against Mr. Dunn, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Streeter, Mr. Ellington, Ms. Jones, Ms. Givens, Mr. Brooks, Ms. Graham, Mr. Malone, Mr. White, Mr. Santa-Maria, (Count Twenty through Twenty-Four); (5) failure to intervene under 42 U.S.C. § 1983 against Mr. Dunn, Mr. Culliver, Ms. Price, and Mr. Streeter (Count Twenty-Nine); (6) state law civil conspiracy against Mr. Dunn, Mr. Culliver, and Ms. Naglich (Count Twenty Eight); (7) state law intentional infliction of emotional distress against Mr. Dunn, Mr. Culliver, and Ms. Naglich (Count Thirty-One); and (8) wrongful acts or omissions resulting in death under Ala. Code § 6-5-410 against Mr. Dunn, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Ellington, Ms. Jones, and Mr. Streeter

(Count Thirty-Two). (*Id.* at ¶¶ 297–724). All moving Defendants are sued in their individual capacity (*Id.* at ¶ 31).

## II.    DISCUSSION

To survive a motion to dismiss, a plaintiff must plead enough facts that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (cleaned up). The court cannot credit conclusory allegations with a presumption of truth. *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022).

The arguments made by the fourteen moving Defendants are divided between two different motions to dismiss. (*See* docs. 96, 98). The first group classify themselves as the "ADOC Officials" and include Mr. Dunn, Mr. Fassl, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Ellington, Ms. Jones, and Mr. Streeter. (Doc. 96 at 8). The second group classify themselves as the "St. Clair Facility Supervisors" and include Ms. Graham, Mr. Malone, Mr. White, Mr. Santa-Maria, Ms. Givens, and Mr. Brooks. (Doc. 98 at 5).

### 1. Federal Claims

The moving Defendants make several arguments in support of dismissal of the claims against them, including that the federal claims against them do not state

a claim for relief for supervisory liability and that they are entitled to state agent immunity for the state law claims against them. (Doc. 96 at 21–37; doc. 98 at 12–18). Because the court agrees, it need not address their other arguments.

All the moving Defendants are supervisors. (Doc. 90 at 34–79). Supervisory officials cannot be held liable under § 1983 on a theory of *respondeat superior*. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). Instead, to hold a supervisor liable under § 1983, the supervisor must have "either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Id.*

The Eleventh Circuit has recognized three ways that a plaintiff can establish a causal connection. *Gonzalez v. Reno*, 325 F.3d 1228, 1234–35 (11th Cir. 2003). First, a plaintiff can allege facts that show "the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id*. at 1235. Second, a plaintiff can show that a "supervisor's improper custom or policy . . . resulted in deliberate indifference to constitutional rights." *Id*. at 1234 (quotation marks omitted). Finally, "[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). "The deprivations that constitute widespread abuse sufficient to notify the supervising

official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* (quotations omitted).

### a. Failure to Protect

Mr. Pilcher asserts claims for failure to protect against all moving Defendants. (Doc. 90 at ¶¶ 297–467). In his response brief, Mr. Pilcher indicated that he does not oppose dismissal of his failure to protect claims against Ms. Givens, Mr. Brooks, Ms. Graham, Mr. Malone, Mr. White, and Mr. Santa-Maria. Thus, the court **WILL GRANT** these Defendants' motion to dismiss as to Mr. Pilcher's failure to protect claim. (*Id.* at ¶¶ 406–451).

A prison official violates a prisoner's Eighth Amendment right to protection from violence when that official is deliberately indifferent to a risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). This requirement imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates," which further includes "protect[ing] prisoners from violence at the hands of other prisoners." *Id.* at 832–33 (quotation marks omitted). To state a failure-to-protect claim, a plaintiff must allege sufficient facts to plausibly show: (1) the inmate was incarcerated under conditions that posed a substantial risk of serious harm; (2) deliberate indifference to that risk by each of the defendants against whom a plaintiff makes that claim; and (3) causation. *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).

Mr. Pilcher alleges that the moving Defendant failed to protect Mr. Pilcher by (1) not enacting policies that would provide adequate supervision of inmates; (2) not properly staffing Fountain and St. Clair with well-trained medical personnel; (3) housing Mr. Prim in the Hot Bay when he was a minimum security inmate; (4) permitting the use of Hot Bay dormitories; (5) failing to provide resources to prisoners housed in Hot Bay dormitories; (6) failing to monitor the Hot Bay; (7) failing to fix the overcrowding at Fountain and St. Clair; (8) failing to address inmate-on-inmate violence; and (9) failing to adopt proper security, prison management, and training protocols. (Doc. 90 at ¶¶ 304, 308, 322, 340, 359, 378, 396, 412, 416, 418, 460). The allegations can be boiled down into four categories: (1) the creation of and policies behind Hot Bay dormitories exhibited a failure to protect Mr. Prim; (2) the failure to adopt proper security, prison management, and training protocols exhibited a failure to protect Mr. Prim; (3) not properly staffing Fountain and St. Clair with properly trained guards and medical personnel exhibited a failure to protect Mr. Prim; and (4) not fixing overcrowding issues at Fountain and St. Clair exhibited a failure to protect Mr. Prim.

As to the final two types of allegations, Mr. Pilcher has not adequately alleged that <u>any</u> of the moving Defendants could have corrected the understaffing and overcrowding problems at St. Clair and Fountain. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Mia.*, 637 F.3d 1178, 1190 (11th Cir. 2011) ("A causal

connection can be established if a supervisor has the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he fails to do so.") (citing *Keating v. City of Mia.*, 598 F.3d 753, 765 (11th Cir. 2010) ("A failure to stop claim under a theory of supervisory liability only requires that the supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it.")).

In fact, Mr. Pilcher expressly alleges that Mr. Dunn, the defendant most likely to be able to fix overcrowding and understaffing in his capacity as the Commissioner of ADOC, was petitioning the Alabama Legislature to provide ADOC more funding to fix these problems. (Doc. 90 at ¶ 237) (citing to an article entitled "Prison Officials Request $42 Million Increase to Hire Staff, Improve Healthcare" and explaining that "there is a direct correlation between overcrowding and understaffing"). Given the allegation that Mr. Dunn was actively seeking the funds necessary to hire more prison guards and medical staff, Mr. Pilcher's complaint falls short absent plausible facts supporting an allegation there were other things Mr. Dunn or the other moving Defendants could have done to correct the problem. *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).

As to the first type of allegation, Mr. Pilcher alleges that the moving Defendants acted with deliberate indifference by housing Mr. Prim—a minimum custody inmate—in the unsupervised Hot Bay. (Doc. 90 at ¶¶ 105, 223, 304). Mr. Pilcher does not allege that the moving Defendants personally participated in placing Mr. Prim in the Hot Bay. (*See id.*). Instead, Mr. Pilcher alleges that the Defendants are liable as supervisors for knowing about a widespread pattern of constitutional violations throughout ADOC prisons and failing to correct those violations. (*See, e.g.*, *id.* at ¶ 307).

Even assuming Mr. Pilcher's allegations state an underlying constitutional violation, his amended complaint nonetheless fails to allege facts which, if proven, would satisfy the "extremely rigorous" standard for imposing supervisory liability. *See Piazza*, 923 F.3d at 957. First, Mr. Pilcher has not alleged "a history of widespread abuse [sufficient to] put[] the responsible supervisor on notice of the need to correct the alleged deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).

Throughout his amended complaint, Mr. Pilcher alleges that inmates at Fountain faced a substantial risk of harm from inmate-on-inmate violence. (*See, e.g.*,

doc. 90 at ¶¶ 205, 223, 244–245). But he does not provide sufficient facts to support these conclusory allegations. Most of Mr. Pilcher's factual allegations about other instances of inmate-on-inmate violence address ADOC prisons generally, not Fountain specifically. (*See e.g.*, *id.* at ¶¶ 9, 11–12, 207, 228–38). And, although Mr. Pilcher claims there was an "epidemic" of violence at Fountain prior to Mr. Prim's incarceration, he cites to only six instances of inmate-on-inmate violence in the two years prior to Mr. Prim's attack, none of which he specifically alleges took place in Fountain's Hot Bay. (*Id.* at ¶ 251(b)-(f), (h)). These allegations are insufficient to allege "widespread abuse" necessary to state a claim for supervisory liability. *Cf. Harrison*, 746 F.3d at 1300 ("Holman housed between 830 and 990 inmates during the relevant time period—and the thirty-three incidents involving weapons, only four of which occurred on the back hallway, are hardly sufficient to demonstrate that Holman was a prison where violence and terror reign.") (quotation marks omitted).

Similarly, Mr. Pilcher fails to adequately allege a failure to protect claim due to the moving Defendants' failure to adopt adequate security, prison management, and training protocols. A plaintiff can show that the absence of a policy creates the requisite causation to establish supervisory liability by "point[ing] to multiple incidents, or multiple reports of prior misconduct by a particular employee." *Ingram v. Kubik*, 30 F.4th 1241, 1254 (11th Cir. 2022). And as explained above, none of

Mr. Pilcher's alleged incidents of prior misconduct are sufficient to establish that the absence of any policy at Fountain put the moving Defendants on notice of a potential for constitutional violations.

Mr. Pilcher believes that Defendant Ms. Naglich received a communication from the Equal Justice Initiative informing her in her capacity as the head of the Office of Health Services that Mr. Prim had serious medical needs. (Doc. 90 at ¶ 362, 511). But the amended complaint does not allege what the communication conveyed. (*Id.*). He also alleges in a conclusory fashion that Ms. Naglich had access to and read treating physician notes. (*Id.*). These allegations do not support Mr. Pilcher's conclusory allegation that Ms. Naglich "disregarded the substantial risk of serious harm to Mr. Prim by failing to recognize that Wexford Health was wholly inadequate to provide proper medical care to Mr. Prim." (*Id.*). Mr. Pilcher does not allege how Ms. Naglich would have known that Wexford was not providing Mr. Pilcher with adequate medical care. Thus, this allegation is insufficient to establish supervisory liability for Ms. Naglich.

Accordingly, Mr. Pilcher's allegations fail to state a claim against the moving Defendants for failure to protect.

### b. *Deliberate Indifference to Serious Medical Needs*

Mr. Pilcher asserts claims for deliberate indifference to serious medical needs and denial of adequate health care against Mr. Dunn, Mr. Culliver, Ms. Naglich,

Ms. Price, Mr. Streeter, Mr. Ellington, Ms. Jones, Ms. Givens, Mr. Brooks, Ms. Graham, Mr. Malone, Mr. White, Mr. Santa-Maria.[2] (Doc. 90 at ¶¶ 500–565, 601–655).

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate that a prison official acted with deliberate indifference to a prisoner's medical need, a plaintiff must allege facts showing: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between the indifference and the plaintiff's injury." *Gilmore v. Hodges*, 738 F.3d 266, 273–74 (11th Cir. 2013). To show that an official acted with deliberate indifference, a plaintiff must allege: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

The moving Defendants do not contest that Mr. Prim had serious medical needs. Instead, they argue that Mr. Pilcher's claims fail because he does not allege that they were involved in or had knowledge of Mr. Prim's medical care. (Doc. 96 at 22; doc. 98 at 18). The Defendants also point out that Mr. Prim received outside

---

[2] A denial of adequate health care is not a standalone constitutional claim. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (discussing delay or denial of medical care as one manifestation of deliberate indifference to serious medical needs). Therefore, the court will analyze Mr. Pilcher's Counts regarding denial of health care and deliberate indifference to a serious medical need under the framework for deliberate indifference to serious medical needs.

medical care on multiple separate occasions and that they were entitled to rely on the medical judgment of the medical professionals who provided care to Mr. Prim. (Doc. 96 at 22–23; doc. 98 at 18).

In response, Mr. Pilcher argues that each of the Defendants had subjective knowledge of Mr. Prim's serious medical needs and acted with deliberate indifference to those needs. (Doc. 107 at 35–37). He also claims that the Defendants "persisted in policies and customs that facilitated and promoted constitutional deprivations of emergency medical care, took no action in the face of a substantial risk of harm, and failed to correct their subordinates' conduct." (*Id*. at 37).

Mr. Pilcher does not allege that the relevant moving Defendants had any direct knowledge of Mr. Prim or of his condition or that any of these Defendants were directly involved in Mr. Prim's medical care. Stating without factual support or further explanation that the Defendants knew about Mr. Prim's condition is a conclusory allegation. And alleging the relevant moving Defendants had knowledge of certain institutional deficiencies at Fountain and St. Clair is not the same as alleging that each Defendant knew Mr. Pilcher had a serious medical need that they were deliberately indifferent to.

Mr. Pilcher alleges that Ms. Naglich had personal knowledge of Mr. Prim's condition because a representative of the Equal Justice Initiative contacted her. (Doc. 90 at ¶ 511). But he does not allege when Ms. Naglich received the letter from EJI

17

or its contents. Even assuming this letter put Naglich on notice of Mr. Prim's condition, Mr. Pilcher does not allege any additional facts demonstrating that Ms. Naglich responded to the letter with deliberate indifference.

Nor does Mr. Pilcher satisfy the "extremely rigorous" standard by which a supervisor can be held liable for the actions of a subordinate. *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957 (11th Cir. 2019). Mr. Pilcher alleges generally that medical care throughout ADOC prisons was inadequate at the time of Mr. Prim's incarceration but does not provide any facts or specific instances outside Mr. Prim's own story to support these conclusory allegations. The court certainly empathizes with Mr. Prim's suffering, but absent "other instances of inadequate medical screening or delayed medical care" at Fountain or St. Clair, Mr. Pilcher has not sufficiently pled claims that these supervisors knew about the issues and failed to do anything about it, or that despite their knowledge and ability to address the situation, they knowingly or recklessly declined to act. *See LaMarca*, 995 F.2d at 1538; *Hale*, 50 F.3d at 1583.

Accordingly, Mr. Pilcher's allegations fail to state a claim against Mr. Dunn, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Streeter, Mr. Ellington, Ms. Jones, Ms. Givens, Mr. Brooks, Ms. Graham, Mr. Malone, Mr. White, or Mr. Santa-Maria for deliberate indifference to serious medical needs.

*c. State-Created Danger*

Mr. Pilcher asserts claims for state-created danger against Mr. Dunn, Mr. Culliver, Ms. Price, and Mr. Streeter, alleging that those Defendants "affirmatively placed Mr. Prim in a position of extreme danger" by housing Mr. Prim in the Hot Bay dorm. (Doc. 90 at ¶¶ 468–499).

The Defendants argue in a footnote that Mr. Pilcher's claims for state-created danger are not recognized in the Eleventh Circuit. (Doc. 96 at 7 n.2). This argument fails. In support of this position, the Defendants cite a footnote from an unpublished Eleventh Circuit opinion, *Vaughn v. City of Athens*, 176 F. App'x 974, 976 n.1 (11th Cir. 2006). The cited footnote states that "this Court has written that the 'special relationship' and 'state created danger' doctrines are no longer valid." *Id*. But the case to which *Vaughn* cites for that statement, *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300 (11th Cir. 2003), did not find that the state-created danger doctrine is no longer valid. Rather, in *Waddell*, the Eleventh Circuit explained that for purposes of substantive due process state-created danger claims in the <u>non-custodial setting</u>, the Circuit's "special relationship" and "special danger" doctrines had been superseded by Supreme Court precedent. *Id*. at 1305–06.

Neither *Vaughn* nor *Waddell* stands for the proposition that the Eleventh Circuit does not recognize the state-created danger theory of liability in the custodial setting. Indeed, the Eleventh Circuit has found that "the only relationships that

automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners." *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999).

But although Defendants' argument regarding the existence of a state-created danger claim fails, their argument that Mr. Pilcher did not adequately plead that each Defendant had personal knowledge of the facts at issue here succeeds. (Doc. 96 at 23–26). Mr. Pilcher does not allege facts suggesting that any of these Defendants had personal knowledge of Mr. Prim's placement in Fountain's Hot Bay. Nor does Mr. Pilcher point to other instances of minimum-custody inmates being housed in Fountain's Hot Bay. Accordingly, Mr. Pilcher fails to state a claim for state-created danger and the Defendants are not stripped of state-agent immunity on this ground.

### d. Failure to Intervene

Mr. Pilcher asserts claims for failure to intervene against Mr. Dunn, Mr. Culliver, Ms. Price, and Mr. Streeter, alleging that those Defendants knew Mr. Prim's constitutional rights were being violated and failed to prevent or stop the violations. (Doc. 90 at ¶ 695–704).

The Defendants argue that Mr. Pilcher cannot state a failure to intervene claim because he does not allege that any ADOC Official was present and in a position to intervene in the treatment of Mr. Prim. (Doc. 96 at 22). Mr. Pilcher responds that, to

be liable for a failure to intervene, a "defendant need only have knowingly or recklessly declined to act despite knowing ways to reduce the risk of harm to the victim . . . and been in a position to intervene, because she either directly observed or knew of the harm faced." (Doc. 107 at 31 (internal quotations omitted)).

Mr. Pilcher's claims for failure to intervene fail for the same reason as his failure to protect claims. (*See* doc. 90 at ¶¶ 695–704). As the court has previously explained, Mr. Pilcher does not allege that Mr. Dunn, Mr. Culliver, Ms. Price, or Mr. Streeter personally saw any of the alleged constitutional violations Mr. Prim suffered. Mr. Pilcher also does not sufficiently allege that these supervisory Defendants were on notice of ongoing constitutional violations at either Fountain or at St. Clair. Mr. Pilcher cannot state a claim against the Defendants for failing to intervene in a constitutional violation they were unaware existed. Accordingly, Mr. Pilcher fails to state a claim for failure to intervene.

Accordingly, because none of Mr. Pilcher's federal claims against the moving Defendants state a claim for relief, the court **WILL GRANT** the moving Defendants' motions to dismiss Counts One through Sixteen, Counts Twenty through Twenty-Four, and Count Twenty-Nine.

## 2. State Law Claims

In addition to his federal claims, Mr. Pilcher also asserts state law claims against Mr. Dunn, Mr. Culliver, Ms. Naglich, for civil conspiracy, intentional

infliction of emotional distress, and wrongful death. (Doc. 90 at ¶¶ 689–94, 705–24). The wrongful death claim is also brought against Ms. Price, Mr. Ellington, Ms. Jones, and Mr. Streeter. (*Id.* at ¶ 705–24).

Mr. Dunn, Mr. Culliver, Ms. Naglich, Mr. Ellington, Ms. Price, Ms. Jones, and Mr. Streeter assert they are entitled to state agent immunity for all state law claims against them. (Doc. 96 at 35–37).

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework for application of the state-agent immunity test. *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). First, the state agent must demonstrate that the "plaintiff's claims arise from a function that would entitle the State agent to immunity." *N.C. v. Caldwell*, 77 So. 3d 561, 567 (Ala. 2011) (quotation marks omitted). Mr. Pilcher does not challenge that the Defendants have made this preliminary showing. (*See* doc. 107 at 52–60). Therefore, the burden shifts to Mr. Pilcher to show either: (1) that "the Constitution or laws of the United States" require that the court deny the Defendants' request for immunity, or (2) that the Defendants "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

Mr. Pilcher argues that both *Cranman* exceptions apply. (Doc. 107 at 55–60). Specifically, Mr. Pilcher argues that the first exception applies because his amended complaint alleges that each Defendant violated Mr. Prim's constitutional rights and that the second exception applies because the amended complaint demonstrates that each Defendants' actions were willful. (*Id.*).

Regarding the first exception to state-agent immunity, the Eleventh Circuit has held that if a state official violates a plaintiff's constitutional rights, then state-agent immunity does not apply. *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019). Because the court has already found that Mr. Pilcher's complaint does not adequately allege a constitutional violation against Mr. Dunn, Mr. Culliver, Ms. Naglich, Ms. Price, Mr. Ellington, Ms. Jones, and Mr. Streeter, the first *Cranman* exception does not apply. Now the court will consider whether Mr. Pilcher alleges that the Defendant acted willfully, thus invoking the second exception.

A defendant acts willfully when he "was consciously aware that his act or omission would likely cause harm to someone." *Odom v. Helms*, 314 So. 3d 220, 224 (Ala. 2020); *see also Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1140 (Ala. 2006) ("To constitute willful or intentional injury, there must be knowledge of danger accompanied with a design or purpose to inflict injury, whether the act be one of omission or commission.") (quotation marks omitted).

Mr. Pilcher alleges at various points throughout his complaint that the Defendants' conduct was undertaken willfully. (*See, e.g.*, doc. 90 at ¶¶ 310, 365, 384). But he does not plead sufficient facts to support these conclusory allegations. *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.").

Mr. Pilcher does not allege any facts suggesting that the Defendants were consciously aware that their acts or omissions would likely cause Mr. Prim harm. In fact, Mr. Pilcher does not allege facts indicating that any of the Defendants—except for Ms. Naglich—had any personal knowledge of Mr. Prim's incarceration in the Hot Bay at Fountain or his subsequent medical care at St. Clair at all. (*See* doc. 90 at ¶ 511). And to the extent that Mr. Pilcher alleges that Ms. Naglich had direct knowledge of Mr. Prim's serious medical condition, he alleges no additional facts suggesting that, after receiving the EJI's letter, Ms. Naglich undertook some act or omission with the knowledge that it would cause Mr. Prim harm.

Because Mr. Pilcher has not alleged facts demonstrating that these Defendants acted with the knowledge that any of their actions or omission would likely cause harm to someone, he has not succeeded in showing that the second *Cranman* exception applies. Accordingly, the Defendants are immune from Mr. Pilcher's state law claims and the court **WILL GRANT** the ADOC Defendants' motion to dismiss

Counts Twenty-Eight, Thirty-One, and Thirty-Two to the extent it is brought against the ADOC Defendants.

## III.    CONCLUSION

For the reasons given above, the court **WILL GRANT** Defendants' motions to dismiss Mr. Pilcher's amended complaint.

The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 31, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE